No. 24-20143

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

————————————

### UNITED STATES OF AMERICA,

**Plaintiff-Appellant**

**v.**

### EDWARD CONSTANTINESCU; PERRY "PJ" MATLOCK; JOHN RYBARCZYK; GARY DEEL; STEFAN HRVATIN; TOM COOPERMAN; MITCHELL HENNESSEY; DANIEL KNIGHT,

**Defendants-Appellees**

————————————

On Appeal from the United States District Court for the Southern District of Texas, D. Ct. No. 4:22-cr-612 (Hon. Andrew S. Hanen)

————————————

## OPENING BRIEF FOR THE UNITED STATES

————————————

ALAMDAR S. HAMDANI
United States Attorney
THOMAS H. CARTER
Assistant U.S. Attorney
Southern District of Texas

SCOTT ARMSTRONG
JOHN J. LIOLOS
Criminal Division, Fraud Section

NICOLE M. ARGENTIERI
Principal Deputy Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

ANDREW W. LAING
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Ave. NW
Washington, DC 20530
202.353.8433
andrew.laing@usdoj.gov

## STATEMENT REGARDING ORAL ARGUMENT

The United States respectfully requests oral argument. This is a government appeal from a district court's order dismissing a superseding indictment. In light of the district court's novel legal conclusions and its factual misstatements, the Government believes that oral argument would assist this Court in resolving the issue presented. *See* Fed. R. App. P. 34(a)(2).

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT....................................i

TABLE OF AUTHORITIES ..........................................................iii

STATEMENT OF JURISDICTION...........................................................1

STATEMENT OF THE ISSUE ................................................................1

STATEMENT OF THE CASE ..................................................................1

    I.    Alleged Offense Conduct ............................................... 1

    II.   Procedural History.................................................7

    III.  Ruling Under Review ............................................ 10

SUMMARY OF ARGUMENT .................................................. 10

ARGUMENT ...................................................................... 12

    I.    The Superseding Indictment More Than Adequately Alleges A Classic Pump-And-Dump Securities Fraud Conspiracy And Scheme. ................................................................ 12

        A.    Standard of Review....................................................... 12

        B.    The Superseding Indictment Adequately Pleads The Charged Offenses........................................... 12

        C.    The District Court Erroneously Concluded That *Ciminelli* Precludes A Prosecution For Securities Fraud Based On The Facts Alleged In The Superseding Indictment...................................................... 16

CONCLUSION........................................................................ 26

# TABLE OF AUTHORITIES

## Cases

*Baker v. United States*,
  Nos. 1:13-cr-346 & 1:21-cv-281, 2023 WL 8234212 (W.D. Tex.
  Nov. 27, 2023) ...................................................................... 21

*Carpenter v. United States*,
  484 U.S. 19 (1987) ................................................................. 18

*Ciminelli v. United States*,
  598 U.S. 306 (2023) ................................................ 8, 10, 16, 21

*Kelly v. United States*,
  590 U.S. 391 (2020) ............................................................ 18, 21

*McNally v. United States*,
  483 U.S. 350 (1987) ................................................................ 18

*Shaw v. United States*,
  580 U.S. 63 (2016) .................................................................. 23

*United States v. Baker*,
  923 F.3d 390 (5th Cir. 2019) .................................................. 25

*United States v. Gordon*,
  710 F.3d 1124 (10th Cir. 2013) .............................................. 24

*United States v. Grant*,
  850 F.3d 209 (5th Cir. 2017) .................................................... 1

*United States v. Greenberg*,
  835 F.3d 295 (2d Cir. 2016) .................................................... 25

*United States v. Greenlaw*,
  84 F.4th 325 (5th Cir. 2023) .................................... 8, 14, 17, 23

*United States v. Griffin*,
  76 F.4th 724 (7th Cir. 2023) ................................................... 21

*United States v. Guzman-Ocampo*,
   236 F.3d 233 (5th Cir. 2000) ................................................... 13

*United States v. Hagen*,
   468 F. App'x 373 (4th Cir. 2012) .......................................... 24

*United States v. Kousisis*,
   82 F.4th 230 (3d Cir. 2023) .................................................... 21

*United States v. Laurienti*,
   611 F.3d 530 (9th Cir. 2010) ................................................. 24

*United States v. Masha*,
   990 F.3d 436 (5th Cir. 2021) ............................................ 13, 15

*United States v. McMillan*,
   600 F.3d 434 (5th Cir. 2010) ................................................. 25

*United States v. Palma*,
   58 F.4th 246 (6th Cir. 2023) .................................................. 15

*United States v. Percoco*,
   13 F.4th 158 (2d Cir. 2021) ............................................. 16, 18

*United States v. Rafoi*,
   60 F.4th 982 (5th Cir. 2023) ............................................ 12, 15

*United States v. Resendiz-Ponce*,
   549 U.S. 102 (2007) ............................................................... 13

*United States v. Sabo*,
   No. 4:23-cr-206 (S.D. Tex.) ..................................................... 7

*United States v. Skelly*,
   442 F.3d 94 (2d Cir. 2006) .................................................... 24

*United States v. Wey*,
   No. 15-cr-611, 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017) ...................... 23

**Statutes**

18 U.S.C. § 1343 .................................................................................17, 18

18 U.S.C. § 1348 ............................................................................. passim

18 U.S.C. § 1349 ................................................................... 7, 13, 14, 17

18 U.S.C. § 1957 ...........................................................................................7

18 U.S.C. § 3231 ............................................................................................1

18 U.S.C. § 3731 ............................................................................................1

**Rules**

Fed. R. App. P. 4 ..........................................................................................1

Fed. R. App. P. 34 .........................................................................................i

Fed. R. Crim. P. 7..........................................................................................12

**Other Authorities**

21 Marvin G. Pickholz et al., Securities Crimes § 6:36 (Dec. 2023
    Update)..............................................................................................24

## STATEMENT OF JURISDICTION

Plaintiff-Appellant the United States of America (the "Government") appeals from the district court's opinion and order granting the defendants' motion to dismiss the superseding indictment. The district court (Hanen, J.) had jurisdiction under 18 U.S.C. § 3231. The district court entered its order dismissing the superseding indictment on March 20, 2024. ROA.4164. The Government filed a timely notice of appeal on April 4, 2024. ROA.27, 4200-4201; *see* Fed. R. App. P. 4(b)(1)(B). This Court has jurisdiction under 18 U.S.C. § 3731.

## STATEMENT OF THE ISSUE

Whether the superseding indictment adequately alleges a conspiracy and scheme to commit securities fraud.

## STATEMENT OF THE CASE

### I.    Alleged Offense Conduct

Between January 2020 and April 2022, the defendants carried out a pump-and-dump securities fraud scheme.[1]  ROA.216.  The defendants, in various

---

[1] These facts are drawn from the allegations in the superseding indictment and must be accepted as true in the context of this appeal. *United States v. Grant*, 850 F.3d 209, 215 n.1 (5th Cir. 2017).

combinations, carried out the scheme by exploiting their social media influence, including via the platforms created by Twitter, Inc.,[2] and Discord, Inc.

Each defendant had a significant following on Twitter: Edward Constantinescu had over 500,000 followers; Perry "PJ" Matlock had over 300,000 followers; John Rybarczyk had over 275,000 followers; Gary Deel had over 145,000 followers; Stefan Hrvatin had over 140,000 followers; Tom Cooperman had over 125,000 followers; Mitchell Hennessey had over 225,000 followers; and Daniel Knight had over 175,000 followers.  ROA.217-219.

On Discord, Constantinescu and Matlock co-founded Atlas Trading, a stock-trading community where individual investors could purportedly learn how to trade securities and receive "'alerts'" or messages from Constantinescu and others about particular securities.  ROA.217-218.  Over time, Atlas Trading grew to be one of the largest stock-trading chatrooms, with over 250,000 members.  ROA.217.  Rybarczyk, Deel, Cooperman, Hennessey, and Knight also were members of Atlas Trading, and each frequently posted "alerts" in the chatroom and on Twitter about different securities involved in the scheme. ROA.217-219.  Rybarczyk also created a similar chatroom on Discord called Sapphire Trading.  ROA.218.  In addition, Hennessey and Knight co-hosted a

---

[2] Twitter is now known as "X."  ROA.4167 n.3.  This brief refers to "Twitter" for consistency with the superseding indictment.

podcast called "Pennies: Going in Raw," which they and others advertised as the "#1 Stock Market Podcast." ROA.218-219 (internal quotation marks omitted).

The defendants' fraudulent scheme involved more than 10 different securities and produced tens of millions of dollars in profits. ROA.217, 224-249. The defendants' fraudulent conduct with respect to each security at issue followed the same basic three-step pattern.

First, one or more of the defendants would buy (or "load") shares of a particular security, often notifying other defendants of the purchase so that they could participate. ROA.216, 220.

Second, the defendants would seek to increase (or "pump") that security's price, thus increasing the value of their personal holdings. ROA.216-217, 220. The defendants accomplished this by using misrepresentations about the security to induce other investors to buy the security. ROA.216-217. Such "false, positive information about" the security the defendants held included lies and material omissions about "the defendants' position in the security, how long [they] intended to hold the security, [their] view that the security would increase in price, and the price the security could reach," as well as lies about purported "'due diligence'" and "catalysts" that the defendants claimed would cause the security's price to increase. ROA.216-217, 220.

3

Third, after the "pump" had succeeded, the defendants would secretly sell (or "dump") their shares at an inflated price to make a profit, while continuing "to induce other investors to purchase the same security" and to "conceal[] their intent to sell."  ROA.216-217, 220 ("[T]he defendants used their social media influence to pump and dump securities for their own financial gain.").

This classic "pump-and-dump" pattern—buy a security, lie about it to entice victim-investors to buy it and "pump" its value, then "dump" it while continuing to fraudulently induce investment and conceal the conspirators' sales—was repeated over and over.  For example, in September 2020, Deel, Rybarczyk, and Matlock pumped and dumped a security trading as SXTC. ROA.224-226.  After the three defendants had collectively purchased hundreds of thousands of shares of SXTC at approximately $0.25 per share, Deel posted a "false and misleading tweet," which Rybarczyk had helped wordsmith "to make it more appealing," asserting that the stock was "extremely oversold" and had a "[g]reat set up for a big runner" and that he predicted that its value would soar to $0.61 per share.  ROA.224-225 (internal quotation marks omitted). Then, as the "pump" succeeded and the price of SXTC increased, the three defendants sold every share they personally held, all while continuing to mislead investors via Twitter and Discord and misrepresent their own intentions.

ROA.225-226. The defendants made nearly $20,000 in profit as a result of their fraudulent conduct involving SXTC. ROA.226.

Similarly, in February 2021, Matlock, Deel, and Hennessey pumped and dumped a security trading as TRCH. ROA.226-228. Only minutes after Matlock, Rybarczyk, Deel, Cooperman, Hennessey, and Knight had collectively finished purchasing nearly one million shares of TRCH at approximately $1.83 per share, Hennessey falsely claimed on Twitter that he was "[l]ong TRCH for [the] merger," which was "full steam ahead," while Hennessey and Deel both falsely promoted the stock on Discord. ROA.226-227 (internal quotation marks omitted). While Deel, Matlock, and Hennessey continued to post purportedly positive information about TRCH stock and Matlock reassured investors that "dips" in its price were not cause for concern, all six defendants sold off hundreds of thousands of their shares at fraudulently inflated prices, making over $870,000 in profits. ROA.227-228 (internal quotation marks omitted).

The pattern repeated again in March 2021, when Rybarczyk and Matlock pumped and dumped a security trading as GTT. ROA.228-231. Minutes after Rybarczyk, Deel, Cooperman, and Knight had collectively finished purchasing over 300,000 shares of GTT at approximately $1.76 per share, Rybarczyk began promoting the stock on Twitter, falsely predicting that its value would soar.

ROA.229 (quoting tweets referring to a "major multi billion $$$ catalyst" and a "2B+ deal in place" (internal quotation marks omitted)).  In contrast to their public statements on Twitter and Discord, the defendants expressed confidence in Rybarczyk's technique in private communications with each other: Knight stated that Rybarczyk would continue inflating GTT's price ("He's got more pumpers in him."); Cooperman, noting that Rybarczyk's "little minions" reliably retweeted Rybarczyk's statements and "buil[t] the hype back up," stated, "They have this sh*t down to a f*cking science"; and Knight, after a co-conspirator expressed concern about getting caught and a desire to "do it the right way," responded simply: "The f*cking right way?  We're robbing f*cking idiots of their money."  ROA.229-230 (internal quotation marks omitted).  After selling hundreds of thousands of their GTT shares at fraudulently inflated prices, the relevant defendants made nearly $200,000 in profits.  ROA.231.

The defendants repeated this pattern of conduct again and again in the coming months.  ROA.231-249.  The basic contours of the scheme remained consistent throughout: the defendants used false and misleading messages "to induce other investors to purchase the [targeted] securities so that [they] could sell their shares at a higher price at and around the time of the messages."  ROA.220.

## II.    Procedural History

1.    On December 7, 2022, a federal grand jury in the Southern District of Texas returned an indictment charging the eight above-described defendants with one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 1349; charging seven of the defendants, in various combinations, with a total of 10 counts of securities fraud, in violation of 18 U.S.C. § 1348; and charging Constantinescu with one count of money laundering, in violation of 18 U.S.C. § 1957(a).   ROA.31-74.   On February 8, 2023, a federal grand jury returned a superseding indictment, which added nine counts of securities fraud.[3] ROA.216-259.   One indicted defendant, Knight, pleaded guilty to the conspiracy count.   ROA.27539, 29484.   A ninth defendant, Francis Sabo, who was not charged in the superseding indictment, pleaded guilty to an information charging one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 1349, in a companion case.   Plea Agreement, *United States v. Sabo*, No. 4:23-cr-206, Dkt. No. 20 (S.D. Tex. May 25, 2023).[4]

---

[3] On October 18, 2023, the Government filed a notice of its intent to dismiss the money laundering count prior to trial.   ROA.2157-2160.   The district court orally granted the Government's motion at a later hearing.   ROA.4647-4648.

[4] Both of these defendants' sentencings are "continued until the resolution of" this appeal.   ROA.29466; Order, *Sabo*, No. 4:23-cr-206, Dkt. No. 25 (S.D. Tex. Apr. 16, 2024).

On September 5, 2023, Rybarczyk, joined by Hrvatin, Hennessey, Matlock, Deel, Cooperman, and Constantinescu, moved to dismiss the superseding indictment. ROA.10713-10724. Relying on the Supreme Court's recent decision in *Ciminelli v. United States*, 598 U.S. 306 (2023), and this Court's decision in *United States v. Greenlaw*, 76 F.4th 304 (5th Cir. 2023), *withdrawn and superseded on denial of reh'g*, 84 F.4th 325 (5th Cir. 2023), the defendants argued that the superseding indictment merely alleged that they "depriv[ed] their [T]witter followers of potentially valuable economic information," which "is not a traditional property right for purposes of the Title 18 fraud statutes." ROA.10719. The defendants also claimed that, although they "allegedly profited from their stock sales, the [superseding indictment] is decidedly unclear how the deceit alleged—misrepresentations about Defendants' own trading position[s]—directly resulted in harm to victims." ROA.10722.

2.    Following further briefing and a discussion at a pretrial hearing, *see* ROA.4717-4745, the district court granted the defendants' motion and dismissed the superseding indictment without prejudice, ROA.4164-4175.

After explaining *Ciminelli*'s holding that depriving a victim of the "right to control" in the form of potentially valuable economic information does not deprive that victim of a property interest, ROA.4166, the court held that "*Ciminelli* applies squarely here," ROA.4172. In particular, the court concluded

that the superseding indictment lacked allegations that the defendants "actually harmed anyone's traditional property interests (or that the object of the scheme was to harm anyone's traditional property interests)," asserting that "the language of the [superseding indictment] indicates that losses to victims happened incidentally (i.e., 'at the expense of') rather than as the 'object of' the alleged scheme." ROA.4173. According to the district court, "the scheme as pleaded is *totally indifferent* to its effect on the alleged victims." ROA.4173 (emphasis added). The Court further concluded that the superseding indictment alleged, "at best," "a 'right-to-control' theory rather than a theory grounded in the deprivation of victims' property interests": "the investors were deprived of information" and then "independently invested money in the stock market, and the value of those investments declined." ROA.4173-4174.

The court additionally observed that, "[u]nlike in a traditional fraud case, in which the victim directly surrenders their property to the defendant (or an entity in the defendant's control), the investors here surrendered their property to the stock market at market prices, and in return, received the benefit of the bargain in the form of securities." ROA.4175.[5]

---

[5] The district court also opined with respect to *Greenlaw*, in which this Court discussed the "intent to defraud" element at length, that the superseding indictment "sufficiently alleges 'intent to defraud'" and "probably" satisfies *Greenlaw*. ROA.4173.

3.    The Government moved to stay the district court's order pending this appeal, and the district court denied the Government's motion. ROA.4192-4195. In so doing, the court reiterated its view that the securities fraud scheme alleged in the superseding indictment "did not involve obtaining by fraud money or property . . . ; instead, as alleged, it was a scheme aimed at depriving social media followers of full and honest investing information (which importantly included the Defendants' personal plans to sell the mentioned stocks)." ROA.4192. Such a scheme, the court concluded, "fall[s] under the umbrella of" *Ciminelli*. ROA.4193.

## III.   Ruling Under Review

The Government challenges the district court's order granting the defendants' motion to dismiss the superseding indictment. ROA.4164-4175.

## SUMMARY OF ARGUMENT

The superseding indictment more than adequately sets forth detailed allegations describing the defendants' extraordinarily profitable pump-and-dump securities fraud scheme.

The district court's unprecedented conclusion that *Ciminelli v. United States*, 598 U.S. 306 (2023), forecloses this type of securities fraud prosecution rests on a misreading of the superseding indictment and a misapplication of *Ciminelli*. Unlike in *Ciminelli*, this prosecution does not in any way rely on a

"right-to-control" theory of fraud, nor does it allege that the property of which the victims were deprived and which was the object of the conspiracy and scheme was merely potentially valuable economic information. Rather, as the superseding indictment repeatedly makes clear, the property of which the victims were deprived and which was the object of the conspiracy and scheme was the most traditional property interest of all: the victims' money.

Further, the district court's suggestion that victim-investors were not deprived of money when the defendants fraudulently induced their purchases of securities whose value the defendants misrepresented is both illogical and legally incorrect. Indeed, pump-and-dump schemes necessarily require victims to part with their money, including by buying securities they would not otherwise have bought at artificially inflated prices juiced by the fraud.

Finally, to the extent that the district court faulted the superseding indictment for failing to allege that the defendants obtained money *directly* from the victims, the district court implicitly imposed a so-called "mirror image" or "convergence" requirement that this Court has squarely and repeatedly rejected.

This Court should reverse.

# ARGUMENT

## I.   The Superseding Indictment More Than Adequately Alleges A Classic Pump-And-Dump Securities Fraud Conspiracy And Scheme.

The superseding indictment straightforwardly alleges a prototypical pump-and-dump conspiracy and scheme that had as an object victim-investors' money.  In alleging that scheme, the superseding indictment complies with the pleading requirements of Federal Rule of Criminal Procedure 7, which is all that is required at this stage.  Contrary to the district court's reasoning, *Ciminelli*, which rejected a narrow "right-to-control" theory of fraud liability on which the Government does not in any way rely, is inapposite.  Further, the district court's suggestion that victim-investors were not deprived of property, including because their money did not flow directly to the defendants, is foreclosed by this Court's binding precedent.

### A.   Standard of Review

"This Court reviews the sufficiency of an indictment *de novo*."  *United States v. Rafoi*, 60 F.4th 982, 993 (5th Cir. 2023).

### B.   The Superseding Indictment Adequately Pleads The Charged Offenses

1.   An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  "While detailed allegations might well have been required under

common-law pleading rules, they surely are not contemplated by Rule 7(c)(1)." *United States v. Resendiz-Ponce*, 549 U.S. 102, 110 (2007) (citation omitted). "[A]n indictment must (1) enumerate each prima facie element of the charged offense; (2) fairly inform the defendant of the charges filed against him; and (3) provide the defendant with a double jeopardy defense against future prosecution." *United States v. Guzman-Ocampo*, 236 F.3d 233, 236 (5th Cir. 2000) (internal quotation marks omitted). "An indictment that tracks a statute's words is generally sufficient as long as those words fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished." *United States v. Masha*, 990 F.3d 436, 443 (5th Cir. 2021) (internal quotation marks omitted). "In sum, to be sufficient, an indictment must allege each material element of the offense; if it does not, it fails to charge that offense." *Guzman-Ocampo*, 236 F.3d at 236 (brackets and internal quotation marks omitted).

2.     Here, the superseding indictment charges the defendants with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 1349, and securities fraud, in violation of 18 U.S.C. § 1348. ROA.249-254. Section 1348 prohibits schemes "to defraud any person in connection with . . . any security" meeting certain criteria and schemes "to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection

with the purchase or sale of . . . any security" meeting certain criteria. 18 U.S.C. § 1348(1), (2); *see* ROA.251-252 (superseding indictment charging both subsections of § 1348 in the conjunctive). Section 1349 prohibits any attempt or conspiracy to commit securities fraud. 18 U.S.C. § 1349.

As relevant here, this Court has interpreted these statutes as requiring "a specific 'intent to defraud'" and has interpreted § 1348 as "prohibit[ing] the execution of a 'scheme to defraud.'" *United States v. Greenlaw*, 84 F.4th 325, 339 (5th Cir. 2023). Intent to defraud requires proof of "an intent to (1) deceive, and (2) cause some harm to result from the deceit." *Id.* (internal quotation marks omitted). And a scheme to defraud includes "one in which [the defendants] intended to deprive the [victims] of money or property through misrepresentations, thereby wronging the [victims'] property rights." *Id.* at 344; *see also id.* at 343-344 (discussing Supreme Court and Fifth Circuit case law reflecting the "principle" that "the 'scheme to defraud' and 'intent to defraud' elements must be based on property interests").

The superseding indictment plainly alleges these elements, and the district court did not appear to take issue with its adequacy under Rule 7. In the paragraphs setting forth the conspiracy count, the superseding indictment incorporates detailed factual allegations describing the scheme and tracks the language of § 1348, the statute defining the criminal object of the conspiracy.

14

ROA.249-251. Likewise, the paragraphs setting forth the substantive securities fraud counts incorporate those same detailed factual allegations and track the language of § 1348 while specifying approximate dates corresponding to each individual count. ROA.251-254. These allegations include specific assertions that the charged defendants acted "with the intent to defraud" and that they executed (and attempted to execute) "a scheme and artifice . . . to defraud . . . ." ROA.249-250 (conspiracy count); ROA.251 (substantive counts). Because they track the relevant statutory language and set forth the elements of the charged offenses unambiguously and with the required degree of factual specificity, these allegations pass muster under Rule 7 and should easily survive a motion to dismiss.[6] *Masha*, 990 F.3d at 443.

---

[6] Of course, whether the Government is ultimately able to prove the truth of these allegations is a question for trial; to the extent that the district court expressed skepticism of the factual basis for the superseding indictment's allegations, *see* ROA.4175 ("[T]he scheme did not deprive investors of their money or property through any misrepresentation . . . ."), such skepticism is premature. *See Rafoi*, 60 F.4th at 994 (explaining that defendants may not challenge indictments on the ground that the allegations are unsupported by adequate evidence); *see also United States v. Palma*, 58 F.4th 246, 250 (6th Cir. 2023) (emphasizing that appeal from dismissal of wire fraud conspiracy indictment "comes at the pleading stage" and only requires that the indictment "allege facts showing that the conspiracy as a whole had the object of using deception to deprive consumers of property, and [the defendant] joined the conspiracy").

**C.    The District Court Erroneously Concluded That *Ciminelli* Precludes A Prosecution For Securities Fraud Based On The Facts Alleged In The Superseding Indictment**

The district court granted the defendants' motion to dismiss the superseding indictment based on its conclusion that "*Ciminelli* applies squarely here." ROA.4172. But the superseding indictment in no way relies on the "right-to-control" theory *Ciminelli* rejected. Moreover, the district court erred in suggesting that the superseding indictment did not adequately allege securities fraud because the victim-investors were not deprived of their money when they were fraudulently induced to buy securities "at market prices" and because they did not "directly surrender[] their property to the defendant[s]." ROA.4175.

1.    *Ciminelli* invalidated a specific theory of fraud that is very different from the one alleged in the superseding indictment. In *Ciminelli*, the Supreme Court addressed and rejected the Second Circuit's formulation of the so-called "right-to-control theory" of money-or-property fraud, according to which "a defendant is guilty of wire fraud if he schemes to deprive the victim of 'potentially valuable economic information' 'necessary to make discretionary economic decisions.'" *Ciminelli v. United States*, 598 U.S. 306, 309 (2023) (quoting *United States v. Percoco*, 13 F.4th 158, 170 (2d Cir. 2021)). The prosecutions in *Ciminelli* revolved around New York's "Buffalo Billion" development initiative, through which Fort Schuyler Management Corporation

16

"aimed to invest $1 billion in development projects in upstate New York." *Id.* Several people conspired to "tailor Fort Schuyler's bid process to smooth the way for" a particular contractor "to receive major Buffalo Billion contracts," crafting criteria specifically designed to favor that contractor; their conduct thereby "effectively guaranteed" the contractor "preferred developer" status. *Id.* at 310. A grand jury returned an indictment charging the conspirators with, among other things, wire fraud, in violation of 18 U.S.C. § 1343, and conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349.[7] *Id.*

"Throughout the grand jury proceedings, trial, and appeal, the Government relied on the Second Circuit's 'right to control' theory, under which the Government can establish wire fraud by showing that the defendant schemed to deprive a victim of potentially valuable economic information necessary to make discretionary economic decisions." *Id.*; *see also id.* at 310 n.1 (clarifying that the Government and the district court did not rely on a theory "that the Buffalo Billion contracts were the property at issue"). Critically, the right-to-control theory was the "sole[]" basis for the indictment and the Government's trial strategy, and it was reflected in a jury instruction expressly

---

[7] Although *Ciminelli* did not involve securities fraud charges, this Court has acknowledged that § 1348 "borrows key concepts from the mail and wire fraud statutes, and courts have given the terms similar treatment." *Greenlaw*, 84 F.4th at 339 n.6.

directing "that the term 'property' in § 1343 'includes intangible interests such as the right to control the use of one's assets.'" *Id.* at 310-311. On appeal, the Government again "relied solely on the right-to-control theory," and the Second Circuit affirmed on that basis, "holding that, by 'rigging the [requests-for-proposals] to favor their companies, defendants deprived Fort Schuyler of potentially valuable economic information.'" *Id.* at 311 (quoting *Percoco*, 13 F.4th at 171).

The Supreme Court reversed. The Court began its analysis by reiterating that, under § 1343, the Government was required to "prove not only that wire fraud defendants 'engaged in deception,' but also that money or property was 'an object of their fraud.'" *Id.* at 312 (quoting *Kelly v. United States*, 590 U.S. 391, 398 (2020)). It then explained that "[t]he right-to-control theory cannot be squared with the text of the federal fraud statutes, which are 'limited in scope to the protection of property rights,'" because "[t]he so-called 'right to control' is not an interest that had 'long been recognized as property' when the wire fraud statute was enacted." *Id.* at 314 (quoting *McNally v. United States*, 483 U.S. 350, 360 (1987), and *Carpenter v. United States*, 484 U.S. 19, 26 (1987)). Throughout its opinion, the Court emphasized the absence of support for the proposition that "potentially valuable economic information" is "a traditionally recognized property interest" protected by the mail and wire fraud statutes. *Id.* at 314-315

18

(internal quotation marks omitted); *see also id.* at 314 n.4 ("[T]he right to information necessary to make informed economic decisions, while perhaps useful for protecting and making use of one's property, has not itself traditionally been recognized as a property interest.").

At the same time, the Court was careful to go no further, declining to address the merits of any alternative theory of wire fraud the Government could have presented. *Id.* at 316-317; *see also id.* at 317-318 (Alito, J., concurring) (understanding the Court not to be addressing "the Government's ability to retry petitioner on the theory that he conspired to obtain, and did in fact obtain, by fraud, a traditional form of property, viz., valuable contracts").

2.    Contrary to the district court's conclusion, *Ciminelli* does not preclude the present prosecution. Unlike in *Ciminelli*, in which the indictment explicitly relied exclusively on a "right-to-control" theory, 598 U.S. at 310 & n.1, the superseding indictment here does not rely whatsoever on a "right-to-control" theory of fraud. Rather, the superseding indictment alleges a scheme to defraud that turned on depriving victims of their *money*, an indisputably "traditionally recognized property interest."

For example, the superseding indictment alleges that the defendants used their lies "to induce other investors to *buy* the security" the defendants had previously purchased "and artificially drive up its price," and the purpose of that

"pump" was to enable the defendants to "dump" the security at that inflated price while continuing "to induce other investors to *purchase* the same security." ROA.216-217 (emphasis added). Similar allegations appear throughout, making clear the defendants' objective of inducing victim-investors to part with their money. *See, e.g.*, ROA.220 ("[T]he defendants concealed their intent to use [their social media] messages to induce other investors to purchase the securities so that defendants could sell their shares at a higher price at and around the time of the messages."); ROA.244 ("Certain of the defendants made false and misleading tweets and posts in Atlas Trading Discord about [a security they were pumping] to induce other investors to purchase the security, while at the same time selling shares of [that security] for a profit."); ROA.230 ("We're robbing f*cking idiots of their money.").

In granting dismissal, the district court insufficiently credited or misunderstood the superseding indictment's allegations, which make explicit that victim-investors' money was at the heart of the defendants' fraudulent scheme. The court mistakenly asserted that the scheme alleged involved a "right-to-control" theory because the defendants sought to mislead their social media followers and thus, in a sense, deprive them of valuable information. ROA.4174. But, unlike in *Ciminelli*, the superseding indictment does not allege that those deceptions were *themselves* deprivations of property; rather, they were

20

the *means* by which the defendants sought to deprive victim-investors of their money. *See Ciminelli*, 598 U.S. at 312 ("[T]he 'common understanding' of the words 'to defraud' . . . referred 'to wronging one in his property rights.'"); *see also Kelly*, 590 U.S. at 402 (explaining that property "must be an 'object of the fraud'"). As in any fraud case, the deception here was essential but was not itself a deprivation of a property interest.

Numerous courts have distinguished *Ciminelli* on exactly this basis. *See, e.g.*, *United States v. Kousisis*, 82 F.4th 230, 240-241 & 240 n.63 (3d Cir. 2023) (explaining victim's "dollars," not defendants' "misrepresentations," "establish the requisite property interest here," and distinguishing *Ciminelli*); *United States v. Griffin*, 76 F.4th 724, 738-739 (7th Cir. 2023) (rejecting argument that the Government pursued a right-to-control theory under *Ciminelli*, explaining that "the Government's allegations focused explicitly on the defendants' attempts to deprive the [Small Business Administration] of loan guarantees and the millions of dollars the SBA lost paying out on these loan guarantees"); *Baker v. United States*, Nos. 1:13-cr-346 & 1:21-cv-281, 2023 WL 8234212, at *7 (W.D. Tex. Nov. 27, 2023) (denying § 2255 motion where movant misrepresented a company's "financial condition and business practices to deprive victim-investors of their money by inducing them, fraudulently, to invest," and reasoning that, "[b]ecause the Government alleged [movant] sought to obtain

money from the victims, not that he only withheld valuable economic information, *Ciminelli* does not apply"), *certificate of appealability denied*, No. 23-50898 (5th Cir. May 31, 2024).

Because the superseding indictment did not rely on a "right-to-control" theory of fraud, and instead alleged that an object of the defendants' fraudulent scheme was victim-investors' money, this Court should reverse the district court's contrary conclusion.

3.     The district court also asserted that the pump-and-dump scheme alleged in the superseding indictment "is totally indifferent to its effect on the alleged victims," suggesting (without support from the superseding indictment itself) that "[m]any of the alleged victims may have actually made money." ROA.4173.  That statement is mistaken for at least two reasons.

First, the district court's statement is factually inaccurate—and illogical—because the scheme alleged was not, and could not have been, "indifferent" to the victims' investing decisions.  To succeed at all, the defendants' pump-and-dump scheme *required* its victims to act on the defendants' lies by buying the securities the defendants were holding—including, at least with respect to some victims, at artificially inflated prices—so that the market value of those securities would artificially increase (the "pump").  Only after there was such a "pump" could the defendants then profit at the expense of their followers by selling the

securities the defendants held at prices inflated by the victim-investors' induced purchases (the "dump"), thereby leaving victim-investors holding those overvalued securities whose prices the defendants had artificially inflated. *See United States v. Wey*, No. 15-cr-611, 2017 WL 237651, at \*10 (S.D.N.Y. Jan. 18, 2017) (denying motion to dismiss § 1348 count alleging pump-and-dump scheme and explaining that "[t]hat sort of scheme is, *by its very nature*, designed to generate economic benefits at the expense of unwary consumers" (emphasis added) (internal quotation marks omitted)).

Second, and in any event, the district court's assertion is legally immaterial. In order to prove securities fraud under § 1348, the government is not required to show that "investors incurred monetary loss" as an ultimate consequence of their being tricked into parting with their money and buying securities whose value the defendants misrepresented. *Greenlaw*, 84 F.4th at 346; *see also Shaw v. United States*, 580 U.S. 63, 67 (2016) (explaining that the bank fraud statute, 18 U.S.C. § 1344, "demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss").

If the district court's understanding of the law were correct, moreover, prosecutions of pump-and-dump and other market-manipulation fraud schemes would generally be called into question. Such a revolutionary decision would be contrary to courts' and commentators' well-settled understanding. *See, e.g.,*

21 Marvin G. Pickholz et al., Securities Crimes § 6:36 (Dec. 2023 Update) ("Mail fraud charges are routinely included in prosecutions charging market manipulation, especially so-called 'pump-and-dump' schemes . . . ."); *United States v. Gordon*, 710 F.3d 1124, 1143-1145 (10th Cir. 2013) (holding that, where evidence "tended to establish that there was a group of shareholders . . . who disguised their stake in the applicable stocks . . . and who fraudulently manipulated the price in order to make a profit, all at the expense of the general shareholders," "any rational trier of fact could have found that [the defendant's] conduct was fraudulent within the meaning of the securities laws"); *United States v. Hagen*, 468 F. App'x 373, 375 (4th Cir. 2012) (summarizing securities, mail, and wire fraud convictions based on pump-and-dump scheme in which conspirators "acquired control of a company . . . , made successful efforts to artificially increase its stock price, and then sold the stock at a higher price"); *United States v. Laurienti*, 611 F.3d 530, 537 (9th Cir. 2010) (stating that "overwhelming evidence supports the finding" that "overall 'pump and dump' scheme" was § 371 conspiracy to commit Title 15 securities fraud); *United States v. Skelly*, 442 F.3d 94, 100 (2d Cir. 2006) (rejecting sufficiency-of-the-evidence challenge to wire fraud and Title 15 securities fraud convictions "[g]iven the overwhelming evidence of a pump-and-dump scheme").

4.     Finally, the district court observed that the superseding indictment does not allege that the victim-investors "directly surrender[ed] their property to the defendant[s]," but rather that they "surrendered their property to the stock market at market prices."  ROA.4175.  To the extent that the district court was suggesting that the fraud statutes require a victim's money or property to flow directly to a defendant, it was mistaken.  This Court has expressly and repeatedly rejected the argument that the fraud statutes impose such a "mirror image" requirement.  *United States v. Baker*, 923 F.3d 390, 403-405 (5th Cir. 2019) (noting "no court has held that a 'mirror image' transaction is necessary" and holding jury instructions properly permitted conviction where defendant "intended to deceive the victims out of their money for his own financial benefit" by making false statements to induce their investments in a company, benefiting him indirectly "via bonuses and appreciation of his own stock options"); *see also United States v. McMillan*, 600 F.3d 434, 449 (5th Cir. 2010) (holding "[i]t is irrelevant" whether defendants' misrepresentations were made "directly to the victims" and clarifying that "[t]he issue is whether the victims' property rights were affected by the misrepresentations"); *see generally United States v. Greenberg*, 835 F.3d 295, 306 & n.16 (2d Cir. 2016) (holding "wire fraud does not require convergence between the parties intended to be deceived and those whose property is sought," and collecting cases).  Because victim-investors in stock

market-manipulation schemes by definition "surrender[] their property to the stock market at market prices," ROA.4175, the district court's implicit requirement that victims surrender their property to defendants directly would insulate market-manipulation schemes from the fraud statutes. This Court should apply its existing precedent and reject the district court's novel and legally unsupported rule.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district court.

Respectfully submitted,

ALAMDAR S. HAMDANI
United States Attorney
THOMAS H. CARTER
Assistant U.S. Attorney
Southern District of Texas

SCOTT ARMSTRONG
JOHN J. LIOLOS
Criminal Division, Fraud Section

NICOLE M. ARGENTIERI
Principal Deputy Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

s/ Andrew Laing
ANDREW W. LAING
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Ave. NW
Washington, DC 20530
202.353.8433
andrew.laing@usdoj.gov

# CERTIFICATE OF SERVICE

I certify that on June 10, 2024, I caused the foregoing brief to be served upon all Filing Users through the Court's Case Management/Electronic Case Files ("CM/ECF") system.  I additionally served the foregoing brief upon Carlos M. Fleites, counsel for defendant Hrvatin, via email and identical hard copy.

s/  Andrew Laing
ANDREW W. LAING
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Ave. NW
Washington, DC 20530
202.353.8433
andrew.laing@usdoj.gov

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 5,483 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (a)(6) because it has been prepared in a proportionally spaced, 14-point font in text and footnotes using Word for Microsoft 365.

3.      This brief has been scanned for viruses with the most recent version of a commercial virus-scanning program and, according to that program, is free of viruses.

s/  Andrew Laing
ANDREW W. LAING
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Ave. NW
Washington, DC 20530
202.353.8433
andrew.laing@usdoj.gov
