# No. 24-20143

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

United States of America,

Plaintiff - Appellant

v.

Edward Constantinescu; Perry "PJ" Matlock; John Rybarczyk; Gary Deel; Stefan Hrvatin; Tom Cooperman; Mitchell Hennessey; Daniel Knight,

Defendants - Appellees

---

## On Appeal from

United States District Court for the Southern District of Texas

4:22-CR-612-1

# BRIEF OF APPELLEE JOHN RYBARCZYK AS JOINED BY EDWARD CONSTANTINESCU, MITCHELL HENNESSEY, TOM COOPERMAN, GARY DEEL, STEFAN HRVATIN AND PERRY MATLOCK

SUBMITTED BY:

Eric Samuel Rosen
DYNAMIS LLP
225 Franklin Street, 26th Floor
Boston, MA 02110
617.802.9157

Q. Tate Williams
Philip H. Hilder
Stephanie K. McGuire
HILDER & ASSOCIATES, P.C.
819 Lovett Blvd.
Houston, TX 77006
713.955.9111

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5<u>th Circuit Rule 28.2.1</u> have an interest in the outcome of this case. These representations are made so that the judges of this court may evaluate possible disqualification or recusal.

| Appellees: | Counsel for Appellees: |
| --- | --- |
| Edward Constantinescu | Matthew Ford of Ford O'Brien Landy, L.L.P. Austin, TX |
| Tom Cooperman | Chip Lewis Houston, TX |
| Gary Deel | Neal Davis Houston, TX |
| Mitchell Hennessey | Laura Cordova of Jackson Walker, L.L.P. Houston, TX |
| Mitchell Hennessey | Michael Murtha of Jackson Walker, L.L.P. Dallas, TX |
| Stefan Hrvatin | Carlos Fleites Miami Beach, FL |
| Daniel Knight | Cordt Akers of Akers Firm Houston, TX |
| Perry Matlock | Luis A. Reyes of Ashcroft Sutton Reyes, L.L.C. Austin, TX |
| Perry Matlock | Johnny Sutton of Ashcroft Sutton Reyes, L.L.C. Austin, TX |
| John Rybarczyk | Philip Hilder of Hilder & Associates, P.C. Houston, TX |
| John Rybarczyk | James Rytting of Hilder & Associates, P.C. Houston, TX |

i

| | |
|---|---|
| John Rybarczyk | Quentin Williams of Hilder & Associates, P.C. Houston, TX |
| John Rybarczyk | Stephanie McGuire of Hilder & Associates, P.C. Houston, TX |
| John Rybarczyk | Eric Rosen of Dynamis, L.L.P. Boston, MA |

| **Appellants:** | **Counsel for Appellants:** |
|---|---|
| United States of America | Andrew Laing of U.S. Department of Justice Washington, DC |
| United States of America | Carmen Mitchell of U.S. Attorney's Office Houston, TX |
| United States of America | Anna Kalluri of U.S. Attorney's Office Houston, TX |
| United States of America | Jeremy Sanders of U.S. Department of Justice Washington, DC |

/s/ Eric S. Rosen
Attorney of record for John Rybarczyk

## STATEMENT REGARDING ORAL ARGUMENT

This case presents an attempt by the Department of Justice to expand the parameters of the federal Title 18 fraud statutes far beyond what Congress intended, effectively eliminating the "scheme to defraud" requirement such that people can be charged with property fraud crimes based on "deceit" alone. The result is that the fraud statutes are rendered impermissibly vague as applied to the conduct alleged here and elsewhere. Accordingly, Mr. Rybarczyk requests oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................. iii

TABLE OF CONTENTS ...................................................................................... iv

TABLE OF AUTHORITIES ................................................................................ vi

JURISDICTIONAL STATEMENT ....................................................................... 1

STATEMENT OF THE ISSUE .............................................................................. 1

STATEMENT OF THE CASE ............................................................................... 1

   I.   The Indictment Alleges a Scheme to Deceive, and Not a Scheme to *Deprive* Victims of Money. .......................................................................................... 1

   II.  As the case progressed, the Government made clear that its case was about Defendants' "profits," not harm to victims. .................................................... 7

   III. The Motion to Dismiss the Indictment ...................................................... 11

   IV. Procedural History ..................................................................................... 15

   V.  Ruling Under Review.................................................................................. 19

SUMMARY OF THE ARGUMENT .................................................................... 19

ARGUMENT ....................................................................................................... 20

   I. Title 18 Securities Fraud requires both an intent and scheme to defraud. Because the Indictment here alleges neither element, Judge Hanen correctly dismissed it. .................................................................................................... 20

      A.   Standard of Review ........................................................................... 20

      B.   The court correctly ruled that the Indictment failed to allege Section 1348 securities fraud. ........................................................................... 22

         1.   A "scheme to defraud" must have as its *object* economic harm to a victim. .......................................................................................... 22

2.  *Greenlaw*'s command is clear—to plead an "intent to defraud," an Indictment must allege that a defendant acted with the intent to deceive *and* cheat a victim. .................................................................... 24

3.  The Indictment does not allege that the object of the scheme was to deprive "victims" of money or property. ................................................. 26

4.  Because the Indictment fails to allege that the object of Defendants' scheme was to deprive victims of money, the only actual deprivation is that of valuable economic information about Defendants' own trading. ........................................................................................... 31

C.  The Government's arguments that the Indictment here sufficiently alleges both a "scheme to defraud" and an "intent to defraud" should be rejected. ............................................................................................ 38

1.  The Government mischaracterizes the Indictment's allegations to make it appear that Defendants were lying about the companies themselves. 38

2.  Calling the scheme a "pump and dump" is not sufficient to allege that the object of the scheme is victims' property. ........................................ 42

3.  Other cases that the Government relies on for support will likely be overturned and are inapt. .................................................................... 46

4.  The Government frivolously claims that Judge Hanen's decision "call[s] into question" future "prosecutions of pump-and-dump and other market-manipulation fraud schemes." ................................................. 48

CONCLUSION .................................................................... 51

CERTIFICATE OF SERVICE ............................................... 53

CERTIFICATE OF COMPLIANCE ...................................... 54

# TABLE OF AUTHORITIES

## CASES

*Ciminelli v. United States,*

598 U.S. 306 (2023) ...................................................................... passim

*Cleveland v. United States,*

531 U.S. 12 (2000) ............................................................................ 22, 38

*Dura Pharmaceuticals v. Bruodo,*

544 U.S. 336 (2005) ............................................................................... 45

*Johnson v. United States,*

576 U.S. 591 (2015) ............................................................................... 30

*Kelly v. United States,*

590 U.S. 391 (2020) ...................................................................... 15, 23, 24

*McNally v. United States,*

483 U.S. 350 (1987) .......................................................................... 22, 23

*Russell v. United States,*

369 U.S. 749 (1962) ............................................................................... 21

*Shaw v. United States,*

580 U.S. 63 (2016) ................................................................................. 24

*United States v. Awan,*

459 F. Supp. 2d 167 (E.D.N.Y. 2006) ................................................. 21

*United States v. Bruchhausen*,

   977 F.2d 464 (9th Cir. 1992) .................................................................. 25

*United States v. Bruteyn*,

   686 F.3d 318 (5th Cir. 2012) .................................................................. 49

*United States v. Covington*,

   395 U.S. 57 (1969) .................................................................................. 21

*United States v. Evans*,

   892 F.3d 692 (2018) ................................................................................ 25

*United States v. Flores*,

   404 F.3d 320 (5th Cir. 2005) .................................................................. 21

*United States v. Fontenot*,

   665 F.3d 640 (5th Cir. 2011) ............................................................ 20, 21

*United States v. Gordon*,

   710 F.3d 1124 (10th Cir. 2013) ......................................................... 43, 50

*United States v. Greenlaw*,

   2023 WL 4856259 (5th Cir. Jul. 31, 2023), *withdrawn and superseded by*, 76

   F.4th 304 (2024) .......................................................................... passim

*United States v. Guertin*,

   67 F.4th 445 (D.C. Cir. 2023) ................................................................ 28

*United States v. Hagen*,

468 F. App'x 373 (4th Cir. 2012) ........................................................ 50

*United States v. Hess*,

124 U.S. 483 (1888) ............................................................................ 22

*United States v. Kay*,

359 F.3d 738 (5th Cir. 1998) ........................................................ 20, 42

*United States v. Kousisis*,

82 F.4th 230 (3d Cir. 2023), *cert. granted*, 144 S.Ct. 2655 (2024) ................... 47

*United States v. Laurienti*,

611 F.3d 530 (9th Cir. 2010) .............................................................. 49

*United States v. Markham*,

537 F.2d 187 (5th Cir. 1976) .............................................................. 22

*United States v. Milheiser*,

98 F.4th 935 (9th Cir. 2024) ............................................................... 28

*United States v. Pirro*,

212 F.3d 86 (2d Cir. 2000) ................................................................. 21

*United States v. Ratcliff*,

F.3d 639 (5th Cir. 2007) .................................................................... 24

*United States v. Shellef*,

507 F.3d 82 (2d Cir. 2007) ................................................................. 29

*United States v. Skelly*,

   442 F.3d 94 (2d Cir. 2006) ........................................................................ 50

*United States v. Takhalov*,

827 F.3d 1307 (11th Cir. 2016) ................................................... 12, 25, 27

*United States v. Wey,*

   No. 15-CR-611, 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017) ............................ 44

**STATUTES**

15 U.S.C. §78j .............................................................................................. 1

18 U.S.C. §1348 ............................................................................................ 1

18 U.S.C. §1349 ............................................................................................ 1

**RULES**

Fed. R. Crim. Pro. 12(b)(3)(B)(v) ............................................................... 20

# JURISDICTIONAL STATEMENT

The Government's jurisdictional statement is correct.

# STATEMENT OF THE ISSUE

Whether Judge Andrew Hanen erred in dismissing a Superseding Indictment charging a conspiracy and scheme to commit securities fraud under Title 18, United States Code, Sections 1348 and 1349.

# STATEMENT OF THE CASE

## I. The Indictment Alleges a Scheme to Deceive, and Not a Scheme to *Deprive* Victims of Money.

The Superseding Indictment ("Indictment") charged Defendants, collectively, with 19 counts of securities fraud under Title 18, U.S.C., §1348 ("Section 1348") and one count of conspiracy to commit securities fraud under Title 18, U.S.C., §1349. ROA.216. No charges were brought under the Securities Exchange Act (15 U.S.C. §78j, "Title 15" or "Rule 10b-5") "traditional" securities fraud statute.

The Government charged each Defendant together in a conspiracy but only relevant Defendants in each substantive count. As examples, Rybarczyk was charged in six of the 19 substantive counts, while Cooperman was charged in five counts. Nine of the 19 substantive counts, all of which concerned an individual stock, charged only a single Defendant. ROA.249-254.

The Indictment described the alleged conduct as a "pump and dump" based on "false and misleading information and material omissions about [the charged]

securities." <u>ROA.216</u>, <u>220</u> ¶¶1, 13. That said, there are no allegations that any of the Defendants were: (i) company insiders, (ii) possessed inside information, (iii) disguised their stock ownership, (iv) had a fiduciary duty to their Twitter followers, (v) controlled any of the securities at issue, (vi) reverse merged a private company into a public shell, (vii) acquired more than 5% of a stock or failed to file any required SEC forms as to their stock ownership,[1] or (viii) engaged in any type of illicit trading (*i.e.* match and wash trading) to manipulate a stock.

Moreover, while a traditional "pump and dump" typically involves insiders' lies about the company itself, this Indictment alleges that the false statements were about Defendants' own trading intentions and price predictions. The Indictment's first paragraph makes this clear:

> To carry out the scheme, the defendants (1) purchased shares in their trading accounts; (2) posted messages on social media platforms with false, positive information about the security—**including as to, among the defendants' position in the security, how long the defendants intended to hold the security, the defendants' view that the security would increase in price, and the price the security could reach**—to induce other investors to buy the security and artificially drive up its price, and (3) secretly sold their own shares of the security at a higher price to secure a profit for themselves, at or around the time they posted messages to induce other investors to purchase the same security and concealed their intent to sell.

---

[1] As examples, Schedules 13D and 13G of the Exchange Act require shareholders of more than 5% of the outstanding shares of a company to file beneficial owner reports with the SEC. Section 16 of the Exchange Act requires company's directors and officers and 10% shareholders to also report their transactions to the SEC. None of those legal duties, which are generally ignored in traditional "pump and dumps," where a single group controls the entirety of a company's free trading shares such that there is *no* natural market for the shares, are at issue here.

(ROA.216-17 ¶1). Defendants, as alleged, were complete outsiders with no connection to any of the Indictment's publicly traded Nasdaq-listed securities. *See, e.g.*, ROA.217-219. Defendants "tweeted" under monikers (*i.e.* @MrZackMorris or @LadeBackk) that no reasonable person would associate with the company (or mistake for investment advice). *Id*. Their alleged "scheme" involved tweeting falsities about their own trading positions.

Importantly, the alleged purpose of Defendants' tweets was not to deprive followers of money (after all, their stock sales were arm's-length transactions in open markets), but for Defendants "to *enrich themselves* by pumping and dumping securities … through false and misleading posts and material omissions on" social media. ROA.251 ¶118. That the alleged scheme's object was to allow Defendants to profit from their sales of publicly traded stock is made clear because each ticker description in the Indictment ends with a tally of "profits" made by each Defendant. *See, e.g.,* ROA.226, 228, 231, 233, 235, 237, 239, 243, 247 and 249. There are no allegations that: (i) any trader was *deprived* of her money by Defendants' alleged misrepresentations or was a victim; (ii) any Defendant specifically caused an increase in a stock's price; or (iii) any of the stocks crashed once Defendants' alleged misrepresentations (or stock sales) were revealed to the market.

The closest the Indictment came to alleging an injury is in paragraph 12 (ROA.219-220), which states that Defendants "used their credibility to maximize

their own trading profits … *often at the expense* of their Twitter followers and members of Atlas," meaning that an incidental byproduct of Defendants' quest for profits is that those profits came, at times, "at [their followers'] expense." But even there, the Indictment does not allege that these followers suffered an actual injury, and it does not allege that this "expense" was the object of Defendants' scheme. A few examples from the Indictment illustrate the above arguments:

**With respect to SXTC, the Indictment alleges only that Defendants made misrepresentations about their own trading intentions, and that Defendants then sold their shares for a profit**. ROA.224-226. On September 11 and 14, 2020, Defendants Deel, Rybarczyk, and Matlock agreed to tweet out to their followers that they bought SXTC stock (which was true), but their Tweets did not reveal their intent to sell their shares. ROA.224. After Deel's initial tweet predicting that SXTC would be a "big runner," other Defendants tweeted that they too purchased SXTC (without disclosing their intent to sell). By the morning of September 14, 2020, each Defendant had sold his shares and collectively, the group profited less than $20,000. ROA.226. There are no allegations that: (i) any lies were told about SXTC itself; (ii) Defendants' tweets caused an increase in the stock price or that their alleged misrepresentations, once made public, caused the stock to decline; (iii) there are no allegations that SXTC later collapsed or declined for other reasons; and/or, (iv) any individuals were victimized or lost money as a direct result of these tweets.

4

**As for TRCH, the Indictment alleges only that Defendants made misrepresentations about their own trading intentions and that they later sold their shares for a profit**. ROA.226-228. In February 2021, Matlock, Rybarczyk, Deel, Cooperman, and Knight collectively profited $876,106 from trading TRCH. The allegations center on Defendants' alleged false claims about their own trading intentions. For example, Hennessey claimed he was entering into a "swing" trade when he was trading short-term. ROA.226. Deel posted that he "added TRCH" while omitting he had "begun to sell his own shares." *Id*. 226-227. Matlock tweeted his opinion that "$TRCH will be $10+ stock IMO," but then began selling his shares before the price reached that level. *Id*. 228.

Once again, there are no allegations that: (i) any lies were told about the company; (ii) Defendants' alleged misrepresentations caused the price of the stock to rise or decline; (iii) TRCH later collapsed or declined for other reasons; and (iv) "victims" (or anyone) lost money as a direct result of these tweets.

**For GTT, the Indictments alleges only that Defendants made misrepresentations about their own trading intentions, and subsequently sold their shares for a profit**. ROA.228-231. In early March 2021, Rybarczyk, Deel, Cooperman, and Knight collectively purchased 301,300 shares of GTT (at a price of $1.76), and later sold their shares, collectively earning almost $200,000. While the Indictment includes snippets of surreptitiously recorded *private* conversations (as

discussed below), the *public* statements alleged are those about Defendants' own trading intentions. *See, e.g.*, ROA.229-231 ¶45 ("RYBARCZYK falsely claimed in a tweet that "$GTT 24RSI +++ major multi billion $$$ catalyst," while not disclosing his own intent to sell his own shares); ¶51 ("MATLOCK falsely claimed in Atlas Trading Discord that "I just added GTT with Ultra," referring to Rybarczyk, but did not disclose his "intent to immediately sell his shares"); ¶52 ("RYBARCZYK falsely claimed in a tweet a goal of "$GTT Short Squeeze to $3" when GTT was trading at approximately $2 per share," but then sold his shares). Once more, there are no allegations that: (i) GTT's price increased because of these tweets or later decreased once Defendants' alleged misrepresentations were revealed to the market; (ii) there were any lies to the public about the company itself; and/or (iii) any victims lost money as a direct result of these tweets.

**The Indictment's other tickers follow a similar pattern as those described above.** The Indictment's core is that Defendants tweeted positive statements and opinions about stocks without disclosing their sales or intent to sell. *See, e.g.*, ¶58 ("MATLOCK misleadingly claimed in a post in Atlas Trading Discord that he was 'Long SURF with [HENNESSEY] adding here on this pullback . . . '. without disclosing his intent to sell …"); ¶66 ("DEEL falsely claimed in a tweet how '$ALZN is now my largest swing position open … I added these dips through lunch and now I will ride this for new highs and more.'"); ¶74 ("DEEL falsely claimed in

Atlas Trading Discord that 'I just added UPC for an overnight [hold] too.'"); ¶79 ("RYBARCZYK falsely tweeted '$UPC no BS here. Full position intact, I don't dump. I think we get a halt up at open . . . .'"); ¶106(d) ("CONSTANTIN falsely tweeted: '$DATS We're early and shorts are trying hard. We'll squeeze that seeking alpha hoe. He's short. See you at over $30 b*tches.'"); ¶107(g) ("HRVATIN falsely tweeted: '$DATS 8-K out. I like this part. See you at $20,' but then sold shares in DATS soon thereafter").

None of these allegedly false statements pertain to any deal or agreement that Defendants had with any other trading. There are no specific claims that these tweets resulted in a material increase (or decrease) in the securities' price. Nor, and critically, are there are any allegations that there are any victims of this alleged "deceit" or even that the object of the scheme, unlike in a traditional pump and dump, was to deprive others of money. The Indictment focused on profits Defendants obtained through tweets touting their own trading positions.

## II. As the case progressed, the Government made clear that its case was about Defendants' "profits," not harm to victims.

The Indictment described 19 trading "episodes" (*i.e.* individual pump and dumps) that amounted to alleged securities fraud. In the leadup to trial, however, the Government increased the number of episodes from 19 to 397. ROA.7417-7462. The defense opposed this expanded case, moving to exclude the Government's attempt to admit any episodes beyond the 19 in the Indictment. ROA.10726-10730. On

September 15, 2023, the Government responded to this motion, "voluntarily" reducing the number of episodes from 397 to 54, and in so doing, made several arguments relevant to this appeal. ROA.10759-10769.

> *First*, the Government argued that to prove fraudulent intent at trial it would:

> introduce evidence Defendants believed they had the power to induce others to buy (e.g., "I'm gonna send SNOA in AH twitter," "we gon moon this . . .") and that others in fact did buy based on Defendants' allegedly false social-media posts (victim-witness testimony) … **That fraudulent conduct is what is charged** … These two facts prove fraudulent intent and materiality ….

ROA.10765-10766 (emphasis added). For the Government, the alleged fraud was about self-enrichment through deception. But as Judge Hanen later wrote in the dismissal, profits are only "one-half" of a scheme to defraud. ROA.13115-13116. The other half is depriving a victim of money (inflicting economic injury).

> *Second*, although Defendants' conduct was (repeatedly) alleged to be a "pump and dump," the Government's opposition stated it could not prove that either the "pump" or the "dump" had an impact on the securities' price. Specifically, the Government argued that "Defendant's arguments about the backward-looking causation in fact of the price movement"—*i.e.* that there were other causes for the price movements of the 397 separate trading episodes—was irrelevant …". ROA.10766. "That other market participants may have purchased the stock because of some other news article or for a reason wholly unrelated to Defendants' conduct,"

was, the Government believed, "not probative of whether Defendants in fact had fraudulent intent and executed a scheme to defraud." *Id*. The Government did not contend that Defendants were the "sole cause" of stock price movements. Rather, the Government wrote—"that the price of a security may have increased or decreased in part because of unrelated market activity (**it almost certainly did in most or every instance**)" did not prove or disprove the "fraudulent intent and scheme." *Id*. (emphasis added).

*Third*, to explain why stock price movements were relevant in some cases but not others, the Government postured that the "total trading profits" a Defendant earned through trading a stock was a "matter of descriptive fact … that Defendants sought to capture gains for themselves at the expense of their followers." ROA.10767. While seemingly linking profits to harm, the Government then explained that this "fraud" was simply Defendants' "hopes" that the "price would rise," and *not* that anyone would be harmed by this price increase. There was no explanation for how any gain (or loss) came at their followers' "expense." *Id*.  In short, the Government conceded that Defendants' total earnings would prove the scheme and intent to defraud, rather than losses suffered by victims.

This issue arose again months later when the Government disclosed Dr. Maria Garibotti's expert report. Garibotti analyzed each Defendants' total earned profits during the 54 separate "episodes." ROA.11104-11141. The report did not link any

of these profits to actual losses caused by fraud. *See, e.g.,* ROA.11131 (describing "profits" calculation). In moving to exclude Garibotti's testimony, Rybarczyk argued that gross profit calculations were irrelevant because "Defendants are not on trial for profiting from trading," and "profiting from trading [is not] an element of the charged offenses," as the Government conceded. ROA.11078. In its opposition, the Government acknowledged profits were not equivalent to "fraudulent proceeds." *See* ROA.12035 (no opinion will be offered "about whether the profits in these [trading] window[s] are fraudulent proceeds.").

During the March 20, 2024, oral argument, the defense again reiterated that the "total trading profits calculation … are not proceeds of securities fraud," in that "[t]here is no relation between the profits that they've chosen and what we're actually on trial for." ROA.5066. Judge Hanen then asked the Government, "[w]hat is the relevance of the profit, though, that's not tied to the fraud?". ROA.5067. The Government could not answer, stating only that:

> once [Defendants] established this plan during this window, that the trading profits during this window are part and parcel of the scheme. Because they all start talking about what they're going to do. They all start front loading it, and then they put the plan into action with the false statements.

*Id*. Judge Hanen excluded Dr. Garibotti's reference to gross trading profits (the same figures used in the Indictment) as being irrelevant to the alleged fraud. ROA.5072.

### III.  The Motion to Dismiss the Indictment

On September 5, 2023, Rybarczyk (joined by the other Defendants) moved to dismiss the Indictment, arguing that, pursuant to *Ciminelli v. United States*, 598 U.S. 306 (2023), the Indictment alleged only a scheme to deprive trading counterparties of valuable economic information—*i.e.* Defendants' true trading positions and intentions, which is not property protected by the federal fraud statutes. ROA.10713. Likewise, Rybarczyk argued that the Fifth Circuit's decision in *United States v. Greenlaw*, 2023 WL 4856259, *1 (5th Cir. Jul. 31, 2023), *withdrawn and superseded by*, 76 F.4th 304 (2024), mandated that to properly allege a specific intent to defraud, the Government needed to allege an intent to deceive *and* cheat a victim. Only showing deception was insufficient.

The Government opposed, arguing the Indictment was sufficient under *Ciminelli* because it adequately tracked §1348's language, and, quoting Knight's "rob[ ] … idiots of their money" quip, claimed that "[m]oney or property, not information," was the "object" of the scheme. ROA.10753 (citing ¶14 of the Indictment—Defendants concealed their intent to use Tweets "to induce other investors to purchase the securities so that defendants could sell their shares at a higher price at and around the time of the messages …"). As to *Greenlaw*, the Government asserted the Indictment adequately alleged fraudulent intent (including an intent to cheat) and an "intent to deprive victims of money or property or to enrich

themselves." The response did not address the "scheme to defraud" element, and in a footnote regarding *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016)—a key citation in *Greenlaw*—the Government appeared to conflate an "intent to defraud" with a "scheme to defraud." ROA.10754.

Oral argument was held on March 19 and 20, 2024, one week before trial and about five months after this Court's modified *Greenlaw* decision. During this argument, the Court agreed with the Government that the Indictment adequately alleged Defendants' intent to enrich themselves, but it did not plead that they had an intent to *deprive* anyone of money or property— "I mean, I've not only read it word for word, but I've had – I've had my secretary word search it with every possible word combination we can come up." ROA.4723. In response, the Government repeatedly conflated together trading profits with depriving victims of money. ROA.4723, 4728-29. Counsel kept repeating that Defendants were "enriching themselves" through false statements that led people "to depart with their own money to the benefit of the defendants." *Id*.

This exchange best illustrates the dichotomy between what the Government believed had to be alleged (self-enrichment through misrepresentations) juxtaposed against what the law required the Government to allege (the deprivation of money, meaning harm to victims):

12

| | |
|---|---|
| **Government** | So we do have to prove the intent. We don't have to prove that it, in fact, succeeded, right? So the focus is on the scheme and how it was concocted by the defendants and the fact that they had the fraudulent intent to deprive people of their money and property. money and property. It's the scheme itself. |
| **Judge** | Right. And so my question is: Given what you just said, don't you have to plead that in the indictment? |
| **Government** | I believe that the indictment has multiple examples of showing how they intended to *induce people to part with their money or property*. |
| **Judge** | **No, no, no. *Deprive* them of their money and property.** |

ROA.4724-25 (emphasis added). The Court then explained why simply alleging an inducement to buy stock through misrepresentations did not, automatically, allege an intent to *cheat* people out of money:

| | |
|---|---|
| **Government** | Through false and misleading statements. And they have to spend their money to purchase the stocks. |
| **Judge** | Okay. So if I hypothetically invest in GM and I go on the internet and say GM's just invented an electric car that actually works, and who wouldn't buy stock in that? And other people go, yeah, what a good idea. Or, closer to home, I see what the administration is doing regarding oil and gas and it's driving the price of oil and gas up. And I say, man, who wouldn't invest in an oil company right now? I'm investing in an oil company. And I'm doing it because I want to make money, which I don't think is illegal. And I don't care, number one, whether you make money or not. I care about whether I make money. At the same time, I don't intend for you to lose money. If the price of oil goes to $100 a barrel, everybody wins. That's not illegal, is it? |

ROA.4725. As the court explained, trading stocks in an open market is not a zero-sum game, where all sellers win, and all buyers lose. ROA.4727, 5167. Purchasing a stock in the market, even due to misrepresentations about a person's own trading habits, did not result in the *deprivation* of property— the purchaser is still exchanging money for shares of stock equivalent to that amount of money. ROA.5167-5168. Buyers were receiving something in return for their cash—a free trading share that could appreciate (or depreciate) in value after purchase.[2]

After additional argument, the Government could point to only two allegations which provided any hint that "victims" were being *deprived* of property: (i) the allegations that Defendants maximized their profits, "often at the expense of" their followers (ROA.219-20 ¶12), and (ii) the allegations concerning GTT, where Defendants falsely tweeted their trading positions (ROA.229-30 ¶¶45, 51-52), during which Knight told an unidentified individual he was "[r]obbing f*cking idiots of their money." ROA.4728-29. These arguments were repeated the next day, with the Government again pointing to these two allegations in the Indictment as their evidence that victims were *deprived* of money. ROA.5157-5192.

---

[2] This is different from a traditional pump and dump, where victims are exchanging money for worthless stock.

## IV. Procedural History

On March 20, 2024, Judge Hanen dismissed the Indictment. ROA.4164. In his order, the court explained that while the Government alleged a scheme by Defendants to obtain "financial gain," recent decisions by the Supreme Court and this Court—*Ciminelli v. United States*, 598 U.S. 306 (2023), *Kelly v. United States*, 590 U.S. 391 (2020) and *United States v. Greenlaw*, 84 F.4th 325 (5th Cir. 2023)— urged "courts to prevent fraud convictions based on deceit alone[.]." ROA.4166, 4172. Most importantly, in *Ciminelli* the Court ruled that the "right to control" property theory, by which a person could be convicted for denying others "information necessary to make discretionary economic decisions," was not a traditional property right. Federal fraud statutes are "limited in scope to the protection of property rights," and a "victim's right to have accurate information" was not one. *Id.* Only "schemes that *harm* a victim's traditional property right are actionable." *Id.*

Judge Hanen recognized that while the Indictment did not explicitly rely on the "right-to-control" theory," its core allegations were that Defendants' social media followers were "misled by false statements and material omissions when they were 'induced[d] to purchase the securities that the Defendants promoted.'" ROA.4166-67. These false statements "pertained to the Defendants' plans to invest or divest in a certain stock or Defendants' price targets for a certain stock." The

Defendants were "not alleged to have been insiders of the companies or otherwise to have been in control of the stocks at issue in any formal way; rather, all of the stocks implicated in the Indictment were publicly traded on the market, and the Defendants [and their alleged victims] were individuals who traded on the market." ROA.4168.

The Government must show both an intent to deceive *and* an intent to cheat. "Deception, alone, will not suffice." A defendant "cannot be convicted of wire fraud on the basis of [a] lie alone … [because] deceiving is a necessary condition of defrauding but not a sufficient one," and cheating meant to "deprive the victim of money or property by means of deception." ROA.4169. With respect to the "scheme to defraud" element, the court wrote that *Greenlaw* was not clear as to whether a "scheme to defraud" required "depriving another of money or property *and* bringing about some financial gain to the defendant, or whether just one of the two was required." ROA.4170. But, Judge Hanen held, the authority cited in *Greenlaw* resulted in the "clear implication" that "the scheme to defraud element should be in the conjunctive, and that the "Government must not only plead a pattern of action that is intended or designed to bring about some financial gain to the wrongdoer, but also a pattern that is intended or designed to deprive another of money or property." *Id*.

16

Here, there were allegations about Defendants lying to "maximize their profits," but "obtaining financial gain, was only half of the equation." ROA.4172. The other half, which was "lacking," was "harming a victim's traditional property right." *Id*. At best, the Indictment alleged that Defendants' gains occurred "at the expense of" their Twitter followers—but this just established that any losses were incidental rather than the "object of the alleged scheme." ROA.4173. The scheme, as pled, was "totally indifferent to its effect on the alleged victims." *Id*. And even if victims ultimately lost money because share prices decreased, Defendants "did not obtain something of value from the entity to be deceived," because the losses were "one step too far removed from" Defendants' alleged misrepresentations. Instead, the property right "that the Defendants' conduct harmed was their right to control their assets … their right to make an informed discretionary decision." ROA.4174.

As for Knight's "robbing … idiots of their money" comment, the court concluded that this statement alleged an "intent to defraud," but it did not, on its own, allege that Defendants executed a "scheme to defraud" as defined in *Ciminelli*—explaining, that a "conspirator believed he was 'robbing … idiots' does not make it so, especially when the mechanism or object of the scheme, did not deprive others of their traditional property rights …". ROA.4173-74. Knight's bluster aside, the scheme, as executed, must allege that its object was to harm other investors, and here it did not. *Id*. "At best," the Indictment alleged a "right-to-

17

control" theory (the deprivation of "potentially valuable economic information" such as trading positions) rather than a "theory grounded in the deprivation of victims' traditional property interests." ROA.4174.

The Government moved to stay the Indictment's dismissal which was denied on April 3, 2024. ROA.4182-87, 4192-95. In so doing, the court wrote that the scheme "as alleged did not involve obtaining by fraud money or property … instead, as alleged, it was a scheme aimed at depriving social media followers of full and honest investing information (which importantly included the Defendants' personal plans to sell the mentioned stocks)." Those allegations fell under "a recent Supreme Court case: *Ciminelli v. United States*, 598 U.S. 306 (2023), and perhaps fall into the gaps left unanswered by the Fifth Circuit in *United States v. Greenlaw*, 84 F.4th 325 (5th Cir. 2023)." ROA.4193.

This opinion clarified the court's rationale for dismissing the Indictment. Even though, under *Greenlaw*, a defendant "cannot be convicted on 'deceit alone,' deceit alone appears to be all that the Government believes it must prove." ROA.4193. In effect, by ignoring that the object of the scheme must be to *deprive* people "of money or property," the Government "seemingly collaps[es] the two 'scheme to defraud' and 'intent to defraud' elements into one." *Id*. With this "test case," the Government failed to explain how an alleged scheme affected "anything more than the alleged

victims' right to control their assets by depriving them of honest economic information." ROA.4194.

### V. Ruling Under Review

Judge Hanen's March 20, 2024, order dismissing the Indictment, which was expanded in his April 3, 2024, order denying the Government's motion to stay.

## SUMMARY OF THE ARGUMENT

The federal fraud laws, including the Title 18 securities fraud statute, do *not* criminalize schemes that merely induce transactions through deception. Rather, binding Supreme Court precedent makes clear that the federal fraud statutes apply only to schemes that, if completed, result in economic harm to victims. Indeed, the statute's plain wording prohibits "schemes to defraud" and not "schemes to deceive." This requirement that a scheme target the deprivation of a victim's property is not ministerial—it serves as an important dividing line between criminal and civil liability, giving our citizenry clear guidance as to the implications of their conduct.

As Judge Hanen correctly concluded, and as confirmed at oral argument, the Government believed it could circumvent this well-settled precedent. At bottom, the Government's position is that alleging that a defendant obtained money as part of a scheme suffices to allege a scheme to defraud aimed at harming a victim. But this is

not the law. Precedent requires the Government to plead that the deceit alleged here—lies about Defendants' own trading positions and intentions—had as its object economic *harm* to a victim. The Indictment failed to do that. The allegations, taken as true, focus entirely on deceit used to "maximize" Defendants' profits. The "object" of the charged scheme was deception—withholding true information about Defendants' trading positions and intentions. But because the deprivation of valuable economic information is not "property," *see, e.g.*, *Ciminelli v. United States*, 143 S. Ct. 1121 (2023), no crime in the Indictment was pled. Judge Hanen, for these reasons and others, got it right.

# ARGUMENT

## I. Title 18 Securities Fraud requires both an intent and scheme to defraud. Because the Indictment here alleges neither element, Judge Hanen correctly dismissed it.

### A. Standard of Review

The failure of an indictment to state an offense renders it subject to dismissal if the indictment's alleged infirmity is, as here, a "question of law." Fed. R. Crim. Pro. 12(b)(3)(B)(v); *United States v. Fontenot*, 665 F.3d 640, 644 (5th Cir. 2011). In ruling on a motion to dismiss, courts must accept the Indictment's factual "allegations … as true" to determine whether "an offense has been stated." *United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 1998). But "generic terms" that comprise

the allegations need not be credited. *See, e.g., United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000) (recital of "generic terms" was insufficient to allege crime); *United States v. Awan*, 459 F. Supp. 2d 167, 175 (E.D.N.Y. 2006) (same, concerning use of "generic expression 'material support'"); *Kay*, 359 F.3d at 759 (generic terms pertaining to charged statute's "core of criminality" not accepted as true).

Moreover, unlike in other circuits, courts in *this* Circuit can consider "undisputed facts" outside the indictment's four corners when ruling on the sufficiency of an indictment. *United States v. Flores*, 404 F.3d 320, 325 (5th Cir. 2005); *see also Fontenot*, 665 F.3d at 645-66 (taking into account undisputed facts in determining whether indictment alleged material false statement). This is proper because a "question of law presented in a case involving undisputed facts can be determined without a trial …". *Id. citing United States v. Covington*, 395 U.S. 57, 60-61 (1969).

Last, an indictment is insufficient if it simply quotes the "words of the statute, unless those words themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the [offense] intended to be punished." *Russell v. United States*, 369 U.S. 749, 765 (1962) (citations omitted) (cleaned up); *see also Fontenot*, 665 F.3d at 642-43 (although Indictment alleged "materially false and fraudulent statements," Court analyzed specific allegations to determine sufficiency). Rather, the statutory language must include a

21

statement of facts that "will inform the accused of the specific offense, coming under the general description, with which he is charged." *Id*. (*citing United States v. Hess*, 124 U.S. 483, 487 (1888)); *see also United States v. Markham*, 537 F.2d 187, 192 (5th Cir. 1976) (indictment must be read "as a whole . . . and . . . must be determined by practical, not technical, considerations.").

### B. The court correctly ruled that the Indictment failed to allege Section 1348 securities fraud.

To plead Title 18 securities fraud (rather than the more traditional Title 15 10(b)(5) standard), an indictment must allege *both* a "scheme to defraud" and a "specific intent to defraud." This Indictment fails because it alleges neither.

#### 1. A "scheme to defraud" must have as its *object* economic harm to a victim.

The Supreme Court recently reined in zealous prosecutors' attempts to push the boundaries of Title 18's federal fraud laws. In *McNally v. United States*, 483 U.S. 350 (1987), the Court made clear that "fraud" could not be accomplished by deception alone. Rather to "defraud" meant "wronging one in his property rights by dishonest methods or schemes." *Id.* at 358. This was reinforced by *Cleveland v. United States*, 531 U.S. 12, 19 (2000), which again determined that deception and fraud were not equivalent—deception is the means by which fraud can occur, but fraud, more narrowly, is the harming of a victim's property rights. *See also Greenlaw*, 84 F.4th at 344 (noting that Supreme Court cases draw a "fine line"

between "conduct that is merely deceitful, from conduct that "'wrong[s] one in his property rights.'"); *McNally*, 483 U.S. at 356 (fraud schemes prohibit only deceptive "schemes to deprive [the victim of] money or property."). Thus, relying solely on the alleged perpetrators' gains (as the Indictment does) is misplaced. It is conduct's purpose and effect on victims that turns deception into fraud.

More recently, in *Kelley v. United States*, 590 U.S. 391 (2020), the Supreme Court again restrained prosecutors, holding that schemes to defraud must not only "deprive [the victim of] money or property," but also that the "*object* of their fraud was property." Incidental effects on money or property, such as where something happens "at the expense of" another as the Government repeatedly contended below, could not prove a "scheme to defraud." *Id*. at 402 ("a property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme."). Last, in *Ciminelli v. United States*, 598 U.S. 313 (2023), the Court reaffirmed (multiple times) that schemes to defraud encompassed only "schemes to deprive people of traditional property interests," and further held that valuable information "necessary to make discretionary economic decisions" is not a "traditional property interest" protected by fraud statutes.

This Court, in *Greenlaw*, declined to decide whether the jury instruction at issue in the "scheme to defraud" instruction—specifically, whether deprivation of property was conjunctive or disjunctive with bringing about financial gain to the

person engaged in the scheme—was a correct statement of law. But more important than the *Greenlaw* jury instruction is that this Court ruled definitively that a "scheme to defraud" *must* be based on the victims' property interests. 84 F.4ᵗʰ at 343-44. This fundamental concept was not even disputed by the *Greenlaw* prosecutors, who had to assert that "depriving a victim of a property right and obtaining gain *from fraud* are two sides of the same coin." Simply stated, it is undisputed that to engage in a scheme to defraud, the scheme must have as its object economic harm to a victim that "result[s] from the deceit." *Greenlaw*, 84 F.4th at 352; *see also Ciminelli,* 598 U.S. at 312 (to defraud refers to "wronging one in his property rights"); *Kelly,* 590 U.S. at 401-02 (property fraud contemplates "taking of property" causing "economic loss"); *Shaw v. United States*, 580 U.S. 63, 73 (2016) ("scheme must be one to deceive the bank and deprive it of something of value"); *see also United States v. Ratcliff*, F.3d 639, 645 (5ᵗʰ Cir. 2007).

### 2. *Greenlaw*'s command is clear—to plead an "intent to defraud," an Indictment must allege that a defendant acted with the intent to deceive *and* cheat a victim.

Like with a scheme to defraud, the "intent to defraud" element requires that the perpetrators intend to harm a victim. *Greenlaw*, 84 F. 4th at 350-51 (government must allege an intent to deceive and cheat victim). Deception, standing alone, "is not synonymous with depriving another of their property interests." *Id.* at 350. Cheating, in turn, is to "deprive the victim of money or property by means of deception."

*Greenlaw*, 84 F.3d at 351; *see also Evans*, 892 F.3d at 712 (Court's "understanding that an "intent to defraud" requires an 'intent to (1) deceive, and (2) cause some harm to result from the deceit.'").

In its explanation, this Court cited approvingly to *United States v. Takhalov*, 827 F.3d 1312, 1314 (11th Cir. 2016), which foreshadowed many issues that have arisen here. In *Takhalov*, women lured unassuming men to bars but failed to disclose that the bars were providing kickbacks in exchange for doing so. The defendants sought a jury instruction that failing to disclose a financial arrangement between the women and the bar was insufficient to prove wire fraud. The request was denied, but the circuit reversed, finding that a wire fraud conviction could not be premised on a "lie alone … [because] deceiving is a necessary condition of defrauding but not a sufficient one." *Id*. at 1312, 1314. The deception in *Takhalov*—the failure to disclose kickbacks—did not go to the nature of the bargain (purchasing drinks at a bar) between the women and their victims. The men received exactly what they had bargained for (drinks in exchange for money), even though the deception, like that here, the defendants financially benefited. Put simply, *obtaining* money by deception is not equivalent to *depriving* a victim of money or property. *See, e.g., United States v. Bruchhausen*, 977 F.2d 464, 467-68 (9th Cir. 1992) (deception does not amount to fraud simply because money changes hands).

### 3. The Indictment does not allege that the object of the scheme was to deprive "victims" of money or property.

Although chock-full of allegations Defendants sought to maximize profits from their alleged false tweets and trading, *see, e.g.*, ROA.251 ¶118 ("purpose" of the conspiracy was for Defendants to "unlawfully *enrich themselves* by pumping and dumping securities … through false and misleading posts and material posts …"), Judge Hanen correctly determined the Indictment failed to allege an offense because it did not allege the scheme's *object* was to cheat victims out of money or property.

As described, in the Government's motion responses, at oral argument, and now again on appeal, the Government has conflated together the Indictment's allegations concerning financial gain through deception with a scheme that has as its object the *deprivation* of property. Even Garibotti, the Government's expert, was prepared to testify only about net trading profits, and not fraud proceeds. Judge Hanen rightfully excluded this irrelevant evidence. During oral argument the day before the case was dismissed, the Government again insisted that misrepresentations that lead people to buy stock suffices to allege that *victims* were deprived of money or property. ROA.4722-4724. Decades of Supreme Court precedent show otherwise.

Misrepresentations that induce people to enter transactions that they would otherwise avoid is *not* a scheme to defraud unless those misrepresentations go to the "nature of the bargain itself," meaning that individuals are being cheated because

they are not getting what they bargained for (and are therefore *deprived* of money or property). The Eleventh Circuit said it best in *Takhalov*:

> a "scheme to defraud" … refers only to those schemes in which a defendant lies about the nature of the bargain itself. That lie can take two primary forms: the defendant might lie about the price (e.g., if he promises that a good costs $10 when it in fact costs $20) or he might lie about the characteristics of the good (e.g., if he promises that a gemstone is a diamond when it is in fact a cubic zirconium). In each case, the defendant has lied about the nature of the bargain and thus in both cases the defendant has committed wire fraud. But if a defendant lies about something else—*e.g.*, if he says that he is the long-lost cousin of a prospective buyer—then he has not lied about the nature of the bargain, has not "schemed to defraud," and cannot be convicted … on the basis of that lie alone.

827 F.3d at 1313-14.

As Judge Hanen correctly pointed out, the investors here purchased stock directly on the open market. ROA.4175. The "bargains" struck were these open-market trades—there was no "bargain" or "transaction" between any Defendant and any alleged victim. Thus, the question, as framed by *Takhalov*, is whether lies about a person's own trading positions and intentions go to the nature of *that* bargain at issue in *this* case or whether they are ancillary misrepresentations that simply induce people to enter transactions that they ordinarily would not have entered. Unlike in a traditional pump and dump, where fraudsters typically lie about the companies themselves (falsely claiming, for example, that a company just developed a cure for cancer) or create fictitious volume through match or wash trades, misrepresentations about a person's own trading intentions do not go to the "nature" of an open-market

stock trade. There was no deprivation of money or property here because even if misrepresentations about Defendants' trading positions and opinions induced investors into making purchases, investors received shares of stock in exchange for money, which is what they paid for.

The Indictment's alleged misrepresentations —lies that induce transactions but the purchasers got what they paid for—are of the type that recent multiple circuit courts have held are insufficient to qualify as deprivations of money or property. In *United States v. Milheiser*, 98 F.4th 935 (9th Cir. 2024), the court reversed a wire fraud conviction predicated on lies told to prospective purchasers of printer supplies. The lies induced customers' purchases, but the customers received what they bargained for (printer supplies). The lies did not go to the nature of the bargain (quality or price of supplies). The court faulted the district court for not instructing the jury that any "false statement must directly or indirectly deceive the victim about the nature of the bargain," scolding the Government for arguing (like here) that "when you lie to somebody on an important fact that causes them to *give you* money, you have defrauded them." *Id*. at 945 (emphasis added).

In *United States v. Guertin*, 67 F.4th 445 (D.C. Cir. 2023), the court reversed an employee's conviction for lying to his employer to maintain his security clearance—and thereby earn a salary—but who otherwise was satisfactory. The court held that federal fraud statutes apply only to schemes where a defendant "lies

about the nature of the bargain itself," and in *Guertin*, where the employee was otherwise satisfactory, the employer was not "defrauded of 'money or property.' *Id*. at 451. The lies "merely deprive[d] the employer of honesty … which cannot serve as a predicate for a fraud conviction." *Id*.

And in *United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007), the indictment alleged defendant's lies "induced" a seller to sell cleaning products that it would have not sold had it been told the purchaser's resale plans. *Id*. at 107. The court deemed the indictment insufficient because it failed to allege that the "defendant contemplated actual harm that would befall victims due to his deception," drawing a line "between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do ..." *Id*. at 107-08.

All these cases stand for the same basic principle: a deception that induces a transaction does not allege a "scheme to defraud"—even if profits for the perpetrator result—unless the victim does *not* receive the benefit of the bargain from the contemplated transaction. Here, the Indictment repeatedly alleges (as confirmed in the Government's pleadings, during oral argument, and with its chosen expert) that the object of Defendants' scheme was profits for themselves, and not harm to victims. Every stock purchaser benefited from their bargain.

Distinguishing between deceit and harm makes sense. The Government's current theory, that *any* misrepresentation that induces a transaction constitutes Title 18 fraud so long as the defendant made (or desired to make) money is hopelessly overbroad. *Cf. Johnson v. United States*, 576 U.S. 591, 595 (2015) (Fifth Amendment violated when a "criminal law [is] so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement."). Every car salesperson who tells a customer that he cannot lower the car's price (when his boss has given him permission to reduce the price further) commits wire fraud once an email memorializing the transaction is sent. Every aspiring homeowner who writes a property owner a letter (containing misrepresentations or exaggerations) about how much she loves the home commits mail fraud if the seller agrees to sell the home premised on the letter's representations. And a Twitter user with a single follower who touts a security hoping that it will increase in value so he can sell has committed securities fraud *even if the stock price does not change as a result of the Tweet* because, as the Government has argued (*see, e.g.*, R.4808), the success of a scheme to defraud is immaterial.[3]   In these situations the defrauded party received what they bargained

---

[3] That the Title 18 fraud statutes are inchoate crimes not dependent on a scheme's "success" mandates *further* in favor of a narrow interpretation of the federal fraud statutes. Under the Government's expansive reading, *anyone* attempting to induce others into a transaction through deception is criminally liable even if the "victim" declines the transaction.

for (and thus there is no "deprivation"), but under the Government's statutory construction, the "fraudster" has committed a federal crime.

Finally, the Government is wrong that the district court implied that market manipulation schemes cannot be prosecuted because stocks are purchased on the open market (instead of directly with Defendants). Br. at 25-26. Given that this is not a case where lies induced a person to sign a contract or where Defendants engaged in transactions directly with victims, the court was simply trying to determine what "bargain" was at issue in *this* case. The court correctly concluded that the lack of privity between Defendants and purchasers meant that the "bargain" that court had to analyze under the fraud statutes to determine whether "victims" received the benefit of that bargain was the open-market stock purchases.[4] ROA.4175. The "mirror image" or convergence requirement was not at issue.

> **4. Because the Indictment fails to allege that the object of Defendants' scheme was to deprive victims of money, the only actual deprivation is that of valuable economic information about Defendants' own trading.**

---

[4] A case cited by the Government illustrates this principle well. In *United States v. Skelly*, 442 F.3d 94 (2d Cir. 2006) investors bought stock, but did so through a broker (Skelly) who had assumed a fiduciary duty to them. Skelly failed to disclose the outlandish commissions that he made from selling his customers certain stock. The "bargain" at issue in *Skelly* was the transaction between the customers and the broker, which qualified as wire fraud because of the existence of a fiduciary relationship. *Id.* at 98-99. Here, there was no fiduciary relationship; as such, the transactions at issue were other investors' purchases of stock on the open market and whether they received the benefit of the bargain from *those* transactions.

With no cognizable theory as to how "victims" were "deprived" of money (as opposed to being "induced" through deception into purchasing free-trading stock), Judge Hanen properly concluded the only "property" the Indictment alleged Twitter followers were deprived of was "potentially valuable economic information" about a proposed transaction—*i.e.* the *Defendants'* trades and planned trades. ROA.4174.

*Ciminelli,* 598 U.S. at 310, at its core, was a case about defendants, like here, who used alleged misrepresentations to enrich themselves. *Ciminelli* was a contractor who surreptitiously paid a lobbyist to help his company obtain favorable treatment while bidding for construction contracts worth hundreds of millions of dollars from the State of New York. It was to obtain this *money* that *Ciminelli* entered into the charged scheme.

The Government observed the underlying scheme was hidden during the contract bidding process. As a result, *Ciminelli* and others were charged with wire fraud under the theory that the awarded contracts themselves were the object of the fraud. *See* Indictment, 19, *United States v. Percoco,* No. 1:16-cr-00776 (S.D.N.Y. Nov. 22, 2016), ECF No. 49 (first indictment alleged that Ciminelli "devised a scheme to defraud Fort Schuyler in its award of significant taxpayer-funded development contracts by representing to Fort Schuyler that the bidding process for those contracts was fair, open, and competitive …").

But because New York benefited from its bargain, the defense's motion to dismiss argued that, as here, the indictment did not contemplate harm to a victim, and deceit alone was "insufficient to support wire fraud because 'the deceit must be coupled with a contemplated harm to the victim,'" which must go to the "very nature of the bargain itself." Joint Memorandum of Law in Support of The Buffalo Defendants' Motion to Dismiss the Indictment Pursuant to <u>Federal Rule of Crim. Procedure 12</u>, <u>28</u>-41, *United States v. Percoco*, No. 1:16-cr-00776 (S.D.N.Y. May 19, 2017), ECF No. 220.

After the motion was filed, the *Ciminelli* prosecutors' opposition rebranded that same indictment (not so much as changing a word) as a "right to control" case. *See* Government's Omnibus Memorandum of Law in Opposition to Defendants' Pretrial Motions, 55, *United States v. Percoco*, No. 1:16-cr-00776 (S.D.N.Y. June 30, 2017), ECF No. 264 (Government argued that "the Superseding Indictment amply alleges a scheme to deprive Fort Schuyler of its right to control its assets, which is a form of property."). In fact (and ironically given the Government's currently arguments), the Government rejected any suggestion that the "right to control" theory need even be pled in the indictment. *Id*. at 57. ("defendants' suggestion that the Government must specifically label as such the right-to-control theory in the indictment …. finds no support in Rule 7 or 12, and indeed is flatly contradicted by precedent."). Thus, despite not mentioning the words "right-to-

control" in the indictment, it was the *Government* that insisted the court could implicitly read a "right-to-control" theory of property into the indictment.

After the Government filed its opposition, the grand jury approved a second superseding indictment, which kept the same allegations, but explicitly stated that defendants devised "a scheme to defraud Fort Schuyler of its right to control its assets," thereby exposing "Fort Schuyler to risk of economic harm …". Second Superseding Indictment, 20, *United States v. Percoco*, No. 1:16-cr-00776 (S.D.N.Y. Sept. 19, 2017), ECF No. 321. The facts did not change. The Government took the same allegations and re-packaged them under a "right to control" theory. The case remained one of misrepresentations that induced the issuance of contracts (and money) to *Ciminelli*. It was this scheme to defraud by deceit alone—rebranded as a "right to control"—with no harm contemplated to a victim, that the Supreme Court rejected.

It is against this background that the Government's attempts to distinguish *Ciminelli* from the facts here, exposes the Indictment's deficits. *First*, *Ciminelli* was not, as the Government contends, a "narrow 'right-to-control'" case that is "inapposite" to that charged here. Br. at 12. It is the same as this case—misrepresentations designed to induce transactions, but with no contemplated harm to victims.

Next, *Ciminelli* is not "a specific theory of fraud that is very different from the one alleged in the superseding indictment." Br. at 16. As described, the right-to-control theory was not even alleged in *Ciminelli's* original indictments—the "property" was the spigot of money that came along with lucrative contracts, much like the alleged $114 million in trading proceeds here. Both *Ciminelli* and this case are premised on allegations that a victim was deceived and would not have entered into a transaction *but for* those misrepresentations. But in the end, everyone benefited from their bargain.

*Third*, while the Government attempts to convince this Court that *Ciminelli* was solely about the "right to control," Br. at 17 ("Throughout the grand jury proceedings, trial and appeal, the Government relied on the Second Circuit's 'right to control' theory ...."), as described, this is not true. *See also Ciminelli*, 598 U.S. at 306 fn. 1 (Supreme Court wrote that the initial indictment "alleged that the Buffalo Billion contracts *were the property at issue* …," not valuable economic information.).[5]

*Fourth*, the Government's attempts to chastise Judge Hanen for allegedly reading a "right-to-control" theory into a supposed traditional property fraud

---

[5] The footnote states: "An earlier indictment alleged that the Buffalo Billion contracts were the property at issue. But, to defend against the defendants' motion to dismiss, the Government relied solely on the theory that the scheme "defraud[ed] Fort Schuyler of its right to control its assets." App. 31–32. The District Court then relied expressly on the right-to-control theory in denying the motion to dismiss."

Indictment (Br. at 19), cannot be squared with the Government's demand, in *Ciminelli* itself, that the court read a "right-to-control" theory directly into that indictment. The *Ciminelli* prosecutors were correct—the *factual allegations* dictate whether a person's conduct falls under the rubric of Title 18 property fraud crimes, not the Government's creativity in describing those facts in a charging instrument.[6] Judge Hanen saw through this gamesmanship. He got it right.

Likewise, the Government's attempt to distinguish this case from *Ciminelli* falls flat given the Government's arguments to the Supreme Court in its attempt to defend *Ciminelli* are nearly identical to those the Government makes here. In that regard, the Government's brief repeatedly describes the charged scheme as one of fraudulent inducement, where Defendants' false tweets "induced" traders to buy securities with the "object" being to obtain money for themselves. *See, e.g.,* Brief at 10, 11, 16, 18. The Government's brief in *Ciminelli* defends its "right-to-control" theory using almost identical language:

> the Second Circuit has applied the right-to-control theory in a more limited manner to identify cases that satisfy all of the property fraud elements. **The core set of cases in which the Second Circuit applies the theory are those in which a defendant fraudulently induces a victim to enter into a transaction. In that situation, the object of the**

---

[6] Allowing the Government to ignore *Ciminelli* by leaving the magic words "right-to-control" out of an indictment would give the Government *carte blanche* to evade Supreme Court decisions by pleading around them. *Ciminelli* was not a case about pleading standards. *Ciminelli* determined that the right to valuable economic was not a protected property interest covered by federal fraud laws. This is true whether pled as a "right-to-control," a "fraudulent inducement," or a scheme to obtain money through misrepresentations about a person's own trading behavior.

**scheme is obtaining money or other consideration in the transaction that indisputably qualifies as "money or property**.[7]

Brief for Respondent, 12, *Ciminelli v. United States*, 598 U.S. 306 (2023) (No. 21-1170). This makes clear that fraudulently inducing a transaction to make money (but without having "harm" as the objective) *is* the right-to-control theory outlawed by the Supreme Court. *Id*. *Ciminelli* was not just a case about indictments that use the term "right to control"; rather, *Ciminelli* reaffirms years of Supreme Court precedent holding that *depriving* a victim of property must be the "object" of the scheme and not a byproduct.

Finally, *Ciminelli* (and the *Kousisis* case, described below), are cases where the defendants contracted with victims. The Supreme Court could have decided to uphold the "right-to-control" theory on the grounds that the misrepresentations *did* go to the "nature of the transaction" because the contract would not have been awarded if the facts were known, but the Court did not do that. Instead, the Court broadly held that schemes to defraud (contract-based or not) *must* have as their object the deprivation of money or property. *See Ciminelli*, 598 U.S. at 315 (rejecting "right-to-control" theory on grounds that the "theory thus makes a federal crime of an almost limitless variety of deceptive actions traditionally left to state contract and

---

[7] *See also* Brief for Respondent, 14, *Ciminelli v. United States*, 598 U.S. 306 (2023) (No. 21-1170) (right-to-control theory "has typically been applied to *fraudulent inducement cases like this one*, in which the object of the deceptive scheme—the funds or other property the defendant will gain from the transaction that he seeks to mislead the victim into entering—plainly qualifies as "money or property.").

tort law" and further explaining that, "[a]bsent [a] clear statement by Congress," courts should "not read the mail [and wire] fraud statute[s] to place under federal superintendence a vast array of conduct traditionally policed by the States.") (*citing Cleveland*, 531 U.S. at 27). Here, there was neither a contract nor a transaction between Defendants and alleged victims, making it even clearer that this is a case about the deprivation of valuable economic information (not money).

**C. The Government's arguments that the Indictment here sufficiently alleges both a "scheme to defraud" and an "intent to defraud" should be rejected.**

**1. The Government mischaracterizes the Indictment's allegations to make it appear that Defendants were lying about the companies themselves.**

Having conceded that the object of the charged scheme must be to *deprive* victims of money (ROA.4728), the Government attempts (to show that the scheme to defraud related to the "nature" of the bargain) to reframe this case as one where the alleged misrepresentations were about the actual companies themselves rather than Defendants' own trading and future intent. *See, e.g.*, Br. at 3 ("defendants accomplished this by using misrepresentations *about the security* to induce other investors"). This is not an accurate reading of the Indictment. Words matter.

With SXTC, for example, the Government does not (because it cannot) identify any misrepresentations about the company. Br. at 4-5. Paragraph 26 of the Indictment contains an allegedly "false and misleading tweet," but the identified lies

are: (i) that DEEL purchased 62,000 shares (instead of 100,000), and (ii) that DEEL "intended to sell his own shares." R.225. In Paragraph 27, the alleged lie is Matlock's claim that he "grabbed a few SXTC" (he purchased shares), and he also allegedly concealed his own stock sales (without identifying a duty to disclose these sales). *Id*. The remaining alleged lies centered on Defendants' own trading done to "entice" others to buy SXTC stock.

The Government similarly isolates a few allegations regarding TRCH to imply that Defendants lied about the company. Br. at 5. As an example, the Government's brief argued that "Hennessey falsely claimed on Twitter he was "[l]ong TRCH for the [the] merger" which was "full steam ahead …". While the Government implies that the tweet was fake news about a merger, the Indictment makes clear that the alleged misrepresentations were that Hennessey had claimed he was "long" and "trading" for a swing, when in fact he had sold his shares. R227 ¶39. The Government has never claimed that the merger news was false because it was not—the merger of TRCH and Metamaterial was announced in February 2021 (at the time of the tweets) and closed in June 2021.[8]

---

[8] *See* Meta-Torchlight Investor Presentation (February 2021), *available at*: https://metamaterial.com/wp-content/uploads/2021/02/META-TRCH-Investor-Presentation-Feb-2021.pdf; *see also* Press Release, Torchlight Energy Resources, Inc., Torchlight Announces Payment of a Special Series A Preferred Stock Dividend, A 1:2 Reverse Stock Split and Planned Closing of The Arrangement Agreement with Metamaterial, Inc. (June 25, 2021) (on file with author)

Last, the Government uses the Indictment's allegations concerning GTT to argue that the object of this alleged scheme was to harm others. Br. at 6. To begin, the actual public misrepresentations pertaining to GTT included in the Indictment were alleged omissions about Defendants' own trading intentions and predictions of future stock prices. R.228-31. As an example, the Government claims that Rybarczyk (not a company insider or financial advisor) tweeted out information "falsely predicting" that GTT's value would "soar." Br. at 5; ROA.229. But the referenced Tweet was about an upcoming "multi billion $$$ catalyst," which the Indictment refers to as false because Rybarczyk neglected to include in the Tweet the "material information" that he intended to sell his own shares. ROA.229 ¶45.

Like the prosecutors before the district court, the Government's brief here relies heavily on Knight's non-public statement to an unidentified individual that "We're robbing f*cking idiots of their money," to argue that the Indictment pled both an intent and scheme to defraud. Br. at 6, 20; ROA.229-30. But what the Government does not include in their brief is the context of Knight's statement, which *is* in the Indictment. ROA.229-30 ¶¶48-49. Knight's blustering about "robbing f*cking idiots" was not about lies he had made or was about to make to the public; it was a characterization about his and CC-2's own *trading* in GTT. *Id*. ¶48 ("KNIGHT described selling his shares of GTT and how "I'm making it look natural . . . . you know, shares going in, shares coming out" and that he was "dumping into

the bid …”); ¶49 (Knight discussed his own trading— his first buy was 35,000 shares of GTT and his next was 7,500). This is made clear by the fact that it was CC-2's comment that he was "add[ing] slowly" (referring to the purchase of shares) which goaded Knight into making his sophomoric "robbing" idiots comment. *Id*. ¶49. Thus, not only does Knight's "robbing f*cking idiots" comment *not* refer to misrepresentations about GTT, but it does not even refer to misrepresentations. It was a remark about *his* trading.[9]

At best, as Judge Hanen wrote, this comment by Knight[10] pertains to whether the Indictment sufficiently alleged a "specific intent to defraud," the *mens rea* of wire fraud. But it says nothing about the *actus rea* of wire fraud—the actual scheme to defraud. The Government must still allege that the scheme's object was to *deprive* Twitter followers of their money. As Judge Hanen observed—"Just because a

---

[9] With respect to the allegation in Paragraph 50 quoting Coopermans's private musings about how Rybarczyk's "minions" reposted his tweets, that allegation does not help the Government for the simple reason that nowhere does Cooperman mention anything about fraud, lies, or causing harm to others. ROA.230 ¶50. While the Government might think that quote is amusing (and it is), it says nothing about a scheme (or even intent) to defraud.

[10] Even if the Government's arguments are fully credited (they should not be), Knight's braggadocio cannot be attributed to anyone but him. Knight, of course, pled guilty and is awaiting the outcome of this appeal before being sentenced. Knight's statement referenced in the Indictment was not made to any charged defendant, it was not in furtherance of a conspiracy, the "we" that Knight refers to appears to reference Knight and the unidentified "CC-2," and no charged Defendant adopted the statement as his own. ROA.229-30. Notably, while GTT (the stock allegedly referenced in Knight's boorish language) is charged in Count VII of the Indictment, Knight, ironically, is *not* charged in that count. Thus, even the Government appears to believe that Knight's statement was about his own trading and not about misrepresentations attributable to others.

conspirator believed he was "robbing … idiots," does not make it so, especially when the mechanism or object of the scheme, as alleged did not deprive others of their traditional property rights." ROA.4173-4174. The allegations in the Indictment, which memorialize what Defendants did (as opposed to what Knight believed), reflect deceptions about Defendants' own positions and trading intentions, which do not suffice to allege a scheme to harm. Put differently, to the extent the Indictment does plead an "intent to defraud" (it does not), it does not allege a "scheme to defraud."

### 2. Calling the scheme a "pump and dump" is not sufficient to allege that the object of the scheme is victims' property.

The Government's brief repeatedly argues the Indictment properly pled a scheme to defraud simply because it uses the generic term "pump and dump" (at times referred to as a "classic" or "prototypical" pump and dump) to describe Defendants' conduct. Br. at 4, 12. The Government even claims that the court's suggestion that victims were not "deprived of money" was "illogical and legally incorrect" because the term "pump and dump" requires "victims to part with their money …". Br. at 11. The Government's arguments are misplaced.

*First*, the term "pump and dump" is not a factual allegation. It is a conclusory description of conduct that has no defined meaning. The Government cites no case holding that using a descriptive generic term such as "pump and dump" suffices to allege a "scheme to defraud." *See Kay*, 359 F.3d at 759 (generic terms that go to the

"core of criminality" (like pump and dump here) do not have to be taken as true). It is the underlying *factual* allegations that matter—not the Government's characterization of those facts with conclusory descriptors.

*Second*, the Government's attempt to piggyback on actual pump and dump schemes by referring to conduct as a "classic" or "prototypical" pump and dump scheme must be rejected. These allegations are not pled in the Indictment and are factually incorrect. A "classic" pump and dump involves an individual or group of individuals who own virtually all of a small, worthless company's free-trading stock. Those individuals then engage in manipulative trading to make it appear that there is volume in the stock, typically combining this trading with misrepresentations (made in paid promotions, blast emails/faxes, or through a boiler room) about the company.

For example, in *United States v. Gordon*, 710 F.3d 1124 (10th Cir. 2013), a case the Government cites: (i) small companies were reverse merged into public shells, (ii) the ownership of the free-trading shares was disguised to make it appear that there were many shareholders, (iii) corporate records were backdated, (iv) the shares were then traded on the OTC (not an exchange), and (v) the materials distributed to promote the stock were rife with lies about the company itself. *Id.* at 1128-34. The lies in *Gordon* went to the "benefit of the bargain" because people

believed (incorrectly) that they were buying stock in a real company that had legitimate market volume.

Likewise, in *United States v. Wey,* No. 15-CR-611, 2017 WL 237651, *1-3 (S.D.N.Y. Jan. 18, 2017), a case the Government also references (Br. at 23), the defendant orchestrated a pump and dump by: (i) employing nominee shell companies, (ii) "covertly amassed beneficial ownership of substantial portions" of those companies (that he needed to, but did not disclose), and (iii) manipulating the stock by, among other methods, engaging in *per se* unlawful match trading. The *Wey* court did not hold that *any* indictment that describes behavior as a "pump and dump" suffices to allege a scheme to defraud.

But perhaps most importantly, the fact patterns in *Gordon* and Wey are different from what is alleged here. Here, Defendants: (i) were Twitter "influencers" who were never company insiders (or even pretended to be); (ii) did not disguise their share ownership through shell companies or nominees; (iii) were not part of control groups who neglected to file beneficial ownership forms; (iv) did not backdate corporate documents; (v) did not engage in wash or match trading; and, (vi) did not Tweet falsely about the underlying companies. None of the allegations about *these* Defendants sought to harm purchasers of the stock, while everything about the deception employed in *Gordon* and *Wey* shows that those defendants *did* have those goals.  Facts matter.

*Third*, contrary to the Government's insinuations, the term "pump and dump" does not "necessarily" mean that "victims" were deprived of money. Br. at 11. The Indictment does not even allege, with respect to any of the specific stocks referenced in the Indictment (ROA.224-49 ¶¶21-115), that Defendants' actions definitively resulted in either an increase in or (and more critically) a *decline* in the stock price due to Defendants' alleged misrepresentations. Without such a stock price decline caused by Defendants' misrepresentations, the Government cannot claim that anyone was injured and deprived of money. *See, e.g., Dura Pharmaceuticals v. Bruodo*, 544 U.S. 336, 346-47 (2005) (Court ruled that an "artificially inflated purchase price" is "not itself a relevant economic loss" complaint must also allege that "share price fell significantly after the truth became known …"). Here, there are no allegations that after the "truth became known" (*i.e.* when Defendants sold shares) that "share price[s] fell significantly," thereby causing injury to "victims."[11] While the Government's brief insists that the Indictment "repeatedly makes clear" that "victims" were deprived of money (Br. at 11), the Indictment itself never once uses the word "victim." This is because, as Judge Hanen concluded, the Indictment pleads a scheme that "is indifferent to its effect on the alleged victims." ROA.4173.

---

[11] It is true that Title 18 securities fraud, like wire fraud, is an inchoate crime that does not require an actual loss in every case. However, to properly allege a scheme to defraud, the Government must show that, *if completed*, the scheme would deprive people of property (cause injury). Here, despite multiple examples in the Indictment of allegedly completed pump and dumps (not to mention the 397 "episodes" the Government sought to introduce at trial), the Government fails to do that.

Put simply, the Government's appellate brief continues to repeat the same mistake the prosecutors made below—it conflates a scheme to make money through misrepresentations that induce transactions, which is not unlawful per *Ciminelli*, with a scheme to deprive victims of property, which requires, as an object, injury to the victim. *See* Br. at 20 (citing Indictment ¶¶14, 105 alleging that Defendants' scheme was to induce people to purchase stock, but which do not describe any injury or intended injury to counterparties).

*Last*, that Defendants did not "scheme to defraud" is obvious when considering these facts. If Defendants truly intended injury to others, they would have: (i) devised a scheme to defraud that embraced lies about the securities themselves; (ii) chosen securities where the volume was so thin that the price would collapse after Defendants' dumped their shares; (iii) engaged in wash and match trading to juice stock volume; and/or (iv) formed control groups so that they had maximum control over the price and volume of that security to "maximize profits." But they did not. Instead, Defendants allegedly lied about their *own trading* and intentions, and then sold their shares thereafter. This lack of semblance to a "traditional" pump and dump reinforces that Judge Hanen was right—the object of the scheme was not to harm others.

     **3.  Other cases that the Government relies on for support will likely be overturned and are inapt.**

In support of its position that *Ciminelli* does not apply because the Indictment does not explicitly plead the "right-to-control" theory, the Government cites other decisions, most prominently, *United States v. Kousisis*, 82 F.4th 230 (3d Cir. 2023), *cert. granted*, 144 S.Ct. 2655 (2024), a case where the Pennsylvania Department of Transportation ("PennDOT") was fraudulently induced to award painting contracts (and money) to the defendant's company. Br. at 21. The fraud that Kousisis intentionally skirted was PennDOT's requirement that a certain percentage of his company's sub-contracts go to disadvantaged business enterprises ("DBE"). Otherwise, the work contracted for was completed. The Government is correct that the Third Circuit affirmed *Kousisis* on the theory that fraudulently inducing an agency to distribute contract money was wire fraud even where the main goals of the contract (in this case, painting work) were not frustrated. The "property" that was the object of the scheme was the contract money.

But on June 17, 2024, just weeks after the Government filed its brief in this case, the Supreme Court granted certiorari in *Kousisis*. The Supreme Court has not decided the case, but *Kousisis'* facts are nearly identical to those of *Ciminelli*, a case the Supreme Court unanimously reversed. The primary difference between the two is that *Ciminelli* was pled as a "right-to-control" case, while *Kousisis* was pled as one of "fraudulent inducement." Thus, *Kousisis* too appears to be on its deathbed, leaving the Government with no viable theory to argue that *Ciminelli* does not apply

47

here because the Indictment was not specifically pled under a "right-to-control" theory. Moreover, to the extent the Supreme Court rejects the *Kousisis* theory of wire fraud—that fraudulently inducing a victim to contract for the payment of monies can be criminal even when the primary object of the contract is not frustrated—as it appears poised to do, that will necessarily mandate rejection of the Indictment here too, which is pled under a similar theory.[12]

Finally, the defendant and the victim in *Kousisis* were in privity of contract, where the victim had the right, under the contract, to expect complete performance of the material terms. Here, there was no alleged contract, agreement, or transaction between Defendants and any alleged victim, rendering *Kousisis* inapplicable on the facts as well.[13]

**4.    The Government frivolously claims that Judge Hanen's decision "call[s] into question" future "prosecutions of pump-and-dump and other market-manipulation fraud schemes." Br. at 23-24.**

To begin with, the court did not rule that the Government had to show that "investors incurred monetary loss." Br. at 23. To the contrary, the court *agreed* with

---

[12] Although the *Kousisis* decision could have significant ramifications for this case, Defendants are not formally requesting a stay. Defendants believe, however, that any decision rendered by this Court could benefit from waiting until after the Supreme Court issues its decision in *Kousisis*, as supplemental brief most likely will be needed.

[13] The two other cases cited by the Government (Br. at 21)—*United States v. Griffin*, 76 F.4th 724 (7th Cir. 2023) and *Baker v. United States*, 21-CV-281, 2023 WL 8234212 (W.D. Tex. Nov. 27, 2023)—encompass fraudulent inducement theories like *Kousisis* and therefore do not need to be independently addressed.

the Government that "success of the scheme is immaterial." *See* ROA.4193. ("the Government has repeatedly argued to this Court that 'success of the scheme is immaterial' … this is an accurate quote from *Greenlaw* with which the Court agrees"). But as the court correctly wrote, that the Government need not prove a realized injury does not relieve the Government from having to allege that the object of the scheme would result, if completed, in the *deprivation* of money or property from a victim. *Id*. As Judge Hanen explained, the Government sought to "convict by intent alone, seemingly collapsing" the "intent to defraud" and "scheme to defraud" elements into one. *Id*.

Nothing about Judge Hanen's decision challenges the prosecution of actual "pump and dump" schemes. Br. at 23-24. *United States v. Laurienti*, 611 F.3d 530, 537 (9th Cir. 2010) was a Title 15 (Rule 10b-5) securities fraud case, which permits convictions based on "untrue statement[s] of material facts" in connection with securities transactions. Here, the Government intentionally did not charge under Title 15 because while it would have allowed them to avoid the "deprivation of money or property" issues in Title 18, it would have required that the lies be "material to a reasonable investor." *See, e.g., United States v. Bruteyn*, 686 F.3d 318, 323 (5th Cir. 2012). Evidently, the Government did not think it could prove beyond a reasonable doubt that boorish tweets rife with profanity by unaffiliated influencers about their own trades could prove the "material to reasonable investors" element

beyond a reasonable doubt. *Cf.* ROA.245 ¶106(d) (Defendant Constantin Tweeted, "We'll squeeze that seeking alpha hoe. He's short. See you at over $30 b*tches.").[14]

Likewise, *Gordon*, 710 F.3d at 1124 (discussed above), *United States v. Hagen*, 468 F. App'x 373, 375 (4th Cir. 2012), and *United States v. Skelly*, 442 F.3d 94, 100 (2d Cir. 2006) are nothing like this case. *Hagen*, like *Gordon*, involved the reverse merger of a small company into a publicly traded shell, leaving the defendant owning 91.4% of the company; control that he then disguised. The defendant also created websites lying about "the company's business prospects, misstating the company's financial position," and publishing press releases repeating these lies. Nothing about this case would preclude a case such as *Hagen*, where insiders told material lies that deprived investors of their bargain when purchasing stock. And in *Skelly*, as described, although investors purchased stock on the open market, they did so through a broker who had assumed a fiduciary relationship with his customers.

---

[14] In addition to reading the "harm" requirement out of Title 18 property fraud cases, the Government has also maintained that the "materiality" standard in Title 18 securities fraud cases is far *lower* than that of traditional Title 15 securities fraud cases. *See* ROA.3841 (Government argued that materiality can be proven two ways: "if a reasonable person would attach importance to its existence or nonexistence in determining his or her choice of action in the transaction in question" … or "even though only an unreasonable person would rely on it, if the person who made the statement knew or had reason to know his victim was likely to rely on it."). Thus, if the Government is successful here, and people can be charged and convicted of Title 18 cases based purely on deceit—without any requirement that the object of the scheme be to inflict harm—both Title 15 and Title 18 securities fraud statutes could be violated through misrepresentations alone. It would necessarily follow that it will be far easier to convict people of *criminal* Title 18 securities fraud (with a lesser materiality standard) than it would be to even pass a motion to dismiss in a Title 15 *civil* securities fraud case (with the more onerous and objective "reasonable investor" standard).

Conviction in *Skelly* made sense—there was a bargain struck between the broker and his customers that the broker would act in their best interests, and he did not. There was no such relationship here.

Far from prohibiting prosecutions for true pump and dump schemes, dismissal of the Indictment here would provide much needed clarity about a constitutionally vague statute (Title 18 securities fraud) that Government prosecutors have now weaponized to target social media influencers who fail to disclose information about their own portfolios on Twitter, a platform already rife with misinformation.

## CONCLUSION

For these reasons, the district court's decision was correct and should be affirmed by this Court.

SUBMITTED BY:

/s/ *Eric S. Rosen*
**DYNAMIS LLP**
Eric S. Rosen
225 Franklin St., 26th Floor
Boston, MA 02110
(617) 802-9157–telephone
erosen@dynamisllp.com

**HILDER & ASSOCIATES, P.C.**

Q. Tate Williams
Philip H. Hilder
Stephanie K. McGuire
19 Lovett Blvd.
Houston, Texas 77006
(713) 655-9111–telephone
(713) 655-9112–facsimile
philip@hilderlaw.com
tate@hilderlaw.com
stephanie@hilderlaw.com

# CERTIFICATE OF SERVICE

I certify that on September 9, 2024, I caused the foregoing brief to be served upon all Filing Users through the Court's Case Management/Electronic Case Files ("CM/ECF") system.

/s/ *Eric S. Rosen*
**DYNAMIS LLP**
Eric S. Rosen
225 Franklin St., 26th Floor
Boston, MA 02110
(617) 802-9157–telephone
erosen@dynamisllp.com

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), and 5th Cir. R. 32.1: this document contains 12,804 words.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and 5th Cir. R. 32.1 and the type-style requirements of Fed R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word for Mac Version 16.88 in 14-point Times New Roman.

3.      This brief has been scanned for viruses with the most recent version of a commercial virus-scanning program and, according to that program, is free of viruses.

/s/ *Eric S. Rosen*
**DYNAMIS LLP**
Eric S. Rosen
225 Franklin St., 26th Floor
Boston, MA 02110
(617) 802-9157–telephone
erosen@dynamisllp.com