No. 24-20143

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellant**

**v.**

**EDWARD CONSTANTINESCU; PERRY "PJ" MATLOCK; JOHN RYBARCZYK; GARY DEEL; STEFAN HRVATIN; TOM COOPERMAN; MITCHELL HENNESSEY; DANIEL KNIGHT,**

**Defendants-Appellees**

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, D. CT. NO. 4:22-CR-612 (HON. ANDREW S. HANEN)

# REPLY BRIEF FOR THE UNITED STATES


ALAMDAR S. HAMDANI
United States Attorney
THOMAS H. CARTER
Assistant U.S. Attorney
Southern District of Texas

JOHN J. LIOLOS
Criminal Division, Fraud Section

NICOLE M. ARGENTIERI
Principal Deputy Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

ANDREW W. LAING
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Ave. NW
Washington, DC 20530
202.353.8433
andrew.laing@usdoj.gov

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................... ii

ARGUMENT ..................................................................................... 1

I. Pump-And-Dump Schemes Are Prosecutable As Securities Fraud, And The Defendants Identify No Reason To Treat Theirs Differently. .................................................................. 3

II. The Superseding Indictment Plainly Alleges A Scheme To Deprive Victim-Investors Of Their Money. ................................ 7

A. The fraud statutes do not require ultimate financial loss. ......................................................................... 7

B. The defendants' fraud related to the "nature of the bargain." ....................................................................... 11

III. The Defendants Incorrectly Claim That *Ciminelli* Forecloses This Prosecution. .................................................................. 14

CONCLUSION ................................................................................ 18

## TABLE OF AUTHORITIES

### Cases

*Carpenter v. United States*,
484 U.S. 19 (1987) .......... 8

*Ciminelli v. United States*,
598 U.S. 306 (2023) .......... 2, 14, 15, 16

*Cleveland v. United States*,
531 U.S. 12 (2000) .......... 9

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005) .......... 8

*Durland v. United States*,
161 U.S. 306 (1896) .......... 9

*Kelly v. United States*,
590 U.S. 391 (2020) .......... 3

*Kousisis v. United States*,
No. 23-909 (cert. granted June 17, 2024) .......... 17

*McNally v. United States*,
483 U.S. 350 (1987) .......... 9

*Neder v. United States*,
527 U.S. 1 (1999) .......... 8

*Shaw v. United States*,
580 U.S. 63 (2016) .......... 8

*United States v. An*,
--- F. Supp. 3d ---, No. 22-cr-460, 2024 WL 2010017 (E.D.N.Y. May 7, 2024) .......... 17

*United States v. Baker*,
923 F.3d 390 (5th Cir. 2019) .......... 18

*United States v. Bell*,
112 F.4th 1318 (11th Cir. 2024) .......... 13

*United States v. Bolos*,
104 F.4th 562 (6th Cir. 2024) .......... 16

*United States v. Gordon*,
710 F.3d 1124 (10th Cir. 2013) .......... 6

*United States v. Greenlaw*,
84 F.4th 325 (5th Cir. 2023) .......... 9

*United States v. Gumrukcu*,
No. 5:22-cr-58, 2024 WL 3849963 (D. Vt. Aug. 16, 2024) .......... 17

*United States v. Hussain*,
972 F.3d 1138 (9th Cir. 2020) .......... 5

*United States v. Milheiser*,
98 F.4th 935 (9th Cir. 2024) .......... 12

*United States v. Rodriguez*,
732 F.3d 1299 (11th Cir. 2013) .......... 10

*United States v. Takhalov*,
827 F.3d 1307, *modified on denial of reh'g*, 838 F.3d 1168 (11th Cir. 2016) .......... 2, 11

*United States v. Tuchinsky*,
703 F. Supp. 3d 1337 (D. Utah 2023) .......... 17

*United States v. Weimert*,
819 F.3d 351 (7th Cir. 2016) .......... 10

*United States v. Wey*,
No. 15-cr-611, 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017) .......... 6

**Statutes**

18 U.S.C. § 1348 .......... 5, 9

## Other Authorities

3 Wayne R. LaFave, Substantive Criminal Law § 19.7(i)(3) (3d ed. Oct. 2024) ... 8

Br. for Respondent, *Ciminelli v. United States*, 598 U.S. 306 (2023) (No. 21-1170), 2022 WL 10224977 ... 16

*Pump-and-dump scam*, Black's Law Dictionary (12th ed. 2024) ... 3

S. Rep. No. 107-146 (2002) ... 6

## ARGUMENT

Pump-and-dump schemes are fraud schemes that depend for their success on depriving victim-investors of money. In order to enrich themselves, pump-and-dump fraudsters induce victim-investors to buy a designated security the fraudsters already own (in order to "pump" its price) by materially misrepresenting facts relating to the security's value, wait for the value of that security to artificially increase, and then sell (or "dump") their own securities at a profit, leaving victim-investors holding the bag.

The defendants here seem to acknowledge that such pump-and-dump fraud schemes are generally prosecutable under Congress's fraud statutes, but claim that the district court properly dismissed the superseding indictment against them because *their* alleged scheme was not an "*actual* 'pump and dump' scheme[]." Br. 49 (emphasis added).[1] That contention is incorrect. The defendants identify no factual characteristics of their alleged scheme that distinguish it from an "actual" pump-and-dump scheme in any relevant way, and their argument that they are not alleged to have engaged in such a scheme is belied by the plain language of the superseding indictment.

---

[1] "Br." refers to John Rybarczyk's answering brief, which his co-defendants join. "Gov't Br." refers to the Government's opening brief.

Further, the defendants' claim that the superseding indictment merely describes a "scheme to deceive," and not a "scheme to deprive" victim-investors of their money, is unpersuasive. That contention ignores the basic structure of the scheme the superseding indictment describes. Moreover, to the extent the defendants' contention rests on a claim that the indictment must allege (and the Government must ultimately prove) that they intended to cause their victims a net pecuniary loss, that is mistaken. The case law of this Court and the Supreme Court makes clear that an intent to deprive victims of their money or property is sufficient.

Relatedly, the defendants' reliance on *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016), to support their argument that, even if victim-investors were deceived into purchasing securities, the deception "did not go to the nature of the bargain" rings hollow. The victim-investors were deceived regarding key characteristics of the securities they were duped into buying, including the likelihood that their investments would appreciate in value. That is, as the Eleventh Circuit itself recently explained, a core attribute of the securities they bought because of the defendants' lies.

Finally, the defendants misconstrue the Supreme Court's narrow holding in *Ciminelli v. United States*, 598 U.S. 306 (2023), in an unpersuasive effort to

explain how the district court correctly relied on it when granting their motion to dismiss.

This Court should reverse.

## I. Pump-And-Dump Schemes Are Prosecutable As Securities Fraud, And The Defendants Identify No Reason To Treat Theirs Differently.

The money-or-property fraud statutes require money or property to be "an object of the fraud." *Kelly v. United States*, 590 U.S. 391, 402 (2020) (internal quotation marks omitted). Pump-and-dump schemes can only succeed if victim-investors are induced to part with their money and purchase securities about which they have been deceived. In that way, victim-investors' money is unmistakably "an object" of a pump-and-dump securities fraud scheme, and it was here, as the superseding indictment makes explicit: it alleges that the defendants, taking advantage of their substantial social media followings, ROA.217-219, repeatedly disseminated lies about securities they held in order to induce victim-investors to part with their money and buy those securities, ROA.216-217 ("To carry out the scheme, the defendants . . . posted messages on social media platforms with false, positive information about the security . . . to induce other investors to buy the security and artificially drive up its price . . . ."). The pump-and-dump scheme alleged in the superseding indictment is consistent with the typical, dictionary-defined operation of such schemes. *Pump-and-dump scam*, Black's Law Dictionary (12th ed. 2024) ("A fraudulent scheme

or practice whereby one or more unscrupulous stockholders generate interest in a stock, luring new (usu. unsophisticated) investors to artificially drive up the price before the original stockholders sell their holdings at a grossly inflated price, thereby ultimately causing the stock's price to plummet. The methods used to generate interest include circulating rumors or making false, misleading, or grossly exaggerated statements, often on social-media platforms or through other channels used by unsophisticated investors. See *securities fraud* under FRAUD."). As explained in detail in the Government's opening brief, this kind of Internet-based pump-and-dump scheme comfortably maps onto the elements of securities fraud. Gov't Br. 13-15.

Significantly, the defendants seem to agree that "actual pump and dump schemes" are indeed fraud schemes and are prosecutable as such (Br. 43), but they insist that *their* scheme was meaningfully different. They observe that certain other cases involving pump-and-dump schemes involved different facts, emphasizing that the defendants in this case: were not "company insiders"; "did not disguise their share ownership"; "were not part of control groups who neglected to file beneficial ownership forms"; "did not backdate corporate documents"; "did not engage in wash or match trading"; and "did not Tweet falsely about the underlying companies." Br. 44.

Even assuming that these claims accurately characterize the defendants' alleged conduct,[2] the defendants fail to explain why any of these purported factual distinctions *matter* for purposes of securities fraud. They do not. Section 1348 does not require a fraudster to be an "insider," to neglect to file a form, to backdate a document, or to trade in a particular way. 18 U.S.C. § 1348 (criminalizing schemes "to defraud any person in connection with . . . any security" meeting certain criteria, as well as schemes "to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of . . . any security" meeting certain criteria); *see also United States v. Hussain*, 972 F.3d 1138, 1145-1146 (9th Cir. 2020) ("[Section 1348] was intended to provide prosecutors with a

[2] Although the defendants baldly assert that they "did not Tweet falsely about the underlying companies" (Br. 44), the superseding indictment includes several allegations that they did just that. *See, e.g.*, ROA.220 ("false and misleading messages" included "[m]essages concerning 'due diligence' about the security and purported catalysts that would increase the security's price over time"), ROA.229 ("RYBARCZYK falsely claimed in a tweet" regarding GTT, "'major multi billion $$$ catalyst'"), ROA.245-246 ("CONSTANTIN falsely claimed in a tweet" regarding DATS, "'lots of catalysts on the way'"). In any event, the defendants fail to explain why this or any of the other facts they highlight would place their pump-and-dump scheme beyond the reach of the fraud statutes. As explained in greater detail below, the defendants' alleged lies, including those regarding their own holdings and intentions as well as those regarding the companies at issue, related to the odds that the victim-investors' investments would increase in value, a core reason why people buy stocks.

different—and broader—enforcement mechanism to address securities fraud than what had been previously provided." (internal quotation marks omitted)).[3]

And none of the cases the defendants struggle to distinguish depended in a relevant way on any of the facts they emphasize. For example, the defendants list (Br. 43-44) several factual distinctions between this case and *United States v. Gordon*, 710 F.3d 1124 (10th Cir. 2013), such as the fact that that case involved "reverse merge[rs]" and the backdating of corporate records. But none of those facts were necessary to the court's holding that the evidence sufficed to prove a fraudulent pump-and-dump scheme—a scheme that turned on "false and misleading" "information disseminated in . . . promotional campaigns," such as "an advertisement representing that 'Wall Street expectations' were good" and "'made up' information" regarding "projected growth numbers." *Id.* at 1142-1143. Likewise, the defendants list (Br. 44) facts that separate their alleged conduct from the conduct at issue in *United States v. Wey*, No. 15-cr-611, 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017), but, again, they fail to explain how these incidental facts (such as the presence of "shell companies" or the use of "*per se*

[3] *See generally* S. Rep. No. 107-146, at 20 (2002) ("[Section] 1348 will be more accessible to investigators and prosecutors and will provide needed enforcement flexibility and, in the context of publicly traded companies, protection against all the types [of] schemes and frauds which inventive criminals may devise in the future.").

unlawful match trading") were necessary to the analysis. They were not. *See id.* at *10 (crediting allegations that defendant "sought to 'defraud the investing public' and to 'obscure from the investing public' his ownership and control over the" securities, and explaining that this sort of "alleged 'pump and dump' scheme" "is, by its very nature, designed to generate economic benefits at the expense of unwary consumers" (internal quotation marks omitted)).

Rather than grapple with the elements of securities fraud, the defendants strain to distinguish their scheme from other schemes that they concede are fraudulent in an apparent attempt to graft additional, atextual requirements onto the money-or-property fraud statutes. The Government is unaware of any case in which a court has held that any of the incidental facts the defendants collect (Br. 44) are *required* in a securities fraud prosecution, and the defendants provide none. This Court should reject the defendants' attempt to distinguish their alleged scheme from any of the other mine-run pump-and-dump schemes courts and commentators have long understood to be fraudulent.

## II. The Superseding Indictment Plainly Alleges A Scheme To Deprive Victim-Investors Of Their Money.

### A. The fraud statutes do not require ultimate financial loss.

The defendants argue throughout their brief that the superseding indictment alleges a scheme to "deceive" victim-investors, but not a scheme to "deprive" them of their money. Br. 1, 3, 7, 22-42. Relatedly, they argue that a

pump-and-dump scheme is only prosecutable as fraud if it causes "a *decline* in the stock price due to Defendants' alleged misrepresentations," "thereby causing injury to 'victims.'" Br. 45.[4] But, as explained in the Government's opening brief, the fraud statutes do not require a showing of ultimate unreimbursed financial *loss*. *Shaw v. United States*, 580 U.S. 63, 67 (2016) ("But the [bank fraud] statute, while insisting upon 'a scheme to defraud,' demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss.").

[4] The defendants also cite *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), for the proposition that merely purchasing a security at an inflated price does not cause an "economic loss" in the context of private federal securities fraud actions. Br. 45. That statutory requirement is irrelevant to the elements of criminal money-or-property fraud, which—unlike private, civil securities fraud actions—include no analogous net "economic loss" requirement. *Shaw v. United States*, 580 U.S. 63, 68 (2016) ("[C]ommentators have made clear that on the criminal side, it is generally held that the lack of financial loss is no defense to false pretenses." (internal quotation marks omitted)); *Carpenter v. United States*, 484 U.S. 19, 26 (1987) (rejecting argument "that a scheme to defraud requires a monetary loss"). That different treatment makes good sense insofar as *private* securities fraud actions exist to allow recovery of damages—"to protect [investors] against those economic *losses* that misrepresentations *actually cause*," *Dura Pharmaceuticals*, 544 U.S. at 345 (emphasis added)—but *criminal* securities fraud encompasses fraudulent schemes even when there may be no pecuniary damages. *See generally* 3 Wayne R. LaFave, Substantive Criminal Law § 19.7(i)(3) (3d ed. Oct. 2024) (explaining that, with respect to crime of "false pretenses," "a civil suit would not lie against the defendant when the victim suffered no damage," "[b]ut on the criminal side, it is generally held that the lack of financial loss is no defense"); *Neder v. United States*, 527 U.S. 1, 24-25 (1999) ("The common-law requirement[] of . . . 'damages[]' . . . plainly ha[s] no place in the federal fraud statutes.").

Indeed, in its very first decision interpreting the phrase "scheme or artifice to defraud," the Supreme Court upheld mail fraud convictions where the defendant's misrepresentations about future earnings induced the victims to buy bonds, rejecting the defendant's argument that the scheme was merely one to breach a contract. *Durland v. United States*, 161 U.S. 306, 312-314 (1896) (observing that "[i]t is common knowledge that nothing is more alluring than the expectation of receiving large returns on small investments"); *see McNally v. United States*, 483 U.S. 350, 356-357 (1987) (discussing *Durland*).

As this Court has explained, "the 'scheme to defraud' and 'intent to defraud' elements must be based on property interests," and there is "a fine line differentiating conduct that is merely deceitful[] from conduct that 'wrong[s] one in his property rights.'" *United States v. Greenlaw*, 84 F.4th 325, 343-344 (5th Cir. 2023) (quoting *Cleveland v. United States*, 531 U.S. 12, 19 (2000)) (second brackets in *Greenlaw*).[5] But this Court also expressly acknowledged that a fraud defendant need not inflict monetary *loss* in order to deprive a victim of money

[5] As *Greenlaw* makes clear, the fraud schemes § 1348 criminalizes must also involve material misrepresentations. 84 F.4th at 340. The defendants baselessly suggest that this materiality requirement was essential to the Government's charging decisions in the course of speculating as to why they were charged with securities fraud under 18 U.S.C. § 1348 rather than Title 15. Br. 49-50 & n.14.

or property, and it affirmed the defendants' fraud convictions where they concealed key attributes of the funds into which they induced investors to invest, notwithstanding "the fact that the Government did not present evidence showing that investors incurred monetary loss." *Id.* at 346; *see also id.* at 345 ("[A] rational trier of fact could infer that Appellants participated in a scheme to obtain something of value—namely, money.").

Of course, the defendants are correct (Br. 24) that deception "standing alone" is not a deprivation of property.[6] Rather, as alleged in the superseding indictment, the defendants' deception regarding key characteristics of the securities they sought to pump and dump was the *means* by which they targeted the object of the fraud scheme: the victim-investors' money, which they

---

[6] The defendants are also correct in suggesting that it is not the case "that *any* misrepresentation that induces a transaction constitutes Title 18 fraud . . . ." Br. 30. The hypothetical examples of cases they assert could be prosecuted under "[t]he Government's current theory" are unpersuasive. For example, a "car salesperson who tells a customer that he cannot lower the car's price" likely has not made a material misrepresentation insofar as he has engaged in a commonplace negotiating tactic. *See United States v. Weimert*, 819 F.3d 351, 357-358 (7th Cir. 2016) (statements of "negotiating position" in car sale "should not be considered material for purposes of mail and wire fraud statutes"). Innocuous false statements of enthusiasm by a prospective home buyer would, like "puffery" or "'sellers' talk'" falsely inflating a vendor's enthusiasm, likewise not be regarded as material misrepresentations. *See United States v. Rodriguez*, 732 F.3d 1299, 1303-1304 (11th Cir. 2013). On the other hand, "a Twitter user with a single follower who touts a security hoping that it will increase in value so he can sell"—if the "tout[ing]" consists of knowing, material misrepresentations calculated to induce investment—may well have committed securities fraud.

surrendered when they bought the securities. *See, e.g.*, ROA.220 (alleging defendants would "post[] false and misleading information about the security . . . so that other investors were induced to purchase the security and artificially increase its price").

**B. The defendants' fraud related to the "nature of the bargain."**

The defendants also argue (Br. 27-31) that a line of cases requiring schemes to defraud to involve "lies about the nature of the bargain itself" forecloses this prosecution, contending that the victim-investors "received shares of stock in exchange for money, which is what they paid for," and deception that merely induces such a transaction is not fraud. The defendants overread these cases, which are fully consistent with the theory of fraud liability reflected in the superseding indictment, while understating their own alleged deception.

In *United States v. Takhalov*, the Eleventh Circuit emphasized that schemes to defraud are only "those schemes in which a defendant lies about the nature of the bargain itself," and the court reversed wire fraud convictions in which purported victims were lured into a bar under false pretenses but received exactly the drinks they paid for. 827 F.3d 1307, *modified on denial of reh'g*, 838 F.3d 1168 (11th Cir. 2016). The court emphasized, however, that prosecutable lies about the "nature of the bargain" can include both lies about "the price" as well as lies about "the characteristics of the good." *Id.* at 1313-1314. Other courts of

appeals have reached similar conclusions on analogous facts. *See, e.g.*, *United States v. Milheiser*, 98 F.4th 935, 940-945 (9th Cir. 2024) (holding defendants did not deprive purported victim businesses of the "benefit of the bargain" where they received exactly the toner they paid for at the agreed price and collecting cases, while emphasizing that "[a] misrepresentation will go to the nature of the bargain if it goes to price or quality, or otherwise to essential aspects of the transaction," which "may depend on the specific transaction at issue").

This line of cases is fully consistent with the theory of fraud liability reflected in the superseding indictment. In order to induce victim-investors to purchase a security, thereby artificially inflating its price, the defendants allegedly misrepresented, among other things, "a purported price target for the security that was significantly higher than the price at which the security was currently trading, and that was higher than the defendants actually valued the security," as well as "'due diligence' about the security and purported catalysts that would increase the security's price over time." ROA.220. In other words, the defendants allegedly misrepresented key characteristics of the securities: characteristics that affected the likelihood that they would appreciate in value.

The Eleventh Circuit recently arrived at exactly this conclusion in a case involving analogous facts. In *United States v. Bell*, the defendants owned a currency-exchange business that sold Iraqi dinar, the value of which was

"pegged," making it unattractive to "professional traders" but "popular with retail investors because of perennial rumors that the Iraqi government would soon 'revalue' the currency and its value would skyrocket." 112 F.4th 1318, 1327 (11th Cir. 2024) (brackets omitted). Although the defendants "did not believe that a revaluation was likely or imminent," they promoted "misinformation," encouraging "the spread of false revaluation rumors" and otherwise "len[ding] credibility to the idea that a revaluation was likely." *Id.* at 1328-1329. The defendants were convicted of mail and wire fraud. *Id.* at 1327. They argued on appeal, much like the defendants here, that the Government's theory of liability was foreclosed by *Takhalov* because the victim-investors received exactly what they paid for (*i.e.*, the dinar they expected at the price they expected). *Id.* at 1332.

The Eleventh Circuit expressly rejected that argument, suggesting that the defendants were reading *Takhalov* too broadly and explaining that "[a] deception need not have a calculable price difference or result in a different tangible good or service being received to constitute fraud." *Id.* at 1332. In *Bell*, the court reasoned, the jury "could reasonably have found that [the defendants] deceived investors about a core attribute of the dinar: *the odds of its appreciation*." *Id.* at 1333 (emphasis added). In short, "both fraud-in-the-factum and fraudulent

inducement schemes fit squarely within the well-settled meaning of actionable fraud." *Id.* at 1334 (internal quotation marks omitted).

Just so here. The superseding indictment alleges that the defendants deceived victim-investors about core attributes of the securities they were duped into buying, in particular the odds that those same securities would soon appreciate in value. Just as a "lottery fraudster" who lies about the odds that a lottery ticket buyer will win the jackpot has committed fraud "if [the buyer] would not have paid [for the ticket] knowing his true odds," *id.* at 1333, these defendants lied about their "view that the securit[ies] would increase in price[] and the price the securit[ies] could reach[ ]to induce other investors to buy the securit[ies]," ROA.217.

## III. The Defendants Incorrectly Claim That *Ciminelli* Forecloses This Prosecution.

As explained in the Government's opening brief, Gov't Br. 16-22, the district court's dismissal of the superseding indictment was primarily based on a misreading of the Supreme Court's recent decision in *Ciminelli v. United States*, 598 U.S. 306 (2023). ROA.4173. The defendants repeat many of the same mistakes in their answering brief, mischaracterizing *Ciminelli* in two principal ways.

*First*, the defendants resist the plain language of *Ciminelli* itself and argue that it was not "solely about the 'right to control,'" observing that the original

indictment in that case charged that the Buffalo Billion contracts themselves (and not a right to potentially valuable economic information) were the property at issue. Br. 35-36. But *Ciminelli* repeatedly makes explicit that the soundness of the right-to-control theory, as relied on by the Government, the district court, and the Second Circuit, was the exclusive focus of the Court's legal analysis. 598 U.S. at 311-312 ("We granted certiorari to determine whether the Second Circuit's right-to-control theory of wire fraud is a valid basis for liability . . . ."); *id.* at 314 ("The right-to-control theory cannot be squared with the text of the federal fraud statutes . . . ."); *id.* at 317-318 (Alito, J., concurring) ("I do not understand the Court's opinion to address . . . the Government's ability to retry petitioner on the theory that he conspired to obtain, and did in fact obtain, by fraud, a traditional form of property, viz., valuable contracts.").

The defendants quote the Government's Supreme Court brief in *Ciminelli* in an attempt to argue that the Government took the position "that fraudulently inducing a transaction to make money (but without having 'harm' as the objective) *is* the right-to-control theory," Br. 36-37, but they misread the Government's brief. The Government did *not* argue before the Supreme Court that the Second Circuit's articulation of the right-to-control theory—that the right to potentially valuable economic information, standing alone, is a property right—was a correct statement of the law. Br. for Respondent at 25-26, *Ciminelli*

*v. United States*, 598 U.S. 306 (2023) (No. 21-1170), 2022 WL 10224977 ("If, however, the right to make informed decisions about the disposition of one's assets, without more, were treated as the sort of 'property' giving rise to wire fraud, it would risk expanding the federal fraud statutes beyond property fraud as defined at common law and as Congress would have understood it."). Rather, the Government contended that certain right-to-control cases decided by the Second Circuit, in which the Second Circuit imposed the additional requirement of "actual or contemplated tangible economic harm" "beyond what the fraud statutes require," could all have been upheld under a traditional money-or-property theory, including *Ciminelli* itself. *Id.* at 26-43. But the Supreme Court made clear that it simply declined to reach the Government's argument that the Court could affirm "on the alternative ground that the evidence was sufficient to establish wire fraud under a traditional property-fraud theory." *Ciminelli*, 598 U.S. at 316-317.

Consistent with this explicit limitation, numerous courts have correctly understood *Ciminelli* to be confined to rejecting the right-to-control theory, not the entire universe of fraudulent inducement. *See, e.g.*, *United States v. Bolos*, 104 F.4th 562, 570 (6th Cir. 2024) (holding *Ciminelli* did not foreclose prosecution of scheme to induce pharmacy benefit managers into contracts where object of fraud was "to obtain the *money* from them"); *United States v. Gumrukcu*, No. 5:22-

cr-58, 2024 WL 3849963, at *6 & n.3 (D. Vt. Aug. 16, 2024) ("Post-*Ciminelli*, other courts have also held that fraud in the inducement of a contract that pertains to the material terms of the bargain may support a wire fraud case where the object of the fraud is a traditional property interest, such as money." (collecting cases)); *United States v. An*, --- F. Supp. 3d ---, No. 22-cr-460, 2024 WL 2010017, at *8 (E.D.N.Y. May 7, 2024) ("*Ciminelli* did not reject the premise that depriving a victim of information in order to induce the victim to part with traditional property can be fraud. *Ciminelli* simply rejected the notion that *information itself can be property*."); *United States v. Tuchinsky*, 703 F. Supp. 3d 1337, 1343 & n.53 (D. Utah 2023) (explaining court's "interpretation of the narrow reach of *Ciminelli* is consistent with other courts who have addressed this question," and collecting cases). The defendants cite no case (other than the district court's opinion), and the Government is aware of none, in which any court has interpreted *Ciminelli* as expansively as they ask this Court to do.[7]

*Second*, the defendants seem to suggest (Br. 37-38) that it was significant that *Ciminelli* was a case in which "the defendants contracted with victims,"

[7] The Government generally agrees with the defendants (Br. 47-48 & n.12) that the Supreme Court's upcoming decision in *Kousisis v. United States*, No. 23-909 (cert. granted June 17, 2024), may elaborate on these principles in a relevant way, and the Government would not object if this Court were to hold this case in abeyance pending the Supreme Court's decision.

noting that, in this case, "there was neither a contract nor a transaction between Defendants and alleged victims, making it even clearer that this is a case about the deprivation of valuable economic information (not money)." Nowhere in *Ciminelli* is there any indication that contractual privity has become an element of money-or-property fraud, and this Court has made clear that the fraud statutes reach schemes in which defendants seek to deprive victims of their money or property, even when that money or property does not flow directly from the victims to the defendants. *See United States v. Baker*, 923 F.3d 390, 403-405 (5th Cir. 2019). Indeed, elsewhere in their brief, the defendants appear to concede that the fraud statutes do not impose a "'mirror image' or convergence requirement." Br. 31. Whether or not the defendants transacted with the victim-investors directly is irrelevant and does not change the fact that *Ciminelli* cannot justify the district court's dismissal of the superseding indictment.

**CONCLUSION**

For the foregoing reasons, and those set forth in the Government's opening brief, this Court should reverse the judgment of the district court.

Respectfully submitted,

ALAMDAR S. HAMDANI
United States Attorney
THOMAS H. CARTER
Assistant U.S. Attorney
Southern District of Texas

JOHN J. LIOLOS
Criminal Division, Fraud Section

NICOLE M. ARGENTIERI
Principal Deputy Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

s/ Andrew Laing
ANDREW W. LAING
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Ave. NW
Washington, DC 20530
202.353.8433
andrew.laing@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on October 10, 2024, I caused the foregoing brief to be served upon all Filing Users through the Court's Case Management/Electronic Case Files ("CM/ECF") system. I additionally served the foregoing brief upon Carlos M. Fleites, counsel for defendant Hrvatin, via email and identical hard copy.

s/ Andrew Laing
ANDREW W. LAING
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Ave. NW
Washington, DC 20530
202.353.8433
andrew.laing@usdoj.gov

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 4,353 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (a)(6) because it has been prepared in a proportionally spaced, 14-point font in text and footnotes using Word for Microsoft 365.

3. This brief has been scanned for viruses with the most recent version of a commercial virus-scanning program and, according to that program, is free of viruses.

s/ Andrew Laing
ANDREW W. LAING
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Ave. NW
Washington, DC 20530
202.353.8433
andrew.laing@usdoj.gov