

No. 24-20143

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

PERRY "PJ" MATLOCK,

Defendant-Appellee Pro Se

(Edward Constantinescu, et al., Co-Defendants-Appellees)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
NO. 4:22-CR-612

## PETITION FOR REHEARING *EN BANC*

**Perry "PJ" Matlock, pro se**
74 N Lamerie Way
The Woodlands, Texas 77382
Telephone: 832-346-7936
Email: pjmatlock@protonmail.com
Defendant-Appellee

## CERTIFICATE OF INTERESTED PARTIES

The undersigned certifies that the following persons and entities have an interest in the outcome of this case, as described in 5th Cir. R. 28.2.1, so that the judges may evaluate possible disqualification or recusal.

1. Perry "PJ" Matlock, Defendant-Appellee.

2. United States of America, Plaintiff-Appellant.

3. Edward Constantinescu, Co-Defendant.

4. John Rybarczyk, Co-Defendant.

5. Gary Deel, Co-Defendant.

6. Stefan Hrvatin, Co-Defendant.

7. Tom Cooperman, Co-Defendant.

8. Mitchell Hennessey, Co-Defendant.

9. Daniel Knight, Co-Defendant.

No publicly traded company owns 10% or more of any party's stock.

Perry "PJ" Matlock, pro se
74 N. Lamerie Way
The Woodlands, Texas 77382
Telephone: 832-346-7936
Email: pjmatlock@protonmail.com
Dated: October 14, 2025

## STATEMENT UNDER FED. R. APP. P. 40(b)(2)

I express a good faith belief that this petition meets the requirements of FRAP 40(b)(1). As a pro se litigant, I respectfully submit with the utmost respect for this Court's jurisprudence and the panel's thoughtful decision, rehearing *en banc* is warranted because (1) the panel decision conflicts with controlling Supreme Court precedent on securities materiality—*TSC Industries, Basic, Omnicare, Matrixx,* and *Macquarie*—by permitting a § 1348 prosecution without any alleged material misrepresentation or omission about an issuer or its securities; and (2) the case presents a question of exceptional importance: whether self-referential trading commentary, optimistic opinions, and puffery (e.g., "holding," "adding," "ripping right now," "$10+ IMO") can satisfy the materiality element of criminal securities fraud, absent any falsehood about corporate facts. *See* Fed. R. App. P. 40(b)(2) (as amended 2024) (standards formerly in Rule 35); 5th Cir. R. 40 (replacing former Rule 35).

## INTRODUCTION

This Court has safeguarded federal fraud limits per Supreme Court precedent. The panel correctly applied *Kousisis*, holding fraudulent inducement satisfies the 'money or property' element without net loss. *See Kousisis*, 145 S. Ct. 1382, 1394. Respectfully, the opinion did not fully address the very crucial and separate threshold element of materiality. Section 1348 requires a "scheme to defraud,"

1

which necessarily includes a material misrepresentation or omission, not merely
conduct that influences others. *See Greenlaw*, 84 F.4th 325, 339 (5th Cir. 2023)
(scheme requires a material misrepresentation).

Here, the superseding indictment does not allege any materially false
statement or omission about an issuer or a security. Instead, it pleads non-material
items: self-referential trading snapshots ("holding," "adding"), personal opinions
("$10+ IMO"), and puffery ("ripping right now," "setting up beautifully")—
deemed "false" by the government because defendants allegedly sold sooner than
implied or concealed their intent to sell, not because anyone misstated an issuer's
financials, operations, or corporate events. The government's own briefing
confirms this, it argued the "material" falsehoods were "self-referential trading
statements" like "holding" or "grabbed a few," allegedly false because defendants
"concealed their intent to sell" (*see* Gov't Opp'n to Dismiss, ECF 295 at 7–9) not
because of any fabricated company or issuer fact.

The government may argue materiality is a jury issue or statements 'capable
of influencing' followers are material, but this confuses influence with materiality
and does not resolve the main issue that a material false statement is not even
alleged in the superseding indictment. The Supreme Court has long held that
securities-law materiality is issuer-focused and objective, turning on whether a
reasonable investor would view the statement as significantly altering the "total

2

mix" of information about the issuer or the security itself. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988). Influence alone is not materiality, and opinions, predictions, and puffery are not false facts absent insincerity or an embedded falsehood. *See Omnicare, Inc. v. Laborers Dist. Council*, 575 U.S. 175, 184–89 (2015); *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 262–63 (2024). While the government need only allege, not prove, each element, the indictment must still plead a material falsehood. *See* Fed. R. Crim. P. 7(c)(1); *United States v. Davis*, 53 F.4th 833, 841 (5th Cir. 2022). The government may claim materiality is a jury question, that presumes the indictment alleges a material falsehood in the first place—which it does not.

Even if the panel's reversal on the property element stands, this Court should grant rehearing *en banc*—or at a minimum, issue guidance—clarifying the meaning of materiality in this context: an objective, reasonable-investor standard focused on issuer-level facts, not subjective influence over online followers or non-fiduciary trading/market commentary. Without clear guardrails, any market-influencing opinion risks criminalization, chilling ordinary speech and transforming puffery and opinion into felony fraud—contrary to decades of Supreme Court precedent.

## BACKGROUND

3

The panel reversed the district court's *Ciminelli*-based dismissal (rejecting "right-to-control" theories), holding the indictment alleged fraudulent inducement under *Kousisis*, 145 S. Ct. at 1394. See Panel Op. at 3–6 (No. 24-20143) (5th Cir. Oct. 2, 2025).[1] It described misrepresenting trading positions to induce purchases while dumping shares. Id. at 1–2."[1] The panel also recognized that an indictment must allege "each material element" of the offense and that § 1348 requires a "scheme to defraud," which in turn demands a material misrepresentation. *Id.* at 3 (citing *Greenlaw*, 84 F.4th 325, 339 (5th Cir. 2023)).

The superseding indictment, however, pleads no material issuer-level falsehood. Its core theory is that defendants allegedly posted "false and misleading" social-media messages about "holding" or "adding" shares, posting price targets, and at times using terms like "due diligence" or "catalysts" (e.g., GTT (¶ 45), SURF (¶¶ 59, 61), DATS (¶ 106))[2]—while concealing their intent to induce other investors to purchase the securities so that defendants could sell their own shares at a profit. But the indictment never ties those words to any specific false corporate fact (such as a fabricated merger, news, contracts, earnings, clinical result, or regulatory event). Paragraph 14 of the indictment makes clear the alleged

---

[1] A copy of the panel's opinion is attached as an unmarked appendix, as required by 5th Cir. R. 40.2.2.

[2] *See* Superseding Indictment ("SI") ¶¶ 13–14 (charging "holding/swing," "adding," price targets, and "due diligence/catalysts," and tying "material falsity" to concealed intent to sell); GTT (¶ 45) ("catalyst"); SURF (¶¶ 59, 61) ("due diligence" / "tons of dd"); DATS (¶ 106) ("upcoming catalysts," "DD looking good").

4

"falsity" is defendants' concealed trading intent, not a misstatement about the

companies or issuers themselves; the count examples (e.g., TRCH) label tweets

"false" because of contemporaneous selling, not because any merger reference was

untrue. Across all TRCH counts (SI ¶¶ 32–42), the indictment cites tweets like

"core swing," "adding," or "ripping right now." Each is labeled to be a "false

statement" solely due to contemporaneous selling (as alleged in SI ¶ 14), not

misstated issuer facts.[3] No count alleges any false corporate information. The tweet

referencing a merger—"to be done soon"—accurately reflected public disclosures.

The TRCH–Metamaterial transaction had been announced months earlier and was

later completed, as shown by *Torchlight Energy Resources, Inc., Current Report*

*(Form 8-K) (Dec. 14, 2020), Ex. 99.1* (announcing the definitive arrangement

agreement with Metamaterial Inc.); *Amendment to Arrangement Agreement (Ex.*

*2.1) (Feb. 3, 2021)* (confirming and updating terms); and *Meta Materials Inc.,*

*Current Report (Form 8-K) (June 28, 2021)* (reporting the closing and ticker

change).[4] Statements like "probably going to 3" or "$10+ IMO" were opinions, not

assertions of fact, and are therefore non-actionable under *Omnicare, Inc. v.*

---

[3] *See* SI ¶¶ 32–42 (TRCH exemplars labeled "false" because of contemporaneous selling); *see also* Meta Materials Inc., Form 8-K (June 28, 2021) (closing of Torchlight–Meta Materials merger and ticker change to MMAT).

[4] These publicly filed SEC documents confirm that the TRCH–Metamaterial merger was a real, publicly disclosed corporate event: announced on Dec. 14, 2020, reaffirmed on Feb. 3, 2021, and completed on June 28, 2021. Thus, the tweet's statement that the "merger [was] to be done soon" reflected a *true*, already-public issuer fact and at most conveyed a timing opinion, not a material misrepresentation.

*Laborers Dist. Council*, 575 U.S. 175, 184–89 (2015). This pattern holds across all counts (SXTC, GTT, SURF, DATS; SI ¶¶ 21–115): no allegation misstates corporate financials, operations, or events. For example, SXTC's "still holding" (SI ¶ 24), GTT's "catalyst" (SI ¶ 45), SURF's "due diligence" (SI ¶¶ 59, 61), and DATS's "DD looking good" (SI ¶ 106) are vague references untied to specific false issuer facts, instead labeled false for concealed selling intent—a non-material omission absent any fiduciary or statutory duty (e.g., under Sections 13(d) or 13(g) for beneficial-ownership reporting, or Section 16 for insider-trading disclosure). *See Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 262 (2024); *United States v. Harris*[5], 821 F.3d 589, 600 (5th Cir. 2016). Under *TSC/Basic* and *Omnicare/Macquarie*, such self-referential plans and optimism are not "material misrepresentations" as a matter of law.

The government may respond that the indictment alleged "material falsehoods," such as a few references to terms like "due diligence" or "catalysts."[6] But the charging document quotes no issuer-level misstatement tied to those terms.

---

[5] *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 262–63 (2024) (Rule 10b-5(b) does not reach pure omissions; liability is for half-truths when one speaks); *United States v. Harris*, 821 F.3d 589, 600 (5th Cir. 2016) (no omission liability absent a duty to disclose).

[6] To the extent the government suggested defendants touted "fake due diligence" or "fake catalysts," such assertions cannot amend or cure the indictment's text. *See* Russell v. United States, 369 U.S. 749, 770 (1962) (indictment must stand on its allegations; defects are not cured by later gloss); *United States v. Davis*, 53 F.4th 833, 841 (5th Cir. 2022) (indictment must allege each material element). The indictment alleges no fabricated issuer fact; its theory of "falsity" is concealed selling intent. *See* SI ¶ 14.

It never alleges that any identified "catalyst" did not exist, that any "due diligence" was fabricated, or that any specific corporate fact (merger, contract, earnings, clinical result, or regulatory action) was false. Rather, paragraph 14 makes clear that the alleged "falsity" is defendants' concealed trading intent—not any untrue statement about the issuers themselves. On a motion testing the sufficiency of an indictment, that pleading choice controls: conclusory references to "DD" or "catalysts" do not transform self-referential trading talk and optimism into material issuer-level misstatements under *TSC/Basic* and *Omnicare/Macquarie*. At oral argument, the panel recognized that statements like "I'm holding" or "I think it will reach [a price]" are not themselves false statements about issuer value.[7] In response, the Government suggested defendants made statements "about the underlying value of the company," including "due diligence" and "catalysts." But the Superseding Indictment does not plead any fabricated merger, contract, earnings, clinical result, or other specific issuer event; paragraph 14 ties "falsity" to concealed intent to sell, not to any untrue issuer fact.

---

[7] Oral Argument Recording, *United States v. Constantinescu*, No. 24-20143 (5th Cir. Sept. 3, 2025), at 8:30–8:41 (Judge: "There's no false statement in that"; Government: pivoting to "underlying value," "due diligence," and "catalysts.").

## ARGUMENT

## I.   SECURITIES MATERIALITY IS ISSUER-FOCUSED, REQUIRING A SUBSTANTIAL LIKELIHOOD OF ALTERING THE "TOTAL MIX" FOR A REASONABLE INVESTOR—NOT MERE INFLUENCE ON FOLLOWERS

The Supreme Court has "carefully" defined materiality to avoid overbreadth: a statement is material only if a reasonable investor would view it as "significantly alter[ing] the 'total mix' of information made available" about the issuer or security. *TSC Industries*, 426 U.S. at 448–49; *Basic*, 485 U.S. at 231–32.[8]

Materiality is an objective standard. A statement or omission is "material" only if there is a substantial likelihood that a reasonable investor would consider it important—i.e., that its disclosure would significantly alter the "total mix" of information available about the security. See *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49 (1976); *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988). The "reasonable investor" is an objective, prudent person evaluating a security based on issuer fundamentals like financials, operations, and events—not impulsive reactions to social media commentary or personal trading talk. The "total mix" concerns issuer and security-focused facts—earnings, assets,

---

[8] *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49 (1976) (materiality requires a substantial likelihood that disclosure would have significantly altered the "total mix" of information); *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (adopting *TSC* for Rule 10b-5).

operations, mergers, regulatory events—not a commentator's personal trading plans or enthusiasm. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (no duty to disclose "any and all" information; only to cure half-truths about issuer facts); *Macquarie*, 601 U.S. at 262–63 (pure omissions not actionable without duty; liability for half-truths misleading about issuer matters).[9] Absent a fiduciary or statutory duty (e.g., Sections 13(d), 13(g), or 16), defendants had no obligation to disclose personal trading plans, rendering alleged "omissions" non-actionable. *See Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 262 (2024) ("Rule 10b-5(b) does not proscribe pure omissions"); *United States v. Harris*, 821 F.3d 589, 600 (5th Cir. 2016). Notably, nothing in the securities laws or fraud jurisprudence creates a duty to update or continuously disclose one's evolving trading intentions in this context. Once defendants truthfully stated their positions at a given moment, they were under no obligation to later announce sales absent a fiduciary or statutory duty—which concededly does not exist here. See Macquarie, 601 U.S. at 262 ('Rule 10b-5(b) does not proscribe pure omissions').

The government may argue that by initially speaking about their trading positions, defendants created a duty to continually update their intent. But absent a

---

[9] *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (no duty to disclose "any and all" information; duty arises to make statements made not misleading); *Macquarie*, 601 U.S. at 262–63 (pure omissions not actionable under Rule 10b-5(b)).

fiduciary relationship or statutory obligation, no such duty exists under securities law for pure omissions of personal plans. See *Macquarie*, 601 U.S. at 262 (Rule 10b-5 does not reach pure omissions; duty arises only for half-truths misleading about stated facts—and even then, only if those facts are material issuer matters, not personal trading intent). Here, the alleged 'half-truths' are self-referential and do not embed or mislead about any issuer-level fact.

Opinions and puffery are presumptively immaterial. An opinion (e.g., '$10+ IMO') is actionable only if embedding a verifiable false issuer fact, as the indictment's reliance on sales timing alone fails to plead insincerity. *Omnicare*, 575 U.S. at 184–89. Here, the indictment alleges no such insincerity or embedded falsehood; instead, it deems opinions "false" solely for concealed selling intent, which does not meet *Omnicare's* standard. Vague optimism ("ripping right now") is puffery at best—"exaggerated, vague, or general statements" no reasonable investor treats as fact. Id. at 183–84; *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968) (*en banc*).

Two limits foreclose the government's likely responses. First, the decisionmaker is an objective "reasonable investor." While reliance *per se* is not an element of § 1348, the materiality standard incorporates whether a reasonable investor would justifiably rely on the statement as significant to the issuer's value—not subjective reactions from followers to non-fiduciary commentary. See

*Basic*, 485 U.S. at 247. *TSC/Basic* demand: would the statement alter the issuer's "total mix" for a reasonable investor evaluating fundamentals? Not whether it influenced day-traders. Treating influence as materiality would criminalize any speech that has the potential to affect decisionmakers, contradicting *Kousisis*'s "demanding materiality requirement [that] substantially narrows the universe of actionable misrepresentations." 145 S. Ct. at 1387, 1394. Second, subject matter is key: materiality reaches issuer facts (or half-truths misleading about them)—not self-referential trading talk (see *Omnicare*, 575 U.S. at 184–89; *Macquarie*, 601 U.S. at 262). The government may invoke *Neder's* "capable of influencing" phrasing, but that describes how to test materiality; *TSC, Basic, Omnicare, Macquarie* define what counts as material in securities cases—issuer-centric and objective, not mere influence. Equating materiality with influence risks First Amendment and vagueness problems, criminalizing protected market commentary.

**II.** THE INDICTMENT PLEADS NO ISSUER-LEVEL MATERIAL
   FALSEHOOD[10]—ONLY TRADING-INTENT TALK AND OPTIMISTIC
   OPINIONS

---

[10] The SEC defines pump-and-dump schemes as involving "false or misleading statements about the company" to boost prices (SEC Investor.gov, "Pump and Dump Schemes," available at https://www.investor.gov/protect-your-investments/fraud/types-fraud/pump-and-dump-schemes). The indictment alleges no such company falsehoods—only personal intent—failing this standard.

Taking the allegations as true, the indictment fails as a matter of law: it labels trading commentary "false" solely for concealed selling intent, not issuer misstatements. *See* SI ¶¶ 13–14 (falsehoods about "holding/swing," "adding," price targets, "due diligence/catalysts" because defendants sold). No count alleges falsity in corporate facts—e.g., for TRCH, the merger was public and completed, yet the tweets are deemed false for implying holding while selling, per the indictment's own theory. *See* SI ¶¶ 32–42; *see also Meta Materials* Form 8-K (June 28, 2021).[11] That is not material: "merger to be done soon" matched issuer disclosures; "probably going to 3" and "$10+ IMO" are opinions or puffery at best. *Omnicare*, 575 U.S. at 184–89. The government may again retort in oral argument that it alleged 'false catalysts' or 'due diligence,'[12] but the indictment quotes none tied to any specific false issuer facts—only personal predictions and vague terms deemed "false information" for "concealed selling intent," which are immaterial as a matter of law. *See TSC*, 426 U.S. at 449; *Macquarie*, 601 U.S. at 262.

Across all examples (SXTC, TRCH, GTT, SURF, DATS), the same pattern holds: no false financials, operations, or events; just non-fiduciary intent non-

---

[11] "Merger to be done soon" matched public disclosures; "probably going to 3" and "$10+ IMO" are opinions/puffery under Omnicare, 575 U.S. at 184–89.

[12] At oral argument, government counsel asserted statements about "due diligence" or "catalysts" are "more obviously objectively false" (Oral Arg. Recording at 8:40-9:13, No. 24-20143 (5th Cir. Sept. 3, 2025), available at https://www.ca5.uscourts.gov/OralArgRecordings/24/24-20143_9-3-2025.mp3). But the indictment alleges no such false issuer facts—only concealed intent—underscoring the theory's overreach.

disclosure. *See* SI ¶¶ 21–115. Under *TSC/Basic/Omnicare/Matrixx/Macquarie*, this does not alter the issuer's total mix for a reasonable investor.

**III.    *NEDER* DOES NOT EXPAND SECURITIES-LAW MATERIALITY;**

**  *KOUSISIS* CONFIRMS MATERIALITY IS A DEMANDING LIMIT**

The government leaned on *Neder v. United States*, 527 U.S. 1 (1999), for the broad phrase "capable of influencing the decisionmaker," then argued that because posts influenced followers, materiality is satisfied. That misreads *Neder* and ignores context. *Neder* addressed general fraud statutes (mail/wire/bank) in cases involving lies about property-relevant facts (e.g., income on a loan application). *Neder* describes how to test materiality; *TSC/Basic/Omnicare/Matrixx/Macquarie* define what counts as material in the securities context: issuer-focused, total-mix significance for a reasonable investor. Treating *Neder*'s phrasing as a stand-alone rule in securities cases would criminalize influence itself: any analyst, anchor, or influencer whose speech influences investment decisions—even while making no false issuer statement—could be indicted. That is not the law, and it raises obvious First Amendment and due-process concerns. The Supreme Court's recent guidance forecloses this overreach. In *Kousisis*, the Court approved a fraudulent-inducement theory only while emphasizing materiality's limiting role: "Materiality of falsehood is an element and a limit of the federal fraud statutes," and the "demanding materiality requirement substantially narrows the universe of

actionable misrepresentations." 145 S. Ct. at 1387, 1394 (cleaned up) (quoting *Escobar*).[13] That is flatly inconsistent with a theory that treats any statement that happens to influence as "material," irrespective of issuer-level content.

## IV. *CIMINELLI/KELLY* ADDRESS THE PROPERTY ELEMENT; THEY DO NOT ERASE MATERIALITY—WHICH THE GOVERNMENT MUST STILL PLEAD AND PROVE

The district court dismissed on *Ciminelli* grounds (rejecting "right-to-control" informational theories). The panel, relying on *Kousisis* (not *Ciminelli*), held that a fraudulent-inducement theory can satisfy the 'money or property' element without a net-loss showing. Panel Op. at 3–6.[14] Even if that is correct, it does not eliminate the materiality requirement. A fraudulent-inducement theory still requires a material misrepresentation; without one, there is no "scheme to defraud," only speech that influenced. That is precisely what *TSC, Basic, Omnicare, Matrixx, Macquarie* forbid.

## V. WHY LIMITED *EN BANC* CLARIFICATION IS NECESSARY NOW

---

[13] *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 193–94 (2016) (materiality is "demanding").

[14] At oral argument, the panel noted Judge Hanen accepted a guilty plea from co-defendant Knight "post-*Ciminelli*" (Oral Arg. Audio at 15:40, available at https://www.ca5.uscourts.gov/OralArgRecordings/24/24-20143_9-3-2025.mp3). However, Knight's plea was in March 20, 2023—before *Ciminelli* (May 11, 2023)—while the dismissal was in March 20, 2024 (post-*Ciminelli*).

This prosecution rests on conflating influence with materiality. The charging document does not quote a single false issuer statement by Mr. Matlock or his co-defendants; its operative theory is concealed personal trading intent coupled with optimism/prediction. *See* SI ¶¶ 13–14, 32–42. Even if the panel's reversal on the property element stands, this Court should grant rehearing *en banc*—or at minimum, clarify the definition of materiality in this context—to ensure uniform application of Supreme Court precedent and to provide clear guardrails on an issue of exceptional importance.

## VI.   THIS CASE CLEANLY PRESENTS A MATTER OF LAW, NOT A FACT DISPUTE FOR A JURY

Materiality is often fact-intensive, but not where the alleged statements are, as a matter of law, opinions/puffery or self-referential trading talk that do not alter the issuer-level total mix. *See Basic*, 485 U.S. at 240; *Omnicare*, 575 U.S. at 184–89; *Macquarie*, 601 U.S. at 262. Taking the indictment's allegations as true, the government still fails to allege any material issuer-level misstatement or half-truth. That legal insufficiency warrants dismissal at the pleading stage—especially in a criminal case where the Supreme Court has repeatedly cautioned against expansive fraud theories. *See Kelly v. United States*, 590 U.S. 391 (2020); *Ciminelli*, 598 U.S. 306.

## WHY *EN BANC* REVIEW IS ESSENTIAL

**1.**    Conflicts with Supreme Court precedent. Allowing a § 1348 prosecution to proceed without any alleged issuer-focused misstatement conflicts with *TSC/Basic/Omnicare/Matrixx/Macquarie*'s materiality/half-truth framework.

**2.**    Exceptional importance / guardrails for speech. Treating non-material online banter and personal trading snapshots as criminal misrepresentations would chill everyday market commentary (on X, TV, podcasts, forums) and transform influence into fraud. *Kousisis* underscores that materiality is a demanding limit; this case is the right vehicle to articulate clear guardrails.

**3.**    The record squarely tees up materiality. The issue has been preserved and repeatedly flagged—including in defendants' Rule 28(j) submission after *Kousisis*, emphasizing materiality's limiting role.[15] The panel may affirm or reverse on any ground supported by the record; the absence of any alleged issuer-level falsehood is dispositive.

## CONCLUSION

The superseding indictment does not allege a material misrepresentation about any issuer or security. It alleges self-referential trading comments and opinions, then deems them "false" because defendants allegedly sold sooner or differently

---

[15] Defendants' counsel, Eric Rosen, specifically highlighted in a footnote that *Kousisis* raised the materiality bar, ensuring this issue was squarely presented below.

than some followers expected. That theory collapses materiality into mere

influence and cannot be reconciled with *TSC, Basic, Omnicare, Matrixx,*

*Macquarie*—or with *Kousisis*'s insistence that materiality is a demanding limit on

federal fraud. Respectfully, the Court should grant rehearing *en banc*, vacate the

panel decision, and affirm the district court's dismissal, or provide such other relief

as justice requires, as the indictment fails to allege an actual crime. At minimum,

the Court should clarify that securities-fraud materiality remains issuer-focused

("total mix" for a reasonable investor) and cannot be satisfied by self-referential

trading talk or puffery—ensuring clear guardrails for what is and is not

prosecutable speech in modern markets.


This petition contains 3890 words, excluding exempted parts (FRAP 32(f)).

Prepared in 14-pt Times New Roman.


Respectfully submitted,

Perry "PJ" Matlock, pro se
74 N Lamerie Way
The Woodlands, Texas 77382
Telephone: 832-346-7936
Email: pjmatlock@protonmail.com

Dated: October 14, 2025

17

EX-2.1 2 d114700dex21.htm EX-2.1

*Exhibit 2.1*

*Execution Version*

Exhibit B – EX 2.1

## AMENDMENT TO ARRANGEMENT AGREEMENT

**THIS AMENDING AGREEMENT** dated Febraury 3, 2021

**AMONG:**

> **TORCHLIGHT ENERGY REOURCES, INC.**, a corporation existing under the Laws of the State of Nevada ("**RTO Acquiror**")
>
> - and -
>
> **METAMATERIAL EXCHANGECO INC.**, a corporation existing under the Laws of the Province of Ontario and formerly named 2798832 ONTARIO INC. ("**Canco**")
>
> - and -
>
> **2798831 ONTARIO INC.**, a corporation existing under the Laws of the Province of Ontario ("**Callco**")
>
> - and -
>
> **METAMATERIAL INC.**, a corporation existing under the Laws of the Province of Ontario ("**Meta**")

**RECITALS:**

A.  On December 14, 2020, the Parties entered into the arrangement agreement (the "**Arrangement Agreement**").

B.  The Parties wish to amend the Arrangement Agreement on the terms and conditions contained in this amending agreement (the "**Amending Agreement**").

C.  Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Arrangement Agreement.

      **THIS AMENDING AGREEMENT WITNESSES THAT** in consideration of the covenants and agreements herein contained and other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the Parties hereto covenant and agree as follows:

1.  Section 2.2(d) of the Arrangement Agreement is deleted in its entirety and replaced with the following:

> "fix the date of the Meta Meeting, which date shall be no later than March 31, 2021, give notice to RTO Acquiror of the Meta Meeting, and allow RTO Acquiror and RTO Acquiror's Representatives (including legal counsel) to attend the Meta Meeting;"

2. The first sentence of Section 2.3 of the Arrangement Agreement is deleted in its entirety and replaced with the following:

"As soon as reasonably practicable after the date of this Agreement, and in any event no later than February 28, 2021, Meta shall apply to the Court in a manner and on terms acceptable to RTO Acquiror, acting reasonably, pursuant to Section 182 of the OBCA and, in cooperation with RTO Acquiror, prepare, file and diligently pursue an application for the Interim Order, which shall provide, among other things:"

3. Section 2.4(a) of the Arrangement Agreement is deleted in its entirety and replaced with the following:

"Meta agrees to convene and conduct the Meta Meeting in accordance with the Interim Order, the constating documents of Meta and applicable Law as soon as practicable, and in any event no later than March 31, 2021;"

4. The reference to "February 1, 2021" in the first sentence of Section 2.11(a) of the Arrangement Agreement is deleted in its entirety and replaced with the words "March 31, 2021".

5. Section 7.6 of the Arrangement Agreement is amended by adding the following at the end thereof:

"Upon the closing of the Pre-Closing Financing, RTO Acquiror shall pay to Meta an amount equal to $5,00,0000 in cash to an account identified by Meta in writing in exchange for a third unsecured promissory note substantially in the same form as the Bridge Notes. In the event this Agreement is terminated, and Closing does not otherwise occur, then Meta shall be obligated to repay to RTO Acquiror, on the one (1)-year anniversary of the closing of the Pre-Closing Financing, an amount equal to $5,400,000 (which amount represents the outstanding principal of $5,000,000 plus interest accrued on such principal at the rate of 8% per annum), as set forth in such third bridge note."

6. The form of Plan of Arrangement attached as Schedule "A" to the Arrangement Agreement is deleted in its entirety and replaced with the form of Plan of Arrangement attached as Schedule "A" hereto.

7. Except as otherwise expressly provided herein, the Arrangement Agreement is hereby ratified and confirmed in all respects and shall remain and continue in full force and effect.

8. The Parties hereby agree that on and after the date first referenced above, each reference in the Arrangement Agreement to "this Agreement" shall mean and be a reference to the Arrangement Agreement, as amended by this Amending Agreement.

9. This Amending Agreement shall be governed, including as to validity, interpretation and effect, by the Laws of the Province of Ontario and the Laws of Canada applicable therein. Each of the Parties hereby irrevocably attorns to the non-exclusive jurisdiction of the courts of the Province of Ontario in respect of all matters arising under and in relation to this Amending Agreement. EACH PARTY TO THIS AMENDING AGREEMENT HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AMENDING AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF THE PARTIES IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT OF THIS AMENDING AGREEMENT.

-2-

10. Each Party hereto shall, from time to time, and at all times hereafter, at the request of any other Party, but without further consideration, do, or cause to be done, all such other acts and execute and deliver, or cause to be executed and delivered, all such further agreements, transfers, assurances, instruments or documents as shall be reasonably required in order to fully perform and carry out the terms and intent hereof and the transactions contemplated hereby.

11. This Amending Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument. The Parties shall be entitled to rely upon delivery of an executed facsimile, portable document format or similar executed electronic copy of this Agreement, and such facsimile, portable document format or similar executed electronic copy shall be legally effective to create a valid and binding agreement between the Parties.

*[Remainder of page intentionally left blank.]*

-3-

IN WITNESS WHEREOF RTO Acquiror, Canco, Callco and Meta have caused this Amending Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**TORCHLIGHT ENERGY REOURCES, INC**

By: /s/ John A. Brda
    Name: John A. Brda
    Title: Chief Executive Officer

**METAMATERIAL EXCHANGECO INC.**

By: /s/ John A. Brda
    Name: John A. Brda
    Title: Chief Executive Officer

**2798831 ONTARIO INC.**

By: /s/ John A. Brda ·
    Name: John A. Brda
    Title: Chief Executive Officer

**METAMATERIAL INC.**

By: /s/ George Palikaras
    Name: George Palikaras
    Title: Chief Executive Officer

**[Amending Agreement – Arrangement Agreement]**

**SCHEDULE "A"**
**PLAN OF ARRANGEMENT**

See attached.

## PLAN OF ARRANGEMENT

### ARTICLE 1
### INTERPRETATION

**1.1  Definitions**

In this Plan of Arrangement:

"**affiliate**" has the meaning ascribed thereto in the *Securities Act* (Ontario), as amended.

"**Agency**" means any domestic or foreign court, tribunal, federal, state, provincial or local government or governmental agency, department or authority or other regulatory authority (including the Exchange and NASDAQ) or administrative agency or commission (including the Securities Authorities and the SEC) or any elected or appointed public official.

"**Ancillary Rights**" means the interest of a holder of Exchangeable Shares as a beneficiary of the trust created under the Voting and Exchange Trust Agreement.

"**Arrangement**" means an arrangement under Section 182 of the OBCA on the terms and subject to the conditions set out in this Plan of Arrangement, subject to any amendments or variations hereto made in accordance with this Plan of Arrangement and the Arrangement Agreement or made at the direction of the Court.

"**Arrangement Agreement**" means the arrangement agreement made as of December 14, 2020 between RTO Acquiror, Canco, Callco and Meta, as amended, supplemented and/or restated in accordance with its terms.

"**Articles of Arrangement**" means the articles of arrangement of Meta in respect of the Arrangement required by the OBCA to be sent to the Director after the Final Order is made, which shall be in a form and content satisfactory to the Parties, each acting reasonably.

"**Automatic Exchange Right**" has the meaning ascribed thereto in the Voting and Exchange Trust Agreement.

"**Business Day**" means a day other than a Saturday, a Sunday or any other day on which commercial banking institutions in Toronto, Ontario or Houston, Texas are authorized or required by applicable Law to be closed.

"**Callco**" means (i) 2798831 Ontario Inc., being a direct or indirect wholly-owned subsidiary of RTO Acquiror incorporated under the laws of the Province of Ontario or (ii) any other direct or indirect wholly-owned subsidiary of RTO Acquiror designated by RTO Acquiror from time to time after the Effective Date in replacement thereof.

"**Canadian Resident**" means (i) a person who is not a non-resident of Canada for the purposes of the ITA, or (ii) a partnership that is a "Canadian partnership" for purposes of the ITA.

"**Canco**" means Metamaterial Exchangeco Inc. (formerly named 2798832 Ontario Inc.), a wholly-owned subsidiary of RTO Acquiror, incorporated under the laws of the Province of Ontario that issues the Exchangeable Shares pursuant to the Arrangement.

"**Certificate of Arrangement**" means the certificate of arrangement to be issued by the Director pursuant to subsection 183(2) of the OBCA in respect of the Articles of Arrangement.

"**Change of Law**" means any amendment to the ITA and other applicable provincial income tax laws that permits holders of Exchangeable Shares who are Canadian Resident, who hold their Exchangeable Shares as capital property, and who deal at arm's length with RTO Acquiror and Canco (all for the purposes of the ITA and other applicable provincial income tax laws) to exchange their Exchangeable Shares for RTO Acquiror Shares on a basis that will not require such holders to recognize any gain or loss or any actual or deemed dividend in respect of such exchange for the purposes of the ITA or applicable provincial income tax laws.

"**Change of Law Call Date**" has the meaning set out in Section 5.3(a).

"**Change of Law Call Purchase Price**" has the meaning set out in Section 5.3(a).

"**Change of Law Call Right**" has the meaning set out in Section 5.3(a).

"**Consideration**" means the consideration to be received by Meta Shareholders pursuant to the Plan of Arrangement in respect of each Meta Share that is issued and outstanding immediately prior to the Effective Time, being either the RTO Acquiror Share Consideration or the Exchangeable Share Consideration as elected by a Meta Shareholder or as otherwise determined in accordance with Section 2.3 in respect of each Meta Share held.

"**Court**" means the Ontario Superior Court of Justice (Commercial List).

"**CRA**" means the Canada Revenue Agency.

"**Current Market Price**" has the meaning set out in the Exchangeable Share Provisions.

"**Depositary**" means the person acting as depositary under the Arrangement.

"**Director**" means the Director appointed pursuant to Section 278 of the OBCA.

"**Dissent Rights**" has the meaning set out in Section 3.1.

"**Dissenting Shareholder**" means a holder of Meta Shares that has duly and validly exercised Dissent Rights and who is ultimately entitled to be paid the fair value of such holder's Meta Shares as determined in accordance with Section 3.1.

"**Dividend Amount**" means an amount equal to all declared and unpaid dividends on an Exchangeable Share held by a holder thereof on any dividend record date which occurred prior to the date of purchase, redemption or other acquisition of such share by Callco, Canco or RTO Acquiror from such holder.

"**Effective Date**" means the date shown on the Certificate of Arrangement giving effect to the Arrangement.

"**Effective Time**" means 12:01 a.m. (Toronto time) on the Effective Date.

"**Election Deadline**" means 11:00 a.m. (Toronto time) on March 11, 2021, or, if the Meta Meeting is adjourned or postponed, prior to 11:00 a.m. (Toronto time) on the Business Day immediately prior to the date of such adjourned or postponed Meta Meeting.

-2-

**"Eligible Holder"** means a Meta Shareholder who is (i) a Canadian Resident, and (ii) not exempt from tax under Part I of the ITA (or, in the case of a partnership, none of the partners of which is exempt from tax under Part I of the ITA).

**"Exchange"** means the Canadian Securities Exchange, the Toronto Stock Exchange or such other recognized securities exchange upon which the Exchangeable Shares may be listed for trading from time to time.

**"Exchange Ratio"** means the number of RTO Acquiror Shares or Exchangeable Shares that a Meta Shareholder will receive at the Effective Time in exchange for each one (1) Meta Share held, determined as follows:

$$A = B/C$$

where

A = the number of RTO Acquiror Shares or Exchangeable Shares to be received in exchange for each one (1) Meta Share, rounded to three decimal places;

B = the Meta Shareholders' proportionate share of the total pro forma number of RTO Acquiror Shares to be outstanding upon completion of the Arrangement, which for greater certainty will be equal to 75% of the total pro forma number of outstanding RTO Acquiror Shares upon completion of the Arrangement (including any RTO Acquiror Shares issued or issuable by RTO Acquiror pursuant to any working capital financing of up to US$5,000,000 permitted pursuant to Section 5.3(b)(i) of the Arrangement Agreement, which are intended to be 100% dilutive to RTO Acquiror Shareholders, but excluding any RTO Acquiror Shares issued or issuable by RTO Acquiror pursuant to the Pre-Closing Financing Transaction to raise amounts in excess of such US$5,000,000 threshold, which are intended to be proportionally dilutive to each party at 75% to Meta Shareholders and 25% to RTO Acquiror Shareholders), subject to further adjustment upward for any other RTO Acquiror Shares issued or issuable prior to the Effective Time that are intended to be 100% dilutive to RTO Acquiror Shareholders; and

C = the number of Meta Shares outstanding immediately prior to the Effective Time.

**"Exchange Time"** means the time that the steps in Sections 2.2(b), 2.2(c), 2.2(d) and 2.2(e) occur.

**"Exchangeable Elected Shares"** means Meta Shares (other than Meta Shares held by RTO Acquiror or an affiliate) that the holder thereof shall have elected, in accordance with Section 2.3(a) in a duly completed Letter of Transmittal and Election Form deposited with the Depositary no later than the Election Deadline, to transfer to Canco under the Arrangement for the Exchangeable Share Consideration.

**"Exchangeable Share Consideration"** means the consideration in the form of Exchangeable Shares, together with Ancillary Rights, elected for each Meta Share by a Meta Shareholder (other than a Dissenting Shareholder) pursuant to Section 2.3(a), which shall be that number of Exchangeable Shares equal to the Exchange Ratio for each Meta Share held immediately prior to the Effective Time.

-3-

"**Exchangeable Share Provisions**" means the rights, privileges, restrictions and conditions attaching to the Exchangeable Shares, which rights, privileges, restrictions and conditions shall be in substantially the form set out in Appendix I hereto.

"**Exchangeable Shares**" means the exchangeable shares in the capital of Canco having the rights, privileges, restrictions and conditions set forth in the Exchangeable Share Provisions.

"**Final Order**" means an order of the Court granted pursuant to Section 185 of the OBCA, in a form acceptable to each of RTO Acquiror and Meta, each acting reasonably, approving the Arrangement after a hearing upon the procedural and substantive fairness of the terms and conditions of the Arrangement, as such order may be affirmed, amended, modified, supplemented or varied by the Court (with the consent of RTO Acquiror and Meta, each acting reasonably) at any time prior to the Effective Date or, if appealed, as affirmed or amended (provided, however, that any such amendment is acceptable to RTO Acquiror and Meta, each acting reasonably) on appeal, unless such appeal is withdrawn, abandoned or denied.

"**Governmental Entity**" means (i) any multinational or supranational body or organization, nation, government, state, province, country, territory, municipality, quasi-government, administrative, judicial or regulatory authority, agency, board, body, bureau, commission, instrumentality, court or tribunal or any political subdivision thereof, or any central bank (or similar monetary or regulatory authority) thereof, any taxing authority, any ministry or department or agency of any of the foregoing, (ii) any self-regulatory organization or stock exchange, including the Exchange and NASDAQ, (iii) any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government; and (iv) any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of such entities or other bodies pursuant to the foregoing.

"**holder**" means the holder of Meta Shares, Meta Options or Meta Warrants shown from time to time in the central securities register maintained by or on behalf of Meta in respect of such securities, as the context requires.

"**including**" means "including without limitation" and "**includes**" means "includes without limitation".

"**Interim Order**" means an order of the Court in a form acceptable to each of RTO Acquiror and Meta, acting reasonably, providing for, among other things, the calling and holding of the Meta Meeting, as the same may be amended by the Court with the consent of RTO Acquiror and Meta, each acting reasonably.

"**ITA**" means the *Income Tax Act* (Canada), as amended.

"**Law**" means, with respect to any person, any and all applicable law (statutory, common, civil or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, order, injunction, judgment, decree, ruling or other similar requirement, whether domestic or foreign, enacted, adopted, promulgated or applied by a Governmental Entity that is binding upon or applicable to such person or its business, undertaking, property or securities, and to the extent that they have the force of law, policies, guidelines, notices and protocols of any Governmental Entity, as amended.

"**Letter of Transmittal and Election Form**" means the letter of transmittal and election form for use by holders of Meta Shares or other securities of Meta, in the form accompanying the Meta Circular.

-4-

"**Liquidation Amount**" has the meaning set out in the Exchangeable Share Provisions.

"**Liquidation Date**" has the meaning set out in the Exchangeable Share Provisions.

"**Meta**" means Metamaterial Inc., a corporation governed under the OBCA.

"**Meta Arrangement Resolution**" means the special resolution of Meta Shareholders, Meta Optionholders, Meta Warrantholders and holders of Meta DSUs approving the Arrangement to be considered at the Meta Meeting.

"**Meta Circular**" means the notice of the Meta Meeting and accompanying management proxy circular, including all schedules, appendices and exhibits thereto and enclosures therewith, sent to the Meta Shareholders, as required by the Court in the Interim Order, in connection with the Meta Meeting, as amended, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement.

"**Meta DSU**" means a deferred share unit of Meta.

"**Meta Meeting**" means the special meeting of Meta Shareholders, Meta Optionholders, Meta Warrantholders and holders of Meta DSUs including any adjournment or postponement thereof, to be called and held in accordance with the Interim Order to consider the Meta Arrangement Resolution, and for any other purpose as may be set out in the Meta Circular.

"**Meta Non-Canadian Subsidiaries**" means Metamaterial Technologies USA, Inc. and Medical Wireless Sensing Ltd.

"**Meta Optionholders**" means the holders at the relevant time of Meta Options.

"**Meta Options**" means, at any time, options exercisable to acquire Meta Shares granted under the Option Plan which are, at such time, outstanding, whether or not vested.

"**Meta Shareholders**" means the holders of Meta Shares.

"**Meta Shares**" means issued and outstanding common shares in the capital of Meta.

"**Meta Warrantholders**" means the holders at the relevant time of Meta Warrants.

"**Meta Warrants**" means the common share purchase warrants to acquire Meta Shares which are at such time outstanding.

"**NASDAQ**" means the NASDAQ Capital Market.

"**OBCA**" means the *Business Corporations Act* (Ontario), as amended.

"**Option Plan**" means the stock option plan of Meta approved by Meta Shareholders on October 10, 2019.

"**person**" includes any individual, firm, partnership, limited partnership, limited liability partnership, joint venture, venture capital fund, limited liability company, unlimited liability company, association, trust, trustee, executor, administrator, legal personal representative, estate, body corporate, corporation, company, unincorporated association or organization, Governmental Entity, syndicate or other entity, whether or not having legal status.

-5-

"**Plan of Arrangement**" means this plan of arrangement.

"**Pre-Closing Financing**" has the meaning set out in the Arrangement Agreement.

"**Redemption Call Purchase Price**" has the meaning set out in Section 5.2(a).

"**Redemption Call Right**" has the meaning set out in Section 5.2(a).

"**Redemption Date**" has the meaning set out in the Exchangeable Share Provisions.

"**RTO Acquiror**" means Torchlight Energy Resources, Inc., a corporation existing under the laws of the State of Nevada.

"**RTO Acquiror Note**" has the meaning set out in Section 2.3(g)

"**RTO Acquiror Replacement Option**" means an option to acquire RTO Acquiror Shares to be issued by RTO Acquiror in consideration for the cancellation of each Meta Option.

"**RTO Acquiror Share Consideration**" means the consideration in the form of RTO Acquiror Shares elected or deemed to be elected for each Meta Share by a Meta Shareholder (other than a Dissenting Shareholder) pursuant to Section 2.3, which shall be that number of RTO Acquiror Shares equal to the Exchange Ratio for each Meta Share held immediately prior to the Effective Time.

"**RTO Acquiror Shares**" means the common stock, par value U.S.$0.01 per share, in the capital of RTO Acquiror.

"**SEC**" means the U.S. Securities and Exchange Commission.

"**Securities Authorities**" means all securities regulatory authorities, including the applicable securities commission or similar regulatory authorities in each of the provinces and territories of Canada, the SEC, the Exchange, and the NASDAQ, that are applicable to Meta or RTO Acquiror, as the case may be.

"**Special Voting Share**" means the special voting share in the capital of RTO Acquiror having substantially the rights, privileges, restrictions and conditions described in the Voting and Exchange Trust Agreement.

"**Support Agreement**" means an agreement to be made among RTO Acquiror, Callco and Canco in connection with this Plan of Arrangement substantially in the form and substance of Schedule I to the Arrangement Agreement.

"**Tax Election Package**" means two copies of CRA form T2057, or, if the Meta Shareholder is a partnership, two copies of CRA form T2058 and two copies of any applicable equivalent provincial or territorial election form, which forms have been duly and properly completed and executed by the Meta Shareholder in accordance with the rules contained in the ITA or the relevant provincial legislation.

-6-

"**Transfer Agent**" means AST Trust Company (Canada) or such other person as may from time to time be appointed by Canco as the registrar and transfer agent for the Exchangeable Shares.

"**US Dollars**" or "**US$**" means United States dollars.

"**Voting and Exchange Trust Agreement**" means an agreement to be made among RTO Acquiror, Canco and the Trustee (as defined in the Exchangeable Share Provisions) in connection with this Plan of Arrangement substantially in the form of Schedule J to the Arrangement Agreement, as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

### 1.2 Headings and References

The division of this Plan of Arrangement into Sections and the insertion of headings are for convenience of reference only and do not affect the construction or interpretation of this Plan of Arrangement. Unless otherwise specified, references to Sections are to Sections of this Plan of Arrangement.

### 1.3 Currency

Except as expressly indicated otherwise, all sums of money referred to in this Plan of Arrangement are expressed and shall be payable in US Dollars.

### 1.4 Time

Time shall be of the essence in each and every matter or thing herein provided. Unless otherwise indicated, all times expressed herein are local time at Toronto, Ontario.

## ARTICLE 2
## THE ARRANGEMENT

### 2.1 Binding Effect

Subject to the terms of the Arrangement Agreement, the Arrangement will become effective at the Effective Time and shall be binding at and after the Effective Time on Meta, RTO Acquiror, Canco, Callco, the Depositary, the Trustee and all holders and beneficial holders of Meta Shares, Meta Options, Meta DSUs and Meta Warrants including Dissenting Shareholders.

### 2.2 The Arrangement

Commencing at the Effective Time on the Effective Date, subject to the terms and conditions of the Arrangement Agreement, the following shall occur as part of the Arrangement and shall be deemed to occur in the following order (except that the steps in Sections 2.2(b), 2.2(c), 2.2(d), 2.2(e) and 2.2(f) shall be deemed to occur simultaneously) without any further act or formality:

(a)    each Meta Share held by a Dissenting Shareholder shall be deemed to be transferred by the holder thereof, without any further act or formality on its part, free and clear of all Encumbrances, to Meta and Meta shall thereupon be obliged to pay the amount therefor determined and payable in accordance with Article 3 hereof, and the name of such holder shall be removed from the central securities register of Meta as a holder of Meta Shares and Meta shall be recorded as the registered holder of the Meta Shares so transferred and shall be deemed to be the legal owner of such Meta Shares, which Meta Shares shall thereupon be cancelled;

-7-

(b)    each Meta Option outstanding immediately prior to the Effective Time shall, without further action or formality by or on behalf of the holders thereof, be exchanged for an RTO Acquiror Replacement Option to purchase from the RTO Acquiror the number of RTO Acquiror Shares equal to the product of (A) the number of Meta Shares issuable pursuant to the exercise of the Meta Option immediately before the Effective Time, and (B) the Exchange Ratio, provided that if the foregoing would result in a fraction of an RTO Acquiror Share being issuable upon any particular exercise of RTO Acquiror Replacement Options, then the number of RTO Acquiror Shares otherwise issuable upon exercise of such RTO Acquiror Replacement Options shall be rounded down to the nearest whole number of RTO Acquiror Shares. The exercise price per RTO Acquiror Share subject to any such RTO Acquiror Replacement Option shall be an amount equal to the quotient of (A) the exercise price per Meta Share under the exchanged Meta Option immediately prior to the Effective Time, divided by (B) the Exchange Ratio. Except as set out above, all terms and conditions of an RTO Acquiror Replacement Option, including the term to expiry, conditions to and manner of exercising, will be the same as the Meta Option for which it was exchanged and any document evidencing a Meta Option shall thereafter evidence and be deemed to evidence such RTO Acquiror Replacement Option;

(c)    each Meta DSU shall, without any further action on the part of any holder thereof, be continued on the same terms and conditions as were applicable immediately prior to the Effective Time, except that, pursuant to the terms of the deferred share unit plan of Meta, the terms of the Meta DSUs shall be amended so as to substitute for the Meta Shares issuable pursuant to such Meta DSUs, such number of RTO Acquiror Shares equal to (A) the number of Meta Shares issuable pursuant to the Meta DSUs immediately prior to the Effective Time, multiplied by (B) the Exchange Ratio, rounded down to the nearest whole number;

(d)    each Meta Warrant shall, without any further action on the part of any holder thereof, be continued on the same terms and conditions as were applicable immediately prior to the Effective Time, except that, pursuant to the terms of the applicable warrant certificate, the terms of the Meta Warrants shall be amended so as to (i) substitute for the Meta Shares issuable pursuant to the exercise of such Meta Warrants such number of RTO Acquiror Shares equal to (A) the number of Meta Shares issuable pursuant to the exercise of such Meta Warrants immediately prior to the Effective Time, multiplied by (B) the Exchange Ratio, rounded down to the nearest whole number; and (ii) adjust the exercise price per RTO Acquiror Share issuable pursuant to the exercise of any such Meta Warrant following the Effective Time to be an amount equal to the quotient of (A) the exercise price per Meta Share under the Meta Warrant immediately prior to the Effective Time divided by (B) the Exchange Ratio;

(e)    each issued and outstanding Meta Share (other than Exchangeable Elected Shares and other than Meta Shares held by RTO Acquiror or an affiliate thereof or Dissenting Shareholders) held by a Meta Shareholder shall be transferred by the holder thereof, without any further act or formality on its part, free and clear of all Encumbrances, to Canco in exchange for RTO Acquiror Share Consideration in accordance with the election or deemed election of such Meta Shareholder pursuant to Section 2.3;

-8-

(f)    each Exchangeable Elected Share shall be transferred by the holder thereof, without any further act or formality on its part, free and clear of all Encumbrances, to Canco in exchange for Exchangeable Share Consideration in accordance with the election of such Meta Shareholder pursuant to Section 2.3; and

(g)    RTO Acquiror, Canco and Callco shall execute the Support Agreement and RTO Acquiror, Canco and the Transfer Agent shall execute the Voting and Exchange Trust Agreement and RTO Acquiror shall issue to and deposit with the Transfer Agent the Special Voting Share in consideration of the payment to RTO Acquiror by Meta on behalf of the Meta Shareholders of one dollar ($1.00), to be thereafter held of record by the Transfer Agent as trustee for and on behalf of, and for the use and benefit of, the holders of the Exchangeable Shares in accordance with the Voting and Exchange Trust Agreement. All rights of holders of Exchangeable Shares under the Voting and Exchange Trust Agreement shall be received by them as part of the property receivable by them under Section 2.2(c) in exchange for the Exchangeable Elected Shares for which they were exchanged.

## 2.3    Consideration Elections

With respect to the exchange of securities effected pursuant to Sections 2.2(b) and 2.2(c):

(a)    Meta Shareholders who are Eligible Holders may elect to (i) receive in respect of any or all of their Meta Shares, the Exchangeable Share Consideration and (ii) receive in respect of the balance of their Meta Shares, if any, the RTO Acquiror Share Consideration;

(b)    the election provided for in Section 2.3(a) shall be made by a Meta Shareholder depositing with the Depositary, prior to the Election Deadline, a duly completed Letter of Transmittal and Election Form indicating such Meta Shareholder's election, together with certificates representing such holder's Meta Shares, if any;

(c)    any Meta Shareholder who does not deposit with the Depositary a duly completed Letter of Transmittal and Election Form prior to the Election Deadline, or otherwise fails to comply with the requirements of Section 2.3(b) and the Letter of Transmittal and Election Form in respect of any such Meta Shareholder's Meta Shares, shall be deemed to have elected to receive the RTO Acquiror Share Consideration; and

(d)    any Letter of Transmittal and Election Form, once deposited with the Depositary, shall be irrevocable and may not be withdrawn by a Meta Shareholder.

## 2.4    Income Tax Elections

Meta Shareholders who are Eligible Holders who are entitled to receive Exchangeable Shares under the Arrangement shall be entitled to make an income tax election pursuant to subsection 85(1) of the ITA or, if the person is a partnership, subsection 85(2) of the ITA (and in each case, where applicable, the analogous provisions of provincial income tax Law) with respect to the transfer of their Meta Shares to Canco by providing the Tax Election Package to the Depositary within 90 days following the Effective Date, duly completed with the details of the number of Meta Shares transferred and the applicable agreed amounts (which cannot be less than the fair market value of the Ancillary Rights at the Exchange Time). Thereafter, subject to the Tax Election Package being correct and complete and complying with the provisions of the ITA (or applicable provincial income or corporate tax Law), the relevant forms will be signed by Canco

-9-

and returned to such persons within 90 days after the receipt thereof by the Depositary for filing with the CRA (or the applicable provincial taxing Agency). Canco will not be responsible for the proper or accurate completion of the Tax Election Package or to check or verify the content of any election form and, except for Canco's obligation to return duly completed Tax Election Packages which are received by the Depositary within 90 days of the Effective Date, within 90 days after the receipt thereof by the Depositary, Canco will not be responsible for any taxes, interest or penalties or any other costs or damages resulting from the failure by a Meta Shareholder to properly and accurately complete or file the necessary election forms in the form and manner and within the time prescribed by the ITA (or any applicable provincial legislation). In its sole discretion, Canco may choose to sign and return Tax Election Packages received more than 90 days following the Effective Date, but Canco will have no obligation to do so.

**2.5    Share Registers**

Every Meta Shareholder from whom a Meta Share is transferred and acquired pursuant to the Arrangement shall be removed from the register of holders of Meta Shares at the Effective Time and shall cease to have any rights in respect of such Meta Shares, and Canco shall become the holder of such Meta Shares and shall be added to that register at the Effective Time and shall be entitled as of that time to all of the rights and privileges attached to the Meta Shares. Every Meta Shareholder who acquires Exchangeable Shares and/or RTO Acquiror Shares pursuant to the Arrangement shall be added to the register of holders of Exchangeable Shares and/or RTO Acquiror Shares, as applicable, and shall be entitled as of the Effective Time to all of the rights and privileges attached to the Exchangeable Shares and/or RTO Acquiror Shares, as the case may be.

**2.6    Adjustments to Consideration**

The consideration to be paid pursuant to Sections 2.2(b), 2.2(c), 2.2(d) and 2.2(e) shall be adjusted to reflect fully the effect of any stock split, reverse split, stock dividend (including any dividend or distribution of securities convertible into RTO Acquiror Shares or Meta Shares, other than stock dividends paid in lieu of ordinary course dividends), reorganization, recapitalization or other like change with respect to RTO Acquiror Shares or Meta Shares occurring after the date of the Arrangement Agreement and prior to the Effective Time.

**ARTICLE 3
DISSENT RIGHTS**

**3.1    Rights of Dissent**

Holders of Meta Shares may exercise rights of dissent with respect to those Meta Shares pursuant to, and (except as expressly indicated to the contrary in this Section 3.1), in the manner set forth in, Section 185 of the OBCA and this Section 3.1 in connection with the Arrangement (the "**Dissent Rights**"); provided that, notwithstanding Section 185(6) of the OBCA, the written objection to the resolution approving the Arrangement referred to in Section 185(6) of the OBCA must be received by Meta not later than 5:00 p.m. (Toronto time) on the second Business Day before the Meta Meeting; and provided further that, notwithstanding the provisions of Section 185 of the OBCA, Meta Shareholders who duly exercise Dissent Rights and who have not withdrawn or been deemed to have withdrawn such exercise of Dissent Rights and who:

-10-

(a) ultimately are determined to be entitled to be paid fair value for their Meta Shares, which fair value, notwithstanding anything to the contrary contained in Section 185 of the OBCA, shall be determined as of the Exchange Time, shall be deemed to have transferred those Meta Shares as of the Exchange Time at the fair value of the Meta Shares determined as of the Exchange Time in accordance with Section 2.2(a), without any further act or formality and free and clear of all Encumbrances, to Meta and shall not be entitled to any other payment or consideration, including any payment that would be payable under the Arrangement had such holder not exercised their Dissent Rights in respect of such Meta Shares; or

(b) ultimately are determined not to be entitled, for any reason, to be paid fair value for their Meta Shares, shall be deemed to have participated in the Arrangement on the same basis as a holder of Meta Shares who has not exercised Dissent Rights and shall be deemed to have elected to receive, and shall receive, the consideration provided in Section 2.3(c),

but in no case shall Meta, RTO Acquiror, Canco, the Depositary or any other person be required to recognize any such holder as a holder of Meta Shares after the Exchange Time, and the names of each such holder shall be deleted from the register of holders of Meta Shares at the Exchange Time.

**ARTICLE 4**
**SHARE DEPOSIT AND FRACTIONAL SHARES**

**4.1 Share Deposit**

Prior to the Exchange Time, Canco and RTO Acquiror shall deposit or cause to be deposited with the Depositary, for the benefit of the holders of Meta Shares, the aggregate number of whole Exchangeable Shares and the aggregate number of whole RTO Acquiror Shares issuable to holders of Meta Shares in accordance with Section 2.2(b) and Section 2.2(c) under this Plan of Arrangement. Upon surrender to the Depositary by a holder of Meta Shares of a duly completed Letter of Transmittal and Election Form and such other documents and instruments as the Depositary may reasonably require along with the certificate or certificates, if any, representing such Meta Shares to be exchanged under the Arrangement for cancellation, such holder of Meta Shares shall be entitled to receive, and promptly after the Exchange Time the Depositary shall deliver to such person, written evidence of the book entry issuance in uncertificated form to, or certificates registered in the name of, such person representing that number of Exchangeable Shares and/or RTO Acquiror Shares which such person is entitled to receive in accordance with Section 2.2(b) and Section 2.2(c) less any amounts withheld pursuant to Section 4.5, and any certificate so surrendered shall forthwith be cancelled. In the event of a transfer of ownership of such Meta Shares which was not registered in the transfer records of Meta, written evidence of the book entry issuance of, or certificates representing, the number of Exchangeable Shares and/or RTO Acquiror Shares issuable to the registered holder may be registered in the name of and issued to the transferee if the certificate representing such Meta Shares is presented to the Depositary, accompanied by a duly completed Letter of Transmittal and Election Form and all documents required to evidence and effect such transfer. Without limiting the provisions of Section 2.5, until surrendered as contemplated by this Section 4.1, each certificate which immediately prior to the Exchange Time represented one or more outstanding Meta Shares that, under the Arrangement, were exchanged pursuant to Section 2.2(b) or Section 2.2(c), shall be deemed at all times after the Exchange Time to represent only the right to receive upon such surrender (i) the Consideration to which the holder thereof is entitled under the Arrangement, or as to a certificate held by a Dissenting Shareholder (other than a shareholder who exercised Dissent Rights who is deemed to have participated in the Arrangement pursuant to Section 3.1(b)), to receive the fair value of the Meta Shares represented by such certificate, and (ii) any dividends or distributions with a record date after the Exchange Time theretofore paid or payable with respect to any Exchangeable Shares or RTO Acquiror Shares issued in exchange therefor as contemplated by Section 4.2, in each case less any amounts withheld pursuant to Section 4.5.

-11-

**4.2   Distributions with Respect to Unsurrendered Certificates**

No dividends or other distributions paid, declared or made with respect to Exchangeable Shares or RTO Acquiror Shares, in each case with a record date after the Exchange Time, shall be paid to the holder of any unsurrendered certificate which immediately prior to the Exchange Time represented outstanding Meta Shares, unless and until such person shall have surrendered its certificates representing Meta Shares in accordance with the provisions of Section 4.1. Subject to applicable Law, at the time such person shall have surrendered its certificates representing Meta Shares in accordance with the provisions of Section 4.1, there shall be paid to such person, without interest (i) the amount of dividends or other distributions with a record date after the Exchange Time theretofore paid with respect to the Exchangeable Share or the RTO Acquiror Share, as the case may be, to which such person is entitled pursuant hereto, and (ii) on the appropriate payment date, the amount of dividends or other distributions with a record date after the Exchange Time but prior to the date of surrender of certificates representing Meta Shares by such person in accordance with the provisions of Section 4.1 and a payment date subsequent to the date of such compliance and payable with respect to such Exchangeable Shares or RTO Acquiror Shares, as the case may be.

**4.3   No Fractional Shares**

No fractional Exchangeable Shares or fractional RTO Acquiror Shares shall be issued upon compliance with the provisions of Section 4.1 and no dividend, stock split or other change in the capital structure of Canco or RTO Acquiror shall relate to any such fractional security and such fractional interests shall not entitle the owner thereof to exercise any rights as a security holder of Canco or RTO Acquiror. Where the aggregate number of RTO Acquiror Shares or Exchangeable Shares to be issued to a Meta Shareholder as consideration under the Arrangement would result in a fraction of a RTO Acquiror Share or an Exchangeable Share being issuable, the number of RTO Acquiror Shares or Exchangeable Shares, as the case may be to be received by such Meta Shareholder shall be rounded down to the nearest whole RTO Acquiror Share or Exchangeable Share, as the case may be.

**4.4   Lost Certificates**

In the event any certificate which immediately prior to the Exchange Time represented one or more outstanding Meta Shares that were exchanged pursuant to Section 2.2 shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming such certificate to be lost, stolen or destroyed, the Depositary will issue in exchange for such lost, stolen or destroyed certificate, any Exchangeable Shares or RTO Acquiror Shares (and any dividends or distributions with respect thereto) deliverable in accordance with Section 2.2 and such holder's Letter of Transmittal and Election Form. When authorizing such payment in exchange for any lost, stolen or destroyed certificate, the person to whom Exchangeable Shares or RTO Acquiror Shares (and any dividends or distributions with respect thereto) are to be issued shall, as a condition precedent to the issuance thereof, give a bond satisfactory to Meta, and RTO Acquiror and its transfer agent (each acting reasonably) in such amount as RTO Acquiror may direct or otherwise indemnify Meta, Canco and RTO Acquiror in a manner satisfactory to Meta, Canco and RTO Acquiror against any claim that may be made against Meta, Canco or RTO Acquiror with respect to the certificate alleged to have been lost, stolen or destroyed.

-12-

**4.5　Extinction of Rights**

Any certificate which immediately prior to the Exchange Time represented outstanding Meta Shares that were exchanged pursuant to Section 2.2 that is not deposited with all other instruments required by Section 4.1 on or prior to the date of the notice referred to in Section 7(2) of the Exchangeable Share Provisions shall cease to represent a claim or interest of any kind or nature as a securityholder of Canco or RTO Acquiror. On such date, the Exchangeable Shares and/or RTO Acquiror Shares to which the former holder of the certificate referred to in the preceding sentence was ultimately entitled shall be deemed to have been surrendered for no consideration to Canco. None of RTO Acquiror, Meta, Canco, Callco or the Depositary shall be liable to any person in respect of any cash or property delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law.

**4.6　Withholding Rights**

Meta, Canco, Callco, RTO Acquiror and the Depositary shall be entitled to deduct and withhold from any dividend, price or consideration otherwise payable to any holder of Meta Shares, RTO Acquiror Shares or Exchangeable Shares such amounts as Meta, Canco, Callco, RTO Acquiror or the Depositary is required to deduct and withhold with respect to such payment under the ITA, United States tax laws or any other applicable Law. To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes hereof as having been paid to the holder of the securities in respect of which such deduction and withholding was made, provided that such withheld amounts are actually remitted to the appropriate taxing Agency. Meta, Canco, Callco, RTO Acquiror and the Depositary are hereby authorized to sell or otherwise dispose of such other portion of the consideration as is necessary to provide sufficient funds to Meta, Canco, Callco, RTO Acquiror and the Depositary, as the case may be, to enable it to comply with such deduction or withholding requirement and Meta, Canco, Callco, RTO Acquiror and the Depositary shall notify the holder thereof and remit any unapplied balance of the net proceeds of such sale.

**4.7　Paramountcy**

From and after the Effective Time: (i) this Plan of Arrangement shall take precedence and priority over any and all Meta Shares issued prior to the Effective Time; (ii) the rights and obligations of the registered holders of Meta Shares (other than RTO Acquiror, Canco or any of their respective affiliates), and of Meta, RTO Acquiror, Canco, the Depositary and any transfer agent or other depositary in relation thereto, shall be solely as provided for in this Plan of Arrangement and the Arrangement Agreement; and (iii) all actions, causes of action, claims or proceedings (actual or contingent and whether or not previously asserted) based on or in any way relating to any Meta Shares shall be deemed to have been settled, compromised, released and determined without liability except as set forth herein.

**ARTICLE 5**
**RIGHTS OF RTO ACQUIROR AND CALLCO TO ACQUIRE EXCHANGEABLE SHARES**

**5.1　Liquidation Call Right**

In addition to the rights contained in the Exchangeable Share Provisions, RTO Acquiror and Callco shall have the following rights in respect of the Exchangeable Shares:

-13-

(a)   Subject to the proviso in Section 5.1(b) that Callco shall only be entitled to exercise the Liquidation Call Right with respect to those Exchangeable Shares, if any, in respect of which RTO Acquiror has not exercised the Liquidation Call Right, RTO Acquiror and Callco shall each have the overriding right (the "**Liquidation Call Right**"), in the event of and notwithstanding the proposed liquidation, dissolution or winding-up of Canco or any other distribution of the assets of Canco among its shareholders for the purpose of winding up its affairs, pursuant to Section 5 of the Exchangeable Share Provisions, and subject to the sale and purchase contemplated by the Automatic Exchange Right, to purchase from all but not less than all of the holders of the Exchangeable Shares (other than any holder of Exchangeable Shares which is RTO Acquiror or any of its affiliates) on the Liquidation Date all but not less than all of the Exchangeable Shares held by each such holder upon payment by RTO Acquiror or Callco, as the case may be, to each such holder of an amount per share (the "**Liquidation Call Purchase Price**") equal to the Current Market Price of RTO Acquiror Shares on the last Business Day prior to the Liquidation Date plus the Dividend Amount, which shall be satisfied in full by RTO Acquiror or Callco, as the case may be, delivering or causing to be delivered to such holder one RTO Acquiror Share plus any Dividend Amount in accordance with Section 5.1(c). In the event of the exercise of the Liquidation Call Right by RTO Acquiror or Callco, as the case may be, each such holder of Exchangeable Shares (other than RTO Acquiror and its affiliates) shall be obligated to sell all of the Exchangeable Shares held by the holder to RTO Acquiror or Callco, as the case may be, on the Liquidation Date upon payment by RTO Acquiror or Callco, as the case may be, to such holder of the Liquidation Call Purchase Price for each such share, and Canco shall have no obligation to pay any Liquidation Amount to the holders of such shares so purchased.

(b)   Callco shall only be entitled to exercise the Liquidation Call Right with respect to those Exchangeable Shares, if any, in respect of which RTO Acquiror has not exercised the Liquidation Call Right. To exercise the Liquidation Call Right, RTO Acquiror or Callco must notify the Transfer Agent, as agent for the holders of the Exchangeable Shares, and Canco of its intention to exercise such right at least 45 days before the Liquidation Date in the case of a voluntary liquidation, dissolution or winding-up of Canco or any other voluntary distribution of the assets of Canco among its shareholders for the purpose of winding up its affairs, at least 30 days before the Liquidation Date and at least 30 days before the Liquidation Date in the case of an involuntary liquidation, dissolution or winding-up of Canco or any other involuntary distribution of the assets of Canco among its shareholders for the purpose of winding up its affairs. The RTO Acquiror will or will cause the Transfer Agent to notify the holders of the Exchangeable Shares as to whether or not RTO Acquiror and/or Callco has exercised the Liquidation Call Right forthwith after the expiry of the period during which RTO Acquiror or Callco may exercise the Liquidation Call Right. If RTO Acquiror and/or Callco exercises the Liquidation Call Right, then on the Liquidation Date, RTO Acquiror and/or Callco, as the case may be, will purchase and the holders of the Exchangeable Shares (other than any holder of Exchangeable Shares which is RTO Acquiror or any of its affiliates) will sell, all of the Exchangeable Shares held by such holders on such date for a price per share equal to the Liquidation Call Purchase Price which shall be satisfied in full by RTO Acquiror or Callco, as the case may be, delivering or causing to be delivered to such holder one RTO Acquiror Share plus any Dividend Amount.

-14-

(c)    For the purposes of completing the purchase and sale of the Exchangeable Shares pursuant to exercise of the Liquidation Call Right, RTO Acquiror or Callco, as the case may be, shall deposit or cause to be deposited with the Transfer Agent, on or before the Liquidation Date, the aggregate number of RTO Acquiror Shares required to be delivered or caused to be delivered pursuant to Section 5.1(a) and a cheque or cheques payable at par at any branch of the bankers of the applicable entity representing the aggregate Dividend Amount, if any, in payment of the total Liquidation Call Purchase Price, less any amounts withheld pursuant to Section 4.5. Provided that such consideration has been so deposited with the Transfer Agent, the holders of the Exchangeable Shares (other than RTO Acquiror and its affiliates) shall cease to be holders of the Exchangeable Shares on and after the Liquidation Date and shall not be entitled to exercise any of the rights of holders in respect thereof (including any rights under the Voting and Exchange Trust Agreement), other than the right to receive their proportionate part of the aggregate Liquidation Call Purchase Price without interest, upon presentation and surrender by the holder of certificates representing the Exchangeable Shares held by such holder and the holder shall on and after the Liquidation Date be considered and deemed for all purposes to be the holder of the RTO Acquiror Shares which such holder is entitled to receive. Upon surrender to the Transfer Agent of a certificate or certificates representing Exchangeable Shares, together with such other documents and instruments as may be required to effect a transfer of Exchangeable Shares under the OBCA and articles of Canco and such additional documents, instruments and payments as the Transfer Agent may reasonably require, the holder of such surrendered certificate or certificates shall be entitled to receive in exchange therefor, and the Transfer Agent on behalf of RTO Acquiror or Callco, as applicable, shall transfer to such holder, the RTO Acquiror Shares to which such holder is entitled and as soon as reasonably practicable thereafter the Transfer Agent shall deliver to such holder written evidence of the book entry issuance in uncertificated form of the RTO Acquiror Shares to which the holder is entitled and a cheque or cheques of RTO Acquiror or Callco, as applicable, payable at par at any branch of the bankers of RTO Acquiror or Callco, respectively, representing the Dividend Amount, if any, and when received by the Transfer Agent, all dividends and other distributions with respect to such RTO Acquiror Shares with a record date after the Liquidation Date and before the date of the transfer of such RTO Acquiror Shares to such holder, less any amounts withheld pursuant to Section 4.6. If neither RTO Acquiror or Callco exercises the Liquidation Call Right in the manner described above, on the Liquidation Date, the holders of the Exchangeable Shares will be entitled to receive in exchange therefor the Liquidation Amount otherwise payable by Canco in connection with the liquidation, dissolution or winding-up of Canco or any distribution of the assets of Canco among its shareholders for the purpose of winding up its affairs pursuant to Section 5 of the Exchangeable Share Provisions.

## 5.2   Redemption Call Right

In addition to the rights contained in the Exchangeable Share Provisions, RTO Acquiror and Callco shall have the following rights in respect of the Exchangeable Shares:

(a)    Subject to the proviso in Section 5.2(b) that Callco shall only be entitled to exercise the Redemption Call Right with respect to those Exchangeable Shares, if any, in respect of which RTO Acquiror has not exercised the Redemption Call Right, and notwithstanding the proposed redemption of the Exchangeable Shares by Canco pursuant to Section 7 of the Exchangeable Share Provisions, RTO Acquiror and Callco shall each have the overriding right (the "**Redemption Call Right**") to purchase from all but not less than all of the holders of the Exchangeable Shares (other than any holder of Exchangeable Shares which is RTO Acquiror or any of its affiliates) on the Redemption Date all but not less than all of the Exchangeable Shares held by each such holder upon payment by RTO

-15-

Acquiror or Callco, as the case may be, to each such holder an amount per Exchangeable Share (the "**Redemption Call Purchase Price**") equal to the Current Market Price of an RTO Acquiror on the last Business Day prior to the Redemption Date plus the Dividend Amount, which shall be satisfied in full by RTO Acquiror or Callco, as applicable, delivering or causing to be delivered to such holder one RTO Acquiror Share plus any Dividend Amount in accordance with Section 5.2(c). In the event of the exercise of the Redemption Call Right by RTO Acquiror or Callco, as the case may be, each such holder of Exchangeable Shares shall be obligated to sell all of the Exchangeable Shares held by the holder to RTO Acquiror or Callco, as the case may be, on the Redemption Date upon payment by RTO Acquiror or Callco, as the case may be, to such holder of the Redemption Call Purchase Price for each such share, and Canco shall have no obligation to redeem, or to pay any Dividend Amount in respect of, such shares so purchased.

(b)    Callco shall only be entitled to exercise the Redemption Call Right with respect to those Exchangeable Shares, if any, in respect of which RTO Acquiror has not exercised the Redemption Call Right. To exercise the Redemption Call Right, RTO Acquiror or Callco must notify the Transfer Agent, as agent for the holders of the Exchangeable Shares, and Canco of its intention to exercise such right (i) in the case of a redemption occurring as a result of a RTO Acquiror Control Transaction, an Exchangeable Share Voting Event or an Exempt Exchangeable Share Voting Event (each as defined in the Exchangeable Share Provisions), on or before the Redemption Date, and (ii) in any other case, at least 30 days before the Redemption Date. The Transfer Agent will notify the holders of the Exchangeable Shares as to whether or not RTO Acquiror and/or Callco has exercised the Redemption Call Right forthwith after the expiry of the period during which RTO Acquiror or Callco may exercise the Redemption Call Right. If RTO Acquiror and/or Callco exercises the Redemption Call Right, RTO Acquiror and/or Callco, as the case may be, will purchase and the holders of the Exchangeable Shares (other than any holder of Exchangeable Shares which is RTO Acquiror or any of its affiliates) will sell, on the Redemption Date, all of the Exchangeable Shares held by such holders on such date for a price per share equal to the Redemption Call Purchase Price which shall be satisfied in full by RTO Acquiror or Callco delivering or causing to be delivered to each such holder one RTO Acquiror Share plus any Dividend Amount.

(c)    For the purposes of completing the purchase and sale of the Exchangeable Shares pursuant to the exercise of the Redemption Call Right, RTO Acquiror and/or Callco, as the case may be, shall deposit or cause to be deposited with the Transfer Agent, on or before the Redemption Date, an aggregate number of RTO Acquiror Shares and a cheque or cheques payable at par at any branch of the bankers of RTO Acquiror or Callco, as applicable, representing the aggregate Dividend Amount, if any, in payment of the aggregate Redemption Call Purchase Price less any amounts withheld pursuant to Section 4.5. Provided that RTO Acquiror or Callco, as applicable, has complied with the immediately preceding sentence, the holders of the Exchangeable Shares (other than RTO Acquiror and its affiliates) shall cease to be holders of the Exchangeable Shares on and after the Redemption Date and, from and after such date, shall not be entitled to exercise any of the rights of holders in respect thereof (including, without limitation, any rights under the Voting and Exchange Trust Agreement) other than the right to receive their proportionate part of the aggregate Redemption Call Purchase Price, without interest, upon presentation and surrender by the holder of certificates representing the Exchangeable Shares held by such holder and the holder shall on and after the Redemption Date be considered and deemed for all purposes to be the holder of the RTO Acquiror Shares which such holder is entitled to receive. Upon surrender to the Transfer

-16-

Agent of a certificate or certificates representing Exchangeable Shares, together with such other documents and instruments as may be required to effect a transfer of Exchangeable Shares under the OBCA and articles of Canco and such additional documents, instruments and payments as the Transfer Agent may reasonably require, the holder of such surrendered certificate or certificates shall be entitled to receive in exchange therefor, and the Transfer Agent on behalf of RTO Acquiror or Callco, as the case may be, shall transfer to such holder, the RTO Acquiror Shares to which such holder is entitled and as soon as reasonably practicable thereafter the Transfer Agent shall deliver to such holder of the RTO Acquiror Shares to which the holder is entitled and a cheque or cheques of RTO Acquiror or Callco, as the case may be, payable at par at any branch of the bankers of RTO Acquiror or Callco, respectively, representing the Dividend Amount, if any, and when received by the Transfer Agent, all dividends and other distributions with respect to such RTO Acquiror Shares with a record date after the Redemption Date and before the date of the transfer of such RTO Acquiror Shares to such holder, less any amounts withheld pursuant to Section 4.6. If Callco does not exercise the Redemption Call Right in the manner described above, on the Redemption Date the holders of the Exchangeable Shares will be entitled to receive in exchange therefor the redemption price otherwise payable by Canco in connection with the redemption of the Exchangeable Shares pursuant to Article 7 of the Exchangeable Share Provisions.

### 5.3    Change of Law Call Right

In addition to the rights contained in the Exchangeable Share Provisions, RTO Acquiror and Callco shall have the following rights in respect of the Exchangeable Shares:

(a)    Subject to the proviso in Section 5.3(b) that Callco shall only be entitled to exercise the Change of Law Call Right with respect to those Exchangeable Shares, if any, in respect of which RTO Acquiror has not exercised the Change of Law Call Right, RTO Acquiror and Callco shall each have the overriding right (the **"Change of Law Call Right"**), in the event of a Change of Law, to purchase from all but not less than all of the holders of the Exchangeable Shares (other than any holder of Exchangeable Shares which is RTO Acquiror or any of its affiliates) on the Change of Law Call Date all but not less than all of the Exchangeable Shares held by each such holder upon payment by RTO Acquiror or Callco, as the case may be, of an amount per share (the **"Change of Law Call Purchase Price"**) equal to the Current Market Price of RTO Acquiror Shares on the last Business Day prior to the Change of Law Call Date plus the Dividend Amount, which shall be satisfied in full by RTO Acquiror or Callco, as the case may be, delivering or causing to be delivered to such holder one RTO Acquiror Share plus any Dividend Amount. In the event of the exercise of the Change of Law Call Right by RTO Acquiror or Callco, each holder of Exchangeable Shares shall be obligated to sell all the Exchangeable Shares held by such holder to RTO Acquiror or Callco, as the case may be, on the Change of Law Call Date upon payment by RTO Acquiror or Callco, as the case may be, to such holder of the Change of Law Call Purchase Price for each such Exchangeable Share.

(b)    Callco shall only be entitled to exercise the Change of Law Call Right with respect to those Exchangeable Shares, if any, in respect of which RTO Acquiror has not exercised the Change of Law Call Right. To exercise the Change of Law Call Right, RTO Acquiror or Callco must notify the Transfer Agent of its intention to exercise such right at least 30 days before the date on which RTO Acquiror or Callco intends to acquire the Exchangeable Shares (the **"Change of Law Call Date"**). If RTO Acquiror or Callco

-17-

exercises the Change of Law Call Right, then, on the Change of Law Call Date, RTO Acquiror or Callco, as the case may be, will purchase and the holders of Exchangeable Shares will sell all of the Exchangeable Shares then outstanding for a price per share equal to the Change of Law Call Purchase Price, which shall be satisfied in full by RTO Acquiror or Callco, as the case may be, delivering or causing to be delivered to such holder one RTO Acquiror Share plus any Dividend Amount.

(c)    For the purposes of completing the purchase and sale of the Exchangeable Shares pursuant to the exercise of the Change of Law Call Right, RTO Acquiror or Callco, as the case may be, shall deposit or cause to be deposited with the Transfer Agent, on or before the Change of Law Call Date, the aggregate number of RTO Acquiror Shares which RTO Acquiror or Callco, as the case may be, shall deliver or cause to be delivered pursuant to Section 5.4(a) and a cheque or cheques of RTO Acquiror or Callco, as the case may be, payable at par at any branch of the bankers of RTO Acquiror or Callco representing the aggregate Dividend Amount, if any, in payment of the aggregate Redemption Call Purchase Price, in each case less any amounts withheld pursuant to Section 4.6. Provided that RTO Acquiror or Callco has complied with the immediately preceding sentence, on and after the Change of Law Call Date the holders of the Exchangeable Shares shall cease to be holders of the Exchangeable Shares and shall not be entitled to exercise any of the rights of holders in respect thereof (including any rights under the Voting and Exchange Trust Agreement), other than the right to receive their proportionate part of the total Change of Law Purchase Price payable by RTO Acquiror or Callco, as the case may be, without interest, upon presentation and surrender by the holder of certificates representing the Exchangeable Shares held by such holder and the holder shall on and after the Change of Law Call Date be considered and deemed for all purposes to be the holder of RTO Acquiror Shares to which such holder is entitled. Upon surrender to the Transfer Agent of a certificate or certificates representing Exchangeable Shares, together with such other documents and instruments as may be required to effect a transfer of Exchangeable Shares under the OBCA and articles of Canco and such additional documents, instruments and payments as the Transfer Agent may reasonably require, the holder of such surrendered certificate or certificates shall be entitled to receive in exchange therefor, and the Transfer Agent on behalf of RTO Acquiror or Callco, as the case may be, shall transfer to such holder, the RTO Acquiror Shares to which such holder is entitled and as soon as reasonably practicable thereafter the Transfer Agent shall deliver to such holder written evidence of the book entry issuance in uncertificated form of the RTO Acquiror Shares to which the holder is entitled and a cheque or cheques of RTO Acquiror or Callco, as the case may be, payable at par at any branch of the bankers of RTO Acquiror or Callco, as the case may be, representing the Dividend Amount, if any, and when received by the Transfer Agent, all dividends and other distributions with respect to such RTO Acquiror Shares with a record date after the Redemption Date and before the date of the transfer of such RTO Acquiror Shares to such holder, less any amounts withheld pursuant to Section 4.5.

-18-

# ARTICLE 6
## AMENDMENT

**6.1   Plan of Arrangement Amendment**

(a)   With the prior written consent of RTO Acquiror, not to be unreasonably withheld, Meta may amend, modify and/or supplement this Plan of Arrangement at any time and from time to time, provided that any such amendment, modification and/or supplement must be contained in a written document that is filed with the Court and, if made after the Meta Meeting, approved by the Court and communicated to Meta Shareholders, Meta Optionholders and Meta Warrantholders if and as required by the Court.

(b)   With the prior written consent of RTO Acquiror, not to be unreasonably withheld, any amendment, modification or supplement to this Plan of Arrangement may be proposed by Meta at any time before or at the Meta Meeting with or without any other prior notice or communication and, if so proposed and accepted by the persons voting at the Meta Meeting in the manner required under the Interim Order, shall become part of this Plan of Arrangement for all purposes.

(c)   Any amendment, modification or supplement to this Plan of Arrangement that is approved or directed by the Court following the Meta Meeting shall be effective only if (i) it is consented to in writing by Meta and RTO Acquiror and, (ii) if required by the Court, it is consented to by Meta Shareholders, Meta Optionholders and/or Meta Warrantholders voting in the manner directed by the Court.

(d)   With the prior written consent of RTO Acquiror, not to be unreasonably withheld, any amendment, modification or supplement to this Plan of Arrangement may be made prior to the Effective Date by Meta and without the approval of the Court, Meta Shareholders, Meta Optionholders or Meta Warrantholders, provided that it concerns a matter which, in the reasonable opinion of Meta, is of an administrative nature required to better give effect to the implementation of this Plan of Arrangement and is not materially adverse to the financial or economic interests of any Meta Shareholder, Meta Optionholder or Meta Warrantholder.

(e)   This Plan of Arrangement may be withdrawn prior to the Exchange Time in accordance with the Arrangement Agreement.

# ARTICLE 7
## FURTHER ASSURANCES

Notwithstanding that the transactions and events set out in this Plan of Arrangement shall occur and shall be deemed to occur in the order set out in this Plan of Arrangement without any further act or formality, each of Meta, RTO Acquiror, Callco and Canco shall make, do and execute, or cause to be made, done and executed, all such further acts, deeds, agreements, transfers, assurances, instruments or documents as may reasonably be required by any of them to document or evidence any of the transactions or events set out in this Plan of Arrangement.

-19-

# ARTICLE 8
## NOTICE

Any notice to be given by RTO Acquiror or Canco to Meta Shareholders, Meta Optionholders or Meta Warrantholders pursuant to the Arrangement will be deemed to have been properly given if it is mailed by first class mail, postage prepaid, to registered Meta Shareholders, Meta Optionholders or Meta Warrantholders, as the case may be, at their addresses as shown on the applicable register of such holders maintained by Meta and will be deemed to have been received on the first day following the date of mailing which is a Business Day.

The provisions of this Plan of Arrangement, the Arrangement Agreement and the Letter of Transmittal and Election Form apply notwithstanding any accidental omission to give notice to any one or more Meta Shareholders, Meta Optionholders or Meta Warrantholders and notwithstanding any interruption of mail services in Canada, the United States or elsewhere following mailing. In the event of any interruption of mail service following mailing, RTO Acquiror intends to make reasonable efforts to disseminate any notice by other means, such as dissemination by press release.

Notwithstanding the provisions of the Arrangement Agreement, this Plan of Arrangement and the Letter of Transmittal and Election Form, certificates, if any, for RTO Acquiror Shares and Exchangeable Shares issuable, pursuant to the Arrangement need not be mailed if RTO Acquiror determines that delivery thereof by mail may be delayed. Persons entitled to cheques and certificates which are not mailed for the foregoing reason may take delivery thereof at the office of the Transfer Agent in respect of which the certificates being issued were deposited, upon application to the Transfer Agent, until such time as RTO Acquiror has determined that delivery by mail will no longer be delayed. Notwithstanding the provisions of the Arrangement Agreement, this Plan of Arrangement and the Letter of Transmittal and Election Form, the deposit of cheques and certificates with the Transfer Agent in such circumstances will constitute delivery to the persons entitled thereto and the RTO Acquiror Shares will be deemed to have been paid for immediately upon such deposit.

-20-

**APPENDIX I**
**TO THE PLAN OF ARRANGEMENT PROVISIONS**
**ATTACHING TO THE EXCHANGEABLE SHARES**

The Exchangeable Shares shall have the following rights, privileges, restrictions and conditions:

1.  **Interpretation**

    (1)  For the purposes of these share provisions:

    "**affiliate**" has the meaning ascribed thereto in the *Securities Act* (Ontario), as amended.

    "**Agent**" means any chartered bank or trust company in Canada selected by Canco for the purposes of holding some or all of the Liquidation Amount or Redemption Price in accordance with Section 5 or Section 7, respectively.

    "**Ancillary Rights**" means the interest of a holder of Exchangeable Shares as a beneficiary of the trust created under the Voting and Exchange Trust Agreement.

    "**Arrangement**" means an arrangement under Section 182 of the OBCA on the terms and subject to the conditions set out in the Plan of Arrangement, subject to any amendments or variations hereto made in accordance with the Plan of Arrangement and the Arrangement Agreement or made at the direction of the Court, to which plan these share provisions are attached as Appendix I.

    "**Arrangement Agreement**" means the arrangement agreement made as of December 11, 2020 between RTO Acquiror, Canco, Callco and Meta, as amended, supplemented and/or restated in accordance with its terms.

    "**Automatic Exchange Right**" has the meaning ascribed thereto in the Voting and Exchange Trust Agreement.

    "**Board of Directors**" means the board of directors of Canco.

    "**Business Day**" means a day other than a Saturday, a Sunday or any other day on which commercial banking institutions in Toronto, Ontario are authorized or required by applicable Law to be closed.

    "**Callco**" means 2798331 Ontario Inc., a direct or indirect wholly-owned subsidiary of RTO Acquiror incorporated under the laws of the Province of Ontario or any other direct or indirect wholly-owned subsidiary of RTO Acquiror designated by RTO Acquiror from time to time after the Effective Date in replacement thereof.

    "**Call Notice**" has the meaning ascribed thereto in Section 6(3) of these share provisions.

    "**Canadian Dollar Equivalent**" means in respect of an amount expressed in a currency other than Canadian dollars (the "**Foreign Currency Amount**") at any date the product obtained by multiplying:

    (a)  the Foreign Currency Amount; by

    (b)  the exchange rate on the Business Day immediately preceding such date for such foreign currency expressed in Canadian dollars as reported by the Bank of Canada or, in the event such exchange rate is not available, such exchange rate on the Business Day immediately preceding such date for such foreign currency expressed in Canadian dollars as may be mutually agreed upon by RTO Acquiror and Meta, to be appropriate for such purpose, which determination shall be conclusive and binding.

"**Canco**" means Metamaterial Exchangeco Inc. (formerly 2798832 Ontario Inc.), being the corporation, which is a wholly-owned subsidiary of RTO Acquiror, incorporated under the laws of the Province of Ontario that issues the Exchangeable Shares pursuant to the Arrangement.

"**Common Shares**" means the common shares in the capital of Canco.

"**Court**" means the Ontario Superior Court of Justice (Commercial List).

"**CRA**" means the Canada Revenue Agency.

"**Current Market Price**", means, in respect of an RTO Acquiror Share on any date, the quotient obtained by dividing (a) the aggregate of the Daily Value of Trades for each day during the period of 20 consecutive trading days ending three trading days before such date; by (b) the aggregate volume of RTO Acquiror Shares used to calculate such Daily Value of Trades.

"**Daily Value of Trades**" means, in respect of the RTO Acquiror Shares on any trading day, the product of (a) the Canadian Dollar Equivalent of the volume weighted average price of RTO Acquiror Shares on the NASDAQ (or, if the RTO Acquiror Shares are not listed on the NASDAQ, the volume weighted average price of RTO Acquiror Shares on such other stock exchange or automated quotation system on which the RTO Acquiror Shares are listed or quoted, as the case may be, as determined by RTO Acquiror for such purpose) on such date; and (b) the aggregate volume of RTO Acquiror Shares traded on such day on the NASDAQ or such other stock exchange or automated quotation system and used to calculate such volume weighted average price; provided that any such selections by RTO Acquiror shall be conclusive and binding.

"**Depositary**" means the person acting as depositary under the Arrangement.

"**Director**" means the Director appointed pursuant to Section 278 of the OBCA.

"**Dividend Amount**" means an amount equal to all declared and unpaid dividends on an Exchangeable Share held by a holder on any dividend record date which occurred prior to the date of purchase, redemption or other acquisition of such share by Callco, Canco or RTO Acquiror from such holder pursuant to Section 5(1), Section 6(1) or Section 7(1).

"**Effective Date**" means the date on which the Arrangement becomes effective in accordance with the OBCA and the Final Order.

"**Exchange**" means the Canadian Securities Exchange, the Toronto Stock Exchange or such other recognized securities exchange upon which the Exchangeable Shares may be listed for trading from time to time.

"**Exchangeable Shares**" means the non-voting, exchangeable shares in the capital of Canco, having the rights, privileges, restrictions and conditions set forth herein.

"**Exchangeable Share Voting Event**" means any matter in respect of which holders of Exchangeable Shares are entitled to vote as shareholders of Canco and in respect of which the Board of Directors determines in good faith that after giving effect to such matter the economic equivalence of the Exchangeable Shares and the RTO Acquiror Shares is maintained for the holders of Exchangeable Shares (other than RTO Acquiror and its affiliates).

2

"**Exempt Exchangeable Share Voting Event**" means an Exchangeable Share Voting Event in order to approve or disapprove, as applicable, any change to, or in the rights of the holders of, the Exchangeable Shares, where the approval or disapproval, as applicable, of such change would be required to maintain the economic equivalence of the Exchangeable Shares and the RTO Acquiror Shares.

"**Final Order**" means an order of the Court granted pursuant to Section 185 of the OBCA, in a form acceptable to each of RTO Acquiror and Meta, each acting reasonably, approving the Arrangement after a hearing upon the procedural and substantive fairness of the terms and conditions of the Arrangement, as such order may be affirmed, amended, modified, supplemented or varied by the Court (with the consent of RTO Acquiror and Meta, each acting reasonably) at any time prior to the Effective Date or, if appealed, as affirmed or amended (provided, however, that any such amendment is acceptable to RTO Acquiror and Meta, each acting reasonably) on appeal, unless such appeal is withdrawn, abandoned or denied.

"**Governmental Entity**" means any domestic or foreign court, tribunal, federal, state, provincial or local government or governmental agency, department or authority or other regulatory authority (including the Exchange and NASDAQ) or administrative agency or commission (including the Securities Authorities and the SEC) or any elected or appointed public official.

"**holder**" means, when used with reference to the Exchangeable Shares, a holder of Exchangeable Shares shown from time to time in the register maintained by or on behalf of Canco in respect of the Exchangeable Shares.

"**including**" means "including without limitation" and "**includes**" means "includes without limitation".

"**ITA**" means the *Income Tax Act* (Canada), as amended.

"**Liquidation Amount**" has the meaning ascribed thereto in Section 5(1) of these share provisions.

"**Liquidation Call Right**" has the meaning ascribed thereto in the Plan of Arrangement.

"**Liquidation Date**" has the meaning ascribed thereto in Section 5(1) of these share provisions.

"**Meta**" means Metamaterial Inc., a corporation governed under the OBCA.

"**NASDAQ**" means the NASDAQ Capital Market.

"**OBCA**" means the *Business Corporations Act* (Ontario), as amended.

"**person**" includes any individual, firm, partnership, limited partnership, joint venture, venture capital fund, limited liability company, unlimited liability company, association, trust, trustee, executor, administrator, legal personal representative, estate, group, body corporate, corporation, unincorporated association or organization, Governmental Entity, syndicate or other entity, whether or not having legal status.

3

**"Plan of Arrangement"** means the plan of arrangement substantially in the form and content of Schedule B annexed to the Arrangement Agreement, and any amendments or variations thereto made in accordance with Article 6 of the Arrangement Agreement or Article 6 of the Plan of Arrangement or made at the direction of the Court.

**"Purchase Price"** has the meaning ascribed thereto in Section 6(3) of these share provisions.

**"Redemption Call Purchase Price"** has the meaning ascribed thereto in the Plan of Arrangement.

**"Redemption Call Right"** has the meaning ascribed thereto in the Plan of Arrangement.

**"Redemption Date"** means the date, if any, established by the Board of Directors for the redemption by Canco of all but not less than all of the outstanding Exchangeable Shares pursuant to Section 7 of these share provisions, which date shall be no earlier than the seventh anniversary of the date on which Exchangeable Shares first are issued, unless:

(a)     there are fewer than [•][1] Exchangeable Shares outstanding (other than Exchangeable Shares held by RTO Acquiror and its affiliates, and as such number of shares may be adjusted as deemed appropriate by the Board of Directors to give effect to any subdivision or consolidation of or stock dividend on the Exchangeable Shares, any issue or distribution of rights to acquire Exchangeable Shares or securities exchangeable for or convertible into Exchangeable Shares, any issue or distribution of other securities or rights or evidences of indebtedness or assets, or any other capital reorganization or other transaction affecting the Exchangeable Shares), in which case the Board of Directors may accelerate such redemption date to such date prior to the seventh anniversary of the date on which Exchangeable Shares first are issued as the Board of Directors may determine, upon at least 30 days' prior written notice to the holders of the Exchangeable Shares and the Trustee;

(b)     an RTO Acquiror Control Transaction occurs, in which case, provided that the Board of Directors determines, in its sole discretion, that it is not reasonably practicable to substantially replicate the terms and conditions of the Exchangeable Shares in connection with such RTO Acquiror Control Transaction and that the redemption of all but not less than all of the outstanding Exchangeable Shares is necessary to enable the completion of such RTO Acquiror Control Transaction in accordance with its terms, the Board of Directors may accelerate such redemption date to such date prior to the seventh anniversary of the date on which Exchangeable Shares first are issued as the Board of Directors may determine, upon such number of days' prior written notice to the holders of the Exchangeable Shares and the Trustee as the Board of Directors may determine to be reasonably practicable in such circumstances;

(c)     an Exchangeable Share Voting Event that is not an Exempt Exchangeable Share Voting Event is proposed and (i) the holders of the Exchangeable Shares fail to take the necessary action, at a meeting or other vote of holders of Exchangeable Shares, to approve or disapprove, as applicable, the Exchangeable Share Voting Event or the holders of the Exchangeable Shares do take the necessary action but, in connection therewith, rights of dissent are required to be granted to the holders of the Exchangeable Shares pursuant to the OBCA and the holders of more than 2% of the outstanding Exchangeable Shares (other than those held by RTO Acquiror and its affiliates) exercise rights of dissent under the OBCA, and (ii) the Board of Directors determines that it is not reasonably practicable to

---

1     [NTD: To be 25% of the number issued on the Effective Date.]

4

accomplish the business purpose (which business purpose must be bona fide and not for the primary purpose of causing the occurrence of the Redemption Date) intended by the Exchangeable Share Voting Event in a commercially reasonable manner that does not result in an Exchangeable Share Voting Event, in which case the Redemption Date shall be the Business Day following the day on which the later of the events described in (i) and (ii) above occur; or

(d)     an Exempt Exchangeable Share Voting Event is proposed and holders of the Exchangeable Shares fail to take the necessary action at a meeting or other vote of holders of Exchangeable Shares to approve or disapprove, as applicable, the Exempt Exchangeable Share Voting Event in which case the Redemption Date shall be the Business Day following the day on which the holders of the Exchangeable Shares failed to take such action

provided, however, that the accidental failure or omission to give any notice of redemption under clauses (a), (b), (c) or (d) above to any of the holders of Exchangeable Shares shall not affect the validity of any such redemption.

"**Redemption Price**" has the meaning ascribed thereto in Section 7(1) of these share provisions.

"**Retracted Shares**" has the meaning ascribed thereto in Section 6(1)(a) of these share provisions.

"**Retraction Call Right**" has the meaning ascribed thereto in Section 6(1)(c) of these share provisions.

"**Retraction Date**" has the meaning ascribed thereto in Section 6(1)(b) of these share provisions.

"**Retraction Price**" has the meaning ascribed thereto in Section 6(1) of these share provisions.

"**Retraction Request**" has the meaning ascribed thereto in Section 6(1) of these share provisions.

"**RTO Acquiror**" means Torchlight Energy Resources, Inc., a corporation existing under the laws of the State of Nevada.

"**RTO Acquiror Control Transaction**" means: (i) any merger, amalgamation, arrangement, take-over bid or tender offer, material sale of shares or rights or interests therein or thereto or similar transactions involving RTO Acquiror that results in the holders of outstanding voting securities of RTO Acquiror immediately prior to such transaction directly or indirectly owning, or exercising control or direction over, voting securities representing less than 50% of the total voting power of all of the voting securities of the surviving entity outstanding immediately after such transaction; or (ii) any sale or disposition of all or substantially of RTO Acquiror's Assets; provided however that RTO Acquiror Control Transaction shall not refer to (i) any Asset Sale Transaction (as such term is defined in the terms of the preferred stock of the RTO Acquiror), or (ii) the reincorporation of the RTO Acquiror under the laws of the State of Delaware.

"**RTO Acquiror Dividend Declaration Date**" means the date on which the board of directors of RTO Acquiror declares any dividend or other distribution on the RTO Acquiror Shares, provided however that RTO Acquiror Dividend Declaration Date shall not refer to any date on which a Asset Sale Dividend is declared (as such term is defined in the terms of the preferred stock of the RTO Acquiror).

5

"**RTO Acquiror Shares**" means the common stock, par value U.S.\$0.01 per share, in the capital of RTO Acquiror.

"**SEC**" means the U.S. Securities and Exchange Commission.

"**Securities Authorities**" means all securities regulatory authorities, including the applicable securities commission or similar regulatory authorities in each of the provinces and territories of Canada, the SEC, the Exchange, and the NASDAQ, that are applicable to Meta or RTO Acquiror, as the case may be.

"**Support Agreement**" means the agreement made between RTO Acquiror, Callco and Canco substantially in the form and content of Schedule I to the Arrangement Agreement.

"**Transfer Agent**" means a person as may from time to time be appointed by Canco as the registrar and transfer agent for the Exchangeable Shares.

"**Trustee**" means the trustee chosen by RTO Acquiror to act as trustee under the Voting and Exchange Trust Agreement, and any successor trustee appointed under the Voting and Exchange Trust Agreement.

"**Voting and Exchange Trust Agreement**" means an agreement to be made among RTO Acquiror, Canco and the Trustee in connection with the Plan of Arrangement substantially in the form of Schedule J to the Arrangement Agreement.

2.    **Ranking of Exchangeable Shares**

The Exchangeable Shares shall be entitled to a preference over the Common Shares and any other shares ranking junior to the Exchangeable Shares with respect to the payment of dividends and the distribution of assets in the event of the liquidation, dissolution or winding-up of Canco, whether voluntary or involuntary, or any other distribution of the assets of Canco among its shareholders for the purpose of winding up its affairs.

3.    **Dividends and Distributions**

    (1)    A holder of an Exchangeable Share shall be entitled to receive and the Board of Directors shall, subject to applicable law, on each RTO Acquiror Dividend Declaration Date, declare a dividend or other distribution on each Exchangeable Share:

        (a)    in the case of a cash dividend or other distribution declared on the RTO Acquiror Shares, in an amount in cash for each Exchangeable Share equal to the cash dividend or other distribution declared on each RTO Acquiror Share on the RTO Acquiror Dividend Declaration Date;

        (b)    in the case of a stock dividend or other distribution declared on the RTO Acquiror Shares to be paid in RTO Acquiror Shares, by the issue or transfer by Canco of such number of Exchangeable Shares for each Exchangeable Share as is equal to the number of RTO Acquiror Shares to be paid on each RTO Acquiror Share unless in lieu of such stock dividend or other distribution Canco elects to effect a corresponding and contemporaneous and economically equivalent (as determined by the Board of Directors in accordance with Section 3(5) hereof) subdivision, redivision or change of the outstanding Exchangeable Shares; or

6

(c)   in the case of a dividend or other distribution declared on the RTO Acquiror Shares in property other than cash or RTO Acquiror Shares, in such type and amount of property for each Exchangeable Share as is the same as or economically equivalent (to be determined by the Board of Directors as contemplated by Section 3(5) hereof) to the type and amount of property declared as a dividend or other distribution on each RTO Acquiror Share.

Such dividends or other distributions shall be paid out of money, assets or property of Canco properly applicable to the payment of dividends, or out of authorized but unissued shares of Canco, as applicable. The holders of Exchangeable Shares shall not be entitled to any dividends or other distributions other than or in excess of the dividends referred to in this Section 3(1).

(2)   Cheques of Canco payable at par at any branch of the bankers of Canco shall be issued in respect of any cash dividends contemplated by Section 3(1)(a) hereof and the sending of such cheque to each holder of an Exchangeable Share shall satisfy the cash dividend or other distributions represented thereby unless the cheque is not paid on presentation. Written evidence of the book entry issuance or transfer to the registered holder of Exchangeable Shares shall be delivered in respect of any stock dividends or other distributions contemplated by Section 3(1)(b) hereof and the sending of such written evidence to each holder of an Exchangeable Share shall satisfy the stock dividend or other distribution represented thereby. Such other type and amount of property in respect of any dividends or other distributions contemplated by Section 3(1)(c) hereof shall be issued, distributed or transferred by Canco in such manner as it shall determine and the issuance, distribution or transfer thereof by Canco to each holder of an Exchangeable Share shall satisfy the dividend or other distribution represented thereby. No holder of an Exchangeable Share shall be entitled to recover by action or other legal process against Canco any dividend or other distribution that is represented by a cheque that has not been duly presented to Canco's bankers for payment or that otherwise remains unclaimed for a period of six years from the date on which such dividend or other distribution was payable.

(3)   The record date for the determination of the holders of Exchangeable Shares entitled to receive payment of, and the payment date for, any dividend declared on the Exchangeable Shares under Section 3(1) hereof shall be the same dates as the record date and payment date, respectively, for the corresponding dividend or other distribution declared on the RTO Acquiror Shares. The record date for the determination of the holders of Exchangeable Shares entitled to receive Exchangeable Shares in connection with any subdivision, redivision or change of the Exchangeable Shares under Section 3(1)(b) hereof and the effective date of such subdivision shall be the same dates as the record and payment date, respectively, for the corresponding stock dividend or other distribution declared on the RTO Acquiror Shares.

(4)   If on any payment date for any dividends or other distributions declared on the Exchangeable Shares under Section 3(1) hereof the dividends or other distributions are not paid in full on all of the Exchangeable Shares then outstanding, any such dividends or other distributions that remain unpaid shall be paid on a subsequent date or dates determined by the Board of Directors on which Canco shall have sufficient moneys, assets or property properly applicable to the payment of such dividends or other distributions.

7

(5)     The Board of Directors shall determine, in its sole discretion, "economic equivalence" for the purposes of these share provisions, including Section 3(1) hereof, and each such determination shall be conclusive and binding on Canco and its shareholders. In making each such determination, the following factors may, without excluding other factors determined by the Board of Directors to be relevant, be considered by the Board of Directors:

    (a)     in the case of any stock dividend or other distribution payable in RTO Acquiror Shares, the number of such shares issued in proportion to the number of RTO Acquiror Shares previously outstanding;

    (b)     in the case of the issuance or distribution of any rights, options or warrants to subscribe for or purchase RTO Acquiror Shares (or securities exchangeable for or convertible into or carrying rights to acquire RTO Acquiror Shares), the relationship between the exercise price of each such right, option or warrant and the Current Market Price;

    (c)     in the case of the issuance or distribution of any other form of property (including any shares or securities of RTO Acquiror of any class other than RTO Acquiror Shares, any rights, options or warrants other than those referred to in Section 3(5)(b) hereof, any evidences of indebtedness of RTO Acquiror or any assets of RTO Acquiror), the relationship between the fair market value (as determined by the Board of Directors in the manner above contemplated) of such property to be issued or distributed with respect to each outstanding RTO Acquiror Share and the Current Market Price of an RTO Acquiror Share; and

    (d)     in all such cases, the general taxation consequences of the relevant event to holders of Exchangeable Shares to the extent that such consequences may differ from the taxation consequences to holders of RTO Acquiror Shares as a result of differences between taxation laws of Canada and the United States (except for any differing consequences arising as a result of differing withholding taxes and marginal taxation rates and without regard to the individual circumstances of holders of Exchangeable Shares).

**4.     Certain Restrictions**

So long as any of the Exchangeable Shares are outstanding, Canco shall not at any time without, but may at any time with, the approval of the holders of the Exchangeable Shares given as specified in Section 12(2) of these share provisions:

    (a)     pay any dividends on the Common Shares or any other shares ranking junior to the Exchangeable Shares, other than stock dividends payable in Common Shares or any such other shares ranking junior to the Exchangeable Shares, as the case may be;

    (b)     redeem or purchase or make any capital distribution in respect of Common Shares or any other shares ranking junior to the Exchangeable Shares;

    (c)     redeem or purchase any other shares of Canco ranking equally with the Exchangeable Shares with respect to the payment of dividends or the distribution of assets in the event of the liquidation, dissolution or winding-up of Canco, whether voluntary or involuntary, or any other distribution of the assets of Canco among its shareholders for the purpose of winding up its affairs; or

8

(d)   issue any Exchangeable Shares or any other shares of Canco ranking equally with the Exchangeable Shares other than by way of stock dividends to the holders of such Exchangeable Shares; and

(e)   issue any shares of Canco ranking superior to the Exchangeable Shares.

5.   **Distribution on Liquidation**

(1)   In the event of the liquidation, dissolution or winding-up of Canco or any other distribution of the assets of Canco among its shareholders for the purpose of winding up its affairs, subject to the exercise by RTO Acquiror or Callco of the Liquidation Call Right, a holder of Exchangeable Shares shall be entitled, subject to applicable law, to receive from the assets of Canco in respect of each Exchangeable Share held by such holder on the effective date (the "**Liquidation Date**") of such liquidation, dissolution, winding-up or other distribution, before any distribution of any part of the assets of Canco among the holders of the Common Shares or any other shares ranking junior to the Exchangeable Shares, an amount per share (the "**Liquidation Amount**") equal to the Current Market Price of an RTO Acquiror Share on the last Business Day prior to the Liquidation Date plus the Dividend Amount, which shall be satisfied in full by Canco delivering or causing to be delivered to such holder one RTO Acquiror Share, plus an amount equal to the Dividend Amount.

(2)   On or promptly after the Liquidation Date, and provided the Liquidation Call Right has not been exercised by RTO Acquiror or Callco, Canco shall pay or cause to be paid to the holders of the Exchangeable Shares the Liquidation Amount for each such Exchangeable Share upon presentation and surrender of the certificates representing such Exchangeable Shares, if any, together with such other documents and instruments as may be required to effect a transfer of Exchangeable Shares under the OBCA and the Articles of Canco and such additional documents, instruments and payments as the Transfer Agent and Canco may reasonably require, at the registered office of Canco or at any office of the Transfer Agent as may be specified by Canco by notice to the holders of the Exchangeable Shares. Payment of the Liquidation Amount for such Exchangeable Shares shall be made by transferring or causing to be transferred to each holder the RTO Acquiror Shares to which such holder is entitled and by delivering to such holder, on behalf of Canco, RTO Acquiror Shares (which shares shall be fully paid and non-assessable) and a cheque of Canco payable at par at any branch of the bankers of Canco in respect of the Dividend Amount. On and after the Liquidation Date, the holders of the Exchangeable Shares shall cease to be holders of such Exchangeable Shares and shall not be entitled to exercise any of the rights of holders in respect thereof (including any rights under the Voting and Exchange Trust Agreement), other than the right to receive the Liquidation Amount without interest upon presentation and surrender of share certificates in accordance with the foregoing provisions, unless, upon having made such presentation and surrender of certificates, payment of the total Liquidation Amount for such Exchangeable Shares shall not be made, in which case the rights of the holders shall remain unaffected until the Liquidation Amount has been paid in the manner hereinbefore provided. Canco shall have the right at any time after the Liquidation Date to transfer or cause to be issued or transferred to, and deposited with, the Agent the Liquidation Amount in respect of the Exchangeable Shares represented by certificates that have not at the Liquidation Date been surrendered by the holders thereof, such Liquidation Amount to be held by the Agent as trustee for and on behalf of, and for the use and benefit of, such holders. Upon such deposit being made, the rights of a holder of Exchangeable Shares after such deposit shall be limited to receiving its

9

proportionate part of the Liquidation Amount for such Exchangeable Shares so deposited, without interest, and when received by the Agent, all dividends and other distributions with respect to the RTO Acquiror Shares to which such holder is entitled with a record date after the date of such deposit and before the date of transfer of such RTO Acquiror Shares to such holder against presentation and surrender of the certificates for the Exchangeable Shares held by them in accordance with the foregoing provisions.

(3)    After Canco has satisfied its obligations to pay the holders of the Exchangeable Shares the Liquidation Amount per Exchangeable Share pursuant to Section 5(1) of these share provisions, such holders shall not be entitled to share in any further distribution of the assets of Canco.

6.    **Retraction of Exchangeable Shares by Holder**

(1)    A holder of Exchangeable Shares shall be entitled at any time, subject to the exercise by RTO Acquiror or Callco of the Retraction Call Right and otherwise upon compliance with, and subject to, the provisions of this Section 6, to require Canco to redeem any or all of the Exchangeable Shares registered in the name of such holder for an amount per share equal to the Current Market Price of an RTO Acquiror Share on the last Business Day prior to the Retraction Date plus the Dividend Amount (the **"Retraction Price"**), which shall be satisfied in full by Canco delivering or causing to be delivered to such holder one RTO Acquiror Share for each Exchangeable Share presented and surrendered by the holder together with, on the designated payment date therefor, the Dividend Amount. To effect such redemption, the holder shall present and surrender at the registered office of Canco or at any office of the Transfer Agent as may be specified by Canco by notice to the holders of Exchangeable Shares the certificate or certificates representing the Exchangeable Shares, if any, which the holder desires to have Canco redeem, together with such other documents and instruments as may be required to effect a transfer of Exchangeable Shares under the OBCA and the Articles of Canco and such additional documents, instruments and payments as the Transfer Agent and Canco may reasonably require, and together with a duly executed statement (the **"Retraction Request"**) in the form of Schedule A hereto or in such other form as may be acceptable to Canco:

(a)    specifying that the holder desires to have all or any number specified therein of the Exchangeable Shares represented by such certificate or certificates, if any, (the **"Retracted Shares"**) redeemed by Canco;

(b)    stating the Business Day on which the holder desires to have Canco redeem the Retracted Shares (the **"Retraction Date"**), provided that the Retraction Date shall be not less than 10 Business Days after the date on which the Retraction Request is received by Canco and further provided that, in the event that no such Business Day is specified by the holder in the Retraction Request, the Retraction Date shall be deemed to be the 15th Business Day after the date on which the Retraction Request is received by Canco and subject also to Section 6(8); and

(c)    acknowledging the overriding right (the **"Retraction Call Right"**) of RTO Acquiror and Callco to purchase all but not less than all the Retracted Shares directly from the holder and that the Retraction Request shall be deemed to be a revocable offer by the holder to sell the Retracted Shares to RTO Acquiror or Callco in accordance with the Retraction Call Right on the terms and conditions set out in Section 6(3) hereof.

10

(2)    Provided that neither RTO Acquiror nor Callco has exercised the Retraction Call Right, upon receipt by Canco or the Transfer Agent in the manner specified in Section 6(1) of a certificate or certificates representing the number of Retracted Shares, if any, together with a Retraction Request, and provided that the Retraction Request is not revoked by the holder in the manner specified in Section 6(7), Canco shall redeem the Retracted Shares effective at the close of business on the Retraction Date and shall transfer or cause to be issued or transferred to such holder the RTO Acquiror Shares and shall pay the Dividend Amount to which such holder is entitled and shall comply with Section 6(4) hereof. If only a part of the Exchangeable Shares represented by any certificate is redeemed (or purchased by RTO Acquiror or Callco pursuant to the Retraction Call Right), a new certificate for the balance of such Exchangeable Shares shall be issued to the holder at the expense of Canco.

(3)    Subject to the provisions of this Section 6, upon receipt by Canco of a Retraction Request, Canco shall immediately notify RTO Acquiror and Callco thereof and shall provide to RTO Acquiror and Callco a copy of the Retraction Request. In order to exercise the Retraction Call Right, RTO Acquiror or Callco must notify Canco of its determination to do so (the **"Call Notice"**) within five Business Days of notification to RTO Acquiror or Callco by Canco of the receipt by Canco of the Retraction Request. If RTO Acquiror or Callco do not so notify Canco within such five Business Day period, Canco will notify the holder as soon as possible thereafter that RTO Acquiror and Callco will not exercise the Retraction Call Right. If RTO Acquiror or Callco delivers the Call Notice within such five Business Day period, and provided that the Retraction Request is not revoked by the holder in the manner specified in Section 6(7), the Retraction Request shall thereupon be considered only to be an offer by the holder to sell the Retracted Shares to RTO Acquiror or Callco, as applicable, in accordance with the Retraction Call Right. In such event, Canco shall not redeem the Retracted Shares and RTO Acquiror or Callco, as applicable, shall purchase from such holder and such holder shall sell to RTO Acquiror or Callco, as applicable on the Retraction Date the Retracted Shares for a purchase price (the **"Purchase Price"**) per share equal to the Retraction Price per share. To the extent that RTO Acquiror or Callco, as applicable, pays the Dividend Amount in respect of the Retracted Shares, Canco shall no longer be obligated to pay any declared and unpaid dividends on such Retracted Shares. For the purpose of completing a purchase pursuant to the Retraction Call Right, on the Retraction Date, RTO Acquiror or Callco shall transfer or cause to be issued or transferred to the holder of the Retracted Shares the RTO Acquiror Shares to which such holder is entitled. Provided that RTO Acquiror or Callco, as applicable, has complied with the immediately preceding sentence and Section 6(4) hereof, the closing of the purchase and sale of the Retracted Shares pursuant to the Retraction Call Right shall be deemed to have occurred as at the close of business on the Retraction Date and, for greater certainty, no redemption by Canco of such Retracted Shares shall take place on the Retraction Date. In the event that RTO Acquiror and Callco do not deliver a Call Notice within such five Business Day period, and provided that the Retraction Request is not revoked by the holder in the manner specified in Section 6(7), Canco shall redeem the Retracted Shares on the Retraction Date and in the manner otherwise contemplated in this Section 6. For greater certainty, only one Call Notice may be given by either RTO Acquiror or Callco in respect of each Retraction Request and, in the event that each of RTO Acquiror and Callco each give a Call Notice to Canco, only the Call Notice first received by Canco shall be valid.

(4)    Canco, RTO Acquiror or Callco, as the case may be, shall deliver or cause the Transfer Agent to deliver to the relevant holder written evidence of the book entry issuance in uncertificated form of RTO Acquiror Shares (which shares shall be fully paid and non-assessable), and, if applicable and on or before the payment date therefor, a cheque payable

11

at par at any branch of the bankers of Canco, RTO Acquiror or Callco, as applicable, representing the aggregate Dividend Amount, in payment of the Retraction Price or the Purchase Price, as the case may be, and such delivery of such RTO Acquiror Shares and cheques by Canco, RTO Acquiror or Callco, as the case may be, or by the Transfer Agent shall be deemed to be payment of and shall satisfy and discharge all liability for the Retraction Price or Purchase Price, as the case may be, to the extent that the same is represented by such share certificates and cheques.

(5)    On and after the close of business on the Retraction Date, the holder of the Retracted Shares shall cease to be a holder of such Retracted Shares and shall not be entitled to exercise any of the rights of a holder in respect thereof (including any rights under the Voting and Exchange Trust Agreement), other than the right to receive the Retraction Price or Purchase Price, as the case may be, without interest, upon presentation and surrender of certificates, if any, in accordance with the foregoing provisions, unless upon having made such presentation and surrender of certificates, payment of the Retraction Price or the Purchase Price, as the case may be, shall not be made as provided in Section 6(4) hereof, in which case the rights of such holder shall remain unaffected until the Retraction Price or the Purchase Price, as the case may be, has been paid in the manner hereinbefore provided. On and after the close of business on the Retraction Date, provided that presentation and surrender of certificates and payment of the Retraction Price or the Purchase Price, as the case may be, has been made in accordance with the foregoing provisions, the holder of the Retracted Shares so redeemed by Canco or purchased by RTO Acquiror or Callco shall thereafter be a holder of the RTO Acquiror Shares delivered to it.

(6)    Notwithstanding any other provision of this Section 6, Canco shall not be obligated to redeem Retracted Shares specified by a holder in a Retraction Request to the extent that such redemption of Retracted Shares would be contrary to solvency requirements or other provisions of applicable law. If Canco believes that on any Retraction Date it would not be permitted by any of such provisions to redeem the Retracted Shares tendered for redemption on such date, if any, and provided that RTO Acquiror or Callco shall not have exercised the Retraction Call Right with respect to the Retracted Shares, Canco shall only be obligated to redeem Retracted Shares specified by a holder in a Retraction Request to the extent of the maximum number that may be so redeemed (rounded down to a whole number of shares) as would not be contrary to such provisions and shall notify the holder and the Trustee at least two Business Days prior to the Retraction Date as to the number of Retracted Shares which will not be redeemed by Canco. In any case in which the redemption by Canco of Retracted Shares would be contrary to solvency requirements or other provisions of applicable law, and provided that the Retraction Call Right has not been exercised by RTO Acquiror or Callco, Canco shall redeem Retracted Shares in accordance with Section 6(2) of these share provisions on a pro rata basis and shall issue to each holder of Retracted Shares a new certificate representing the Retracted Shares not redeemed by Canco pursuant to Section 6(2) hereof. If Canco would otherwise be obligated to redeem the Retracted Shares pursuant to Section 6(2) of these share provisions but is not obligated to do so as a result of solvency requirements or other provisions of applicable law, the holder of any such Retracted Shares not redeemed by Canco pursuant to this Section 6(6) as a result of solvency requirements or other provisions of applicable law shall be deemed by giving the Retraction Request to have instructed the Transfer Agent to require RTO Acquiror to purchase such Retracted Shares from such holder on the Retraction Date or as soon as practicable thereafter on payment by RTO Acquiror to such holder of the Purchase Price for each such Retracted Share, all as more specifically provided for in the Voting and Exchange Trust Agreement.

12

(7)    A holder of Retracted Shares may, by notice in writing given by the holder to Canco before the close of business on the Business Day immediately preceding the Retraction Date, withdraw its Retraction Request, in which event such Retraction Request shall be null and void and, for greater certainty, the revocable offer constituted by the Retraction Request to sell the Retracted Shares to RTO Acquiror or Callco shall be deemed to have been revoked.

(8)    Notwithstanding any other provision of this Section 6, if:

     (a)    exercise of the rights of the holders of the Exchangeable Shares, or any of them, to require Canco to redeem any Exchangeable Shares pursuant to this Section 6 on any Retraction Date would require listing particulars or any similar document to be issued in order to obtain the approval of the NASDAQ to the listing and trading (subject to official notice of issuance) of, the RTO Acquiror Shares that would be required to be delivered to such holders of Exchangeable Shares in connection with the exercise of such rights; and

     (b)    as a result of (a) above, it would not be practicable (notwithstanding the reasonable endeavours of RTO Acquiror) to obtain such approvals in time to enable all or any of such RTO Acquiror Shares to be admitted to listing and trading by the NASDAQ (subject to official notice of issuance) when so delivered,

that Retraction Date shall, notwithstanding any other date specified or otherwise deemed to be specified in any relevant Retraction Request, be deemed for all purposes to be the earlier of (i) the second Business Day immediately following the date the approvals referred to in Section 6(8)(a) are obtained, and (ii) the date which is 30 Business Days after the date on which the relevant Retraction Request is received by Canco, and references in these share provisions to such Retraction Date shall be construed accordingly.

**7.    Redemption of Exchangeable Shares by Canco**

(1)    Subject to applicable law, and provided neither RTO Acquiror nor Callco has exercised the Redemption Call Right, Canco shall on the Redemption Date redeem all but not less than all of the then outstanding Exchangeable Shares for an amount per share (the "**Redemption Price**") equal to the Current Market Price of an RTO Acquiror Share on the last Business Day prior to the Redemption Date plus the Dividend Amount, which shall be satisfied in full by Canco causing to be delivered to each holder of Exchangeable Shares one RTO Acquiror Share for each Exchangeable Share held by such holder, together with an amount equal to the Dividend Amount.

(2)    In any case of a redemption of Exchangeable Shares under this Section 7, Canco shall, at least 30 days before the Redemption Date (other than a Redemption Date established in connection with an RTO Acquiror Control Transaction, an Exchangeable Share Voting Event or an Exempt Exchangeable Share Voting Event), send or cause to be sent to each holder of Exchangeable Shares a notice in writing of the redemption by Canco or the purchase by Callco under the Redemption Call Right, as the case may be, of the Exchangeable Shares held by such holder. In the case of a Redemption Date established in connection with an RTO Acquiror Control Transaction, an Exchangeable Share Voting Event or an Exempt Exchangeable Share Voting Event, the written notice of the redemption by Canco or the purchase by RTO Acquiror or Callco, as applicable, under the Redemption Call Right will be sent on or before the Redemption Date, on as many days prior written notice as may be determined by the Board of Directors to be reasonably practicable in the circumstances. In any such case, such notice shall set out the formula for determining the Redemption Price or the Redemption Call Purchase Price, as the case may be, the Redemption Date and, if applicable, particulars of the Redemption Call Right.

13

(3)  On or after the Redemption Date and provided that the Redemption Call Right has not been exercised by RTO Acquirco or Callco, as applicable, Canco shall pay or cause to be paid to the holders of the Exchangeable Shares to be redeemed the Redemption Price for each such Exchangeable Share, upon presentation and surrender at the registered office of Canco or at any office of the Transfer Agent as may be specified by Canco in such notice of the certificates, if any, representing such Exchangeable Shares, together with such other documents and instruments as may be required to effect a transfer of Exchangeable Shares under the OBCA and the Articles of Canco and such additional documents, instruments and payments as the Transfer Agent and Canco may reasonably require. Payment of the Redemption Price for such Exchangeable Shares shall be made by transferring or causing to be issued or transferred to each holder the RTO Acquiror Shares to which such holder is entitled and by delivering to such holder, on behalf of Canco, written evidence of the book entry issuance in uncertificated form of RTO Acquiror Shares (which shares shall be fully paid), and, if applicable, a cheque of Canco payable at par at any branch of the bankers of Canco in payment of the Dividend Amount. On and after the Redemption Date, the holders of the Exchangeable Shares called for redemption shall cease to be holders of such Exchangeable Shares and shall not be entitled to exercise any of the rights of holders in respect thereof (including any rights under the Voting and Exchange Trust Agreement), other than the right to receive the Redemption Price without interest upon presentation and surrender of certificates, if any, in accordance with the foregoing provisions, unless, upon having made such presentation and surrender of certificates, payment of the Redemption Price for such Exchangeable Shares shall not be made, in which case the rights of the holders shall remain unaffected until the Redemption Price has been paid in the manner hereinbefore provided. Canco shall have the right at any time after the sending of notice of its intention to redeem the Exchangeable Shares as aforesaid to transfer or cause to be issued or transferred to, and deposited with, the Agent named in such notice the Redemption Price for the Exchangeable Shares to which such holder is entitled so called for redemption, or of such of the said Exchangeable Shares represented by certificates that have not at the date of such deposit been surrendered by the holders thereof in connection with such redemption, such aggregate Redemption Price to be held by the Agent as trustee for and on behalf of, and for the use and benefit of, such holders. Upon the later of such deposit being made and the Redemption Date, the Exchangeable Shares in respect whereof such deposit shall have been made shall be redeemed and the rights of the holders thereof after such deposit or Redemption Date, as the case may be, shall be limited to receiving their proportionate part of the aggregate Redemption Price for such Exchangeable Shares, without interest, and when received by the Agent, all dividends and other distributions with respect to the RTO Acquiror Shares to which such holder is entitled with a record date after the later of the date of such deposit and the Redemption Date and before the date of transfer of such RTO Acquiror Shares to such holder, against presentation and surrender of the certificates, if any, for the Exchangeable Shares held by them in accordance with the foregoing provisions.

## 8.  Purchase for Cancellation

Subject to applicable law, Canco may at any time and from time to time purchase for cancellation all or any part of the Exchangeable Shares by private agreement with the holder thereof.

14

**9.    Voting Rights**

Except as required by applicable law and by Section 13 hereof, the holders of the Exchangeable Shares shall not be entitled as such to receive notice of or to attend any meeting of the shareholders of Canco or to vote at any such meeting. Without limiting the generality of the foregoing, the holders of the Exchangeable Shares shall not have class votes except as required by applicable law.

**10.    Specified Amount**

The amount specified in respect of each Exchangeable Share for the purposes of subsection 191(4) of the ITA shall be an amount equal to $[•][2].

**11.    Amendment and Approval**

(1)    The rights, privileges, restrictions and conditions attaching to the Exchangeable Shares may be added to, changed or removed only with the approval of the holders of the Exchangeable Shares given as hereinafter specified.

(2)    Any approval given by the holders of the Exchangeable Shares to add to, change or remove any right, privilege, restriction or condition attaching to the Exchangeable Shares or any other matter requiring the approval or consent of the holders of the Exchangeable Shares in accordance with applicable law shall be deemed to have been sufficiently given if it shall have been given in accordance with applicable law, subject to a minimum requirement that such approval be evidenced by resolution passed by not less than two-thirds of the votes cast on such resolution at a meeting of holders of Exchangeable Shares duly called and held at which the holders of at least 10% of the outstanding Exchangeable Shares at that time are present or represented by proxy; provided that if at any such meeting the holders of at least 10% of the outstanding Exchangeable Shares at that time are not present or represented by proxy within one-half hour after the time appointed for such meeting, then the meeting shall be adjourned to such date not less than five days thereafter and to such time and place as may be designated by the Chairman of such meeting. At such adjourned meeting the holders of Exchangeable Shares present or represented by proxy thereat may transact the business for which the meeting was originally called and a resolution passed thereat by the affirmative vote of not less than two-thirds of the votes cast on such resolution at such meeting shall constitute the approval or consent of the holders of the Exchangeable Shares.

**12.    Reciprocal Changes, etc. in Respect of RTO Acquiror Shares**

(1)    Each holder of an Exchangeable Share acknowledges that the Support Agreement provides, in part, that so long as any Exchangeable Shares not owned by RTO Acquiror or its affiliates are outstanding, RTO Acquiror will not without the prior approval of Canco and the prior approval of the holders of the Exchangeable Shares given in accordance with Section 12(2) of these share provisions:

(a)    issue or distribute RTO Acquiror Shares (or securities exchangeable for or convertible into or carrying rights to acquire RTO Acquiror Shares) to the holders of all or substantially all of the then outstanding RTO Acquiror Shares by way of stock dividend or other distribution, other than an issue of RTO Acquiror Shares

---

[2]    [NTD: this should be an amount that is not greater than the FMV of an Exchangeable Share on the date of issuance.]

(or securities exchangeable for or convertible into or carrying rights to acquire RTO Acquiror Shares) to holders of RTO Acquiror Shares (i) who exercise an option to receive dividends in RTO Acquiror Shares (or securities exchangeable for or convertible into or carrying rights to acquire RTO Acquiror Shares) in lieu of receiving cash dividends, or (ii) pursuant to any dividend reinvestment plan or similar arrangement;

(b)    issue or distribute rights, options or warrants to the holders of all or substantially all of the then outstanding RTO Acquiror Shares entitling them to subscribe for or to purchase RTO Acquiror Shares (or securities exchangeable for or convertible into or carrying rights to acquire RTO Acquiror Shares); or

(c)    issue or distribute to the holders of all or substantially all of the then outstanding RTO Acquiror Shares:

(i)    shares or securities of RTO Acquiror of any class (other than RTO Acquiror Shares or securities convertible into or exchangeable for or carrying rights to acquire RTO Acquiror Shares);

(ii)    rights, options or warrants other than those referred to in Section 13(1)(b) above;

(iii)    evidence of indebtedness of RTO Acquiror; or

(iv)    assets of RTO Acquiror,

unless the economic equivalent on a per share basis of such rights, options, warrants, securities, shares, evidences of indebtedness or other assets is issued or distributed simultaneously to holders of the Exchangeable Shares and at least 7 days prior written notice thereof is given to the holders of Exchangeable Shares; provided that, for greater certainty, the above restrictions shall not apply to any securities issued or distributed by RTO Acquiror in order to give effect to and to consummate, in furtherance of or otherwise in connection with the transactions contemplated by, and in accordance with, the Arrangement Agreement and the Plan of Arrangement.

(2)    Each holder of an Exchangeable Share acknowledges that the Support Agreement further provides, in part, that so long as any Exchangeable Shares not owned by RTO Acquiror or its affiliates are outstanding, RTO Acquiror will not without the prior approval of Canco and the prior approval of the holders of the Exchangeable Shares given in accordance with Section 12(2) of these share provisions:

(a)    subdivide, redivide or change the then outstanding RTO Acquiror Shares into a greater number of RTO Acquiror Shares;

(b)    reduce, combine, consolidate or change the then outstanding RTO Acquiror Shares into a lesser number of RTO Acquiror Shares; or

16

(c)  reclassify or otherwise change the RTO Acquiror Shares or effect an amalgamation, merger, reorganization or other transaction affecting the RTO Acquiror Shares, unless the same or an economically equivalent change shall simultaneously be made to, or in the rights of the holders of, the Exchangeable Shares and at least 10 days prior written notice is given to the holders of Exchangeable Shares, provided that, for greater certainty, the above restrictions shall not apply to any securities issued or distributed by RTO Acquiror in order to give effect to and to consummate, in furtherance of or otherwise in connection with the transactions contemplated by, and in accordance with, the Arrangement Agreement and the Plan of Arrangement. The Support Agreement further provides, in part, that the aforesaid provisions of the Support Agreement shall not be changed without the approval of the holders of the Exchangeable Shares given in accordance with Section 12(2) of these share provisions.

(3)  Notwithstanding the foregoing provisions of this Section 12, in the event of an RTO Acquiror Control Transaction:

(a)  in which RTO Acquiror merges or amalgamates with, or in which all or substantially all of the then outstanding RTO Acquiror Shares are acquired by one or more other corporations to which RTO Acquiror is, immediately before such merger, amalgamation or acquisition, related within the meaning of the ITA (otherwise than virtue of a right referred to in paragraph 251(5)(b) thereof);

(b)  which does not result in an acceleration of the Redemption Date in accordance with paragraph (b) of the definition of such term in Section 1(1) of the share provisions; and

(c)  in which all or substantially all of the then outstanding RTO Acquiror Shares are converted into or exchanged for shares or rights to receive such shares (the "**Other Shares**") of another corporation (the "**Other Corporation**") that, immediately after such RTO Acquiror Control Transaction, owns or controls, directly or indirectly, RTO Acquiror;

then all references herein to "RTO Acquiror" shall thereafter be and be deemed to be references to "Other Corporation" and all references herein to "RTO Acquiror Shares" shall thereafter be and be deemed to be references to "Other Shares" (with appropriate adjustments, if any, as are required to result in a holder of Exchangeable Shares on the exchange, redemption or retraction of shares pursuant to these share provisions or Article 5 of the Plan of Arrangement or exchange of shares pursuant to the Voting and Exchange Trust Agreement immediately subsequent to the RTO Acquiror Control Transaction being entitled to receive that number of Other Shares equal to the number of Other Shares such holder of Exchangeable Shares would have received if the exchange, option or retraction of such shares pursuant to these share provisions or Article 5 of the Plan of Arrangement, or exchange of such shares pursuant to the Voting and Exchange Trust Agreement had occurred immediately prior to the RTO Acquiror Control Transaction and the RTO Acquiror Control Transaction was completed) without any need to amend the terms and conditions of the Exchangeable Shares and without any further action required.

**13.  Actions by Canco under Support Agreement**

(1)  Canco will take all such actions and do all such things as shall be necessary to perform and comply with and to ensure performance and compliance by RTO Acquiror, Callco and Canco with all provisions of the Support Agreement applicable to RTO Acquiror, Callco and Canco, respectively, in accordance with the terms thereof including taking all such actions and doing all such things as shall be necessary to enforce for the direct benefit of Canco all rights and benefits in favour of Canco under or pursuant to such agreement.

17

(2)    Canco shall not propose, agree to or otherwise give effect to any amendment to, or waiver or forgiveness of its rights or obligations under, the Support Agreement without the approval of the holders of the Exchangeable Shares given in accordance with Section 12(2) of these share provisions other than such amendments, waivers and/or forgiveness as may be necessary or advisable for the purposes of:

   (a)    adding to the covenants of the other parties to such agreement for the protection of Canco or the holders of the Exchangeable Shares thereunder;

   (b)    making such amendments or modifications not inconsistent with such agreement as may be necessary or desirable with respect to matters or questions arising thereunder which, in the opinion of Canco, it may be expedient to make, provided that the Board of Directors shall be of the good faith opinion, that such amendments and modifications will not be materially prejudicial to the interests of the holders of the Exchangeable Shares; or

   (c)    making such changes in or corrections to such agreement for the purpose of curing or correcting any ambiguity or defect or inconsistent provision or clerical omission or mistake or manifest error contained therein, provided that the Board of Directors shall be of the good faith opinion that such changes or corrections will not be materially prejudicial to the rights or interests of the holders of the Exchangeable Shares.

**14.    Legend; Call Rights; Withholding Rights**

(1)    The certificates evidencing the Exchangeable Shares, if any, shall contain or have affixed thereto a legend with respect to the Support Agreement, the provisions of the Plan of Arrangement relating to the Liquidation Call Right, the Redemption Call Right and the Change of Law Call Right (as defined in the Plan of Arrangement), the Voting and Exchange Trust Agreement (including the provisions with respect to the voting rights and automatic exchange thereunder) and the Retraction Call Right.

(2)    Each holder of an Exchangeable Share, whether of record or beneficial, by virtue of becoming and being such a holder shall be deemed to acknowledge each of the Liquidation Call Right, the Retraction Call Right, the Redemption Call Right and the Change of Law Call Right and the overriding nature thereof in connection with the liquidation, dissolution or winding-up of Canco or any other distribution of the assets of Canco among its shareholders for the purpose of winding up its affairs, or the retraction or redemption of Exchangeable Shares, as the case may be, and to be bound thereby in favour of RTO Acquiror or Callco as therein provided.

(3)    Notwithstanding any other provisions of these share provisions, Canco, Callco, RTO Acquiror and the Transfer Agent shall be entitled to deduct and withhold from any dividend, distribution, consideration, purchase price or amounts otherwise payable to any holder of Exchangeable Shares such amounts as Canco, Callco, RTO Acquiror or the Transfer Agent is required to deduct and withhold with respect to such payment under the ITA or United States tax laws or any provision of provincial, territorial, state, local or foreign tax law, in each case, as amended. To the extent that amounts are so withheld, such

18

withheld amounts shall be treated for all purposes hereof as having been paid to the holder of the Exchangeable Shares in respect of which such deduction and withholding was made, provided that such withheld amounts are actually remitted to the appropriate taxing Governmental Entity. To the extent that the amount so required to be deducted or withheld from any payment to a holder exceeds the cash portion of the consideration otherwise payable to the holder, Canco, Callco, RTO Acquiror and the Transfer Agent are hereby authorized to sell or otherwise dispose of such portion of the consideration as is necessary to provide sufficient funds to Canco, Callco, RTO Acquiror or the Transfer Agent, as the case may be, to enable it to comply with such deduction or withholding requirement and Canco, Callco, RTO Acquiror or the Transfer Agent shall notify the holder thereof and remit any unapplied balance of the net proceeds of such sale.

15. **Notices**

(1)    Any notice, request or other communication to be given to Canco by a holder of Exchangeable Shares shall be in writing and shall be valid and effective if given by first class mail (postage prepaid) or by delivery to the registered office of Canco and addressed to the attention of the Chief Executive Officer of Canco. Any such notice, request or other communication, if given by mail, telecopy or delivery, shall only be deemed to have been given and received upon actual receipt thereof by Canco.

(2)    Any presentation and surrender by a holder of Exchangeable Shares to Canco or the Transfer Agent of certificates representing Exchangeable Shares in connection with the liquidation, dissolution or winding-up of Canco or the retraction or redemption of Exchangeable Shares shall be made by first class mail (postage prepaid) or by delivery to the registered office of Canco or to such office of the Transfer Agent as may be specified by Canco, in each case, addressed to the attention of the Chief Executive Officer of Canco. Any such presentation and surrender of certificates shall only be deemed to have been made and to be effective upon actual receipt thereof by Canco or the Transfer Agent, as the case may be. Any such presentation and surrender of certificates made by first class mail (postage prepaid) shall be at the sole risk of the holder mailing the same.

(3)    Any notice, request or other communication to be given to a holder of Exchangeable Shares by or on behalf of Canco shall be in writing and shall be valid and effective if given by first class mail (postage prepaid) or by delivery to the address of the holder recorded in the register of shareholders of Canco or, in the event of the address of any such holder not being so recorded, then at the last known address of such holder. Any such notice, request or other communication, if given by mail, shall be deemed to have been given and received on the third Business Day following the date of mailing and, if given by delivery, shall be deemed to have been given and received on the date of delivery. Accidental failure or omission to give any notice, request or other communication to one or more holders of Exchangeable Shares shall not invalidate or otherwise alter or affect any action or proceeding to be taken by Canco pursuant thereto.

(4)    In the event of any interruption of mail service immediately prior to a scheduled mailing or in the period following a mailing during which delivery normally would be expected to occur, Canco shall make reasonable efforts to disseminate any notice by other means, such as press release.

Notwithstanding any other provisions of these share provisions, notices, other communications and deliveries need not be mailed if Canco determines that delivery thereof by mail may be delayed.

19

Persons entitled to any deliveries (including certificates and cheques) which are not mailed for the foregoing reason may take delivery thereof at the office of the Transfer Agent to which the deliveries were made, upon application to the Transfer Agent, until such time as Canco has determined that delivery by mail will not longer be delayed. Canco will provide notice of any such determination not to mail made hereunder as soon as reasonably practicable after the making of such determination and in accordance with this Section 16(4). Such deliveries in such circumstances will constitute delivery to the persons entitled thereto.

**16.   Disclosure of Interests in Exchangeable Shares**

Canco shall be entitled to require any holder of an Exchangeable Share or any person who Canco knows or has reasonable cause to believe holds any interest whatsoever in an Exchangeable Share to confirm that fact or to give such details as to whom has an interest in such Exchangeable Share as would be required (if the Exchangeable Shares were a class of "equity shares" of Canco) under National Instrument 62-104 *Takeover Bids and Issuer Bids* or as would be required under the Articles of RTO Acquiror or any laws or regulations, or pursuant to the rules or regulations of any regulatory Governmental Entity, if the Exchangeable Shares were RTO Acquiror Shares.

20

## SCHEDULE A TO APPENDIX I RETRACTION REQUEST

### [TO BE PRINTED ON EXCHANGEABLE SHARE CERTIFICATES, IF ANY]

To: Metamaterial Exchangeco Inc. ("**Canco**") and 2798331 Ontario Inc. ("**Callco**") and Torchlight Energy Resources, Inc. ("**RTO Acquiror**")

This notice is given pursuant to Section 6 of the provisions (the "**Share Provisions**") attaching to the Exchangeable Shares of Canco represented by this certificate and all capitalized words and expressions used in this notice that are defined in the Share Provisions have the meanings ascribed to such words and expressions in such Share Provisions.

The undersigned hereby notifies Canco that, subject to the Retraction Call Right referred to below, the undersigned desires to have Canco redeem in accordance with Section 6 of the Share Provisions:

(a) ☐ all share(s) represented by this certificate; or

(b) ☐ _____ share(s) only represented by this certificate.

The undersigned hereby notifies Canco that the Retraction Date shall be _____.

NOTE: The Retraction Date must be a Business Day and must not be less than 10 Business Days nor more than 15 Business Days after the date upon which this notice is received by Canco. If no such Business Day is specified above, the Retraction Date shall be deemed to be the 15th Business Day after the date on which this notice is received by Canco.

The undersigned acknowledges the overriding Retraction Call Right of RTO Acquiror and Callco to purchase all but not less than all the Retracted Shares from the undersigned and that this notice is and shall be deemed to be a revocable offer by the undersigned to sell the Retracted Shares to RTO Acquiror or Callco in accordance with the Retraction Call Right on the Retraction Date for the Purchase Price and on the other terms and conditions set out in Section 6(3) of the Share Provisions. This Retraction Request, and this offer to sell the Retracted Shares to RTO Acquiror or Callco, may be revoked and withdrawn by the undersigned only by notice in writing given to Canco at any time before the close of business on the Business Day immediately preceding the Retraction Date.

The undersigned acknowledges that if, as a result of solvency provisions of applicable law, Canco is unable to redeem all Retracted Shares, and provided that neither RTO Acquiror nor Callco has exercised the Retraction Call Right with respect to the Retracted Shares, the Retracted Shares will be automatically exchanged pursuant to the Voting and Exchange Trust Agreement so as to require RTO Acquiror to purchase the unredeemed Retracted Shares.

The undersigned hereby represents and warrants to Callco, RTO Acquiror and Canco that the undersigned:

[is] ☐

[is not] ☐

(select one)

A1

a non-resident of Canada for purposes of the *Income Tax Act* (Canada). **The undersigned acknowledges that in the absence of an indication that the undersigned is not a non-resident of Canada, withholding on account of Canadian tax may be made from amounts payable to the undersigned on the redemption or purchase of the Retracted Shares.**

The undersigned hereby represents and warrants to Callco, RTO Acquiror and Canco that the undersigned is not a person within the United States of America, its territories or possessions or any state thereof, or the District of Columbia (collectively, the "United States") or a U.S. person (within the meaning of Regulation S under the United States *Securities Act of 1933*, as amended) and is not making this Retraction Request for the account or benefit of a person within the United States or such a U.S. person.

The undersigned hereby represents and warrants to Callco, RTO Acquiror and Canco that the undersigned has good title to, and is the beneficial owner of, the share(s) represented by this certificate to be acquired by Callco, RTO Acquiror or Canco, as the case may be, free and clear of all liens, claims and encumbrances.

_____
(Date)

_____
(Signature of Shareholder)

_____
(Guarantee of Signature) E-60

Please check box if the certificates for RTO Acquiror Shares and any cheque(s) resulting from the retraction or purchase of the Retracted Shares are to be held for pick-up by the shareholder from the Transfer Agent, failing which such certificates and cheque(s) will be mailed to the last address of the shareholder as it appears on the register.

NOTE:    This panel must be completed and this certificate, together with such additional documents and payments (including, without limitation, any applicable Stamp Taxes) as the Transfer Agent may require, must be deposited with the Transfer Agent. The securities and any cheque(s) resulting from the retraction or purchase of the Retracted Shares will be issued and registered in, and made payable to, respectively, the name of the shareholder as it appears on the register of Canco and the certificates for RTO Acquiror Shares and any cheque(s) resulting from such retraction or purchase will be delivered to such shareholder as indicated above, unless the form appearing immediately below is duly completed.

**Date:**

Name of Person in Whose Name Securities or Cheque(s) Are to be
Registered, Issued or Delivered (please print):

Street Address or P.O. Box:

Signature of Shareholder:                                                    .

City, Province and Postal Code:

Signature Guaranteed by:

A2

NOTE:    If this Retraction Request is for less than all of the shares represented by this certificate, a certificate representing the remaining share(s) of Canco represented by this certificate will be issued and registered in the name of the shareholder as it appears on the register of Canco, unless the Share Transfer Power on the share certificate is duly completed in respect of such share(s).

A3

EX-99.1 4 ex99-1.htm PRESS RELEASE, DATED DECEMBER 14, 2020

Exhibit C - Ex-99.1

Exhibit 99.1

## METAMATERIAL AND TORCHLIGHT SIGN DEFINITIVE AGREEMENT FOR BUSINESS COMBINATION

### Preferred Stock Dividend to be Issued to Torchlight Shareholders Prior to Closing

PLANO, TX and HALIFAX, NS, December 14, 2020 – Torchlight Energy Resources, Inc. (NASDAQ: TRCH), an oil and gas exploration company ("Torchlight") and Metamaterial Inc. ("Metamaterial" or "META") (CSE: MMAT), a developer of high-performance functional materials and nanocomposite products, announced today the signing of a definitive agreement for a business combination of Torchlight and Metamaterial by way of a statutory plan of arrangement (the "Transaction"). Upon completion of the Transaction, shareholders of Metamaterial are expected to hold an approximate 75% equity interest in the combined company while Torchlight shareholders will retain an approximate 25% equity interest in the combined company, subject to the pre-closing financing described below.

Torchlight shareholders on the record date will be entitled to receive a preferred stock dividend, payable immediately prior to the closing of the Transaction, that entitles them to their pro rata share of any proceeds resulting from any sale of Torchlight's oil and gas assets that occurs on the earlier of December 31, 2021 or six months from the closing of the Transaction, and, after such time if such sales are not complete, will be entitled to receive a pro rata equity interest in a spin-off entity that holds Torchlight's remaining oil and gas assets, subject to certain conditions.

"We are very excited to sign the definitive agreement with Metamaterial," stated John Brda, Torchlight's CEO. "We believe this Transaction provides our shareholders with the best opportunity moving forward. Metamaterial offers proven disruptive technology with strong environmental, social and governance (ESG) priorities. This Transaction provides our shareholders with access to the multi-billion-dollar markets that Metamaterial serves and new applications that are being revolutionized with their sustainable technologies, while still allowing our Shareholders at closing of the Transaction to participate in the proceeds of our oil and gas asset divestitures."

"META's management, led by George Palikaras, has built an extraordinary award-winning cleantech company whose proprietary advanced technologies address multiple markets and improve their customers' capabilities," said Greg McCabe, Torchlight's Chairman. "I am excited to work with the META team and equally excited about the outcome for our faithful Torchlight shareholders."

"NASDAQ is the world's premier technology exchange, providing us with the best platform to expand awareness of Metamaterial on the global stage and fully realize the value of our portfolio of innovative, sustainable products." commented Ram Ramkumar, Metamaterial's Chairman.

"It has been our goal for META to be a NASDAQ-listed company," stated George Palikaras, President & CEO of Metamaterial. "When the business combination with Torchlight closes, obtaining a national exchange listing in the United States is anticipated to provide META with significant value and increased access to global capital markets."

"This Transaction will expand our business' reach and attract additional world-class talent. We look forward to driving significant opportunity for the combined company and all shareholders in our mission to make every product that we produce smarter and more sustainable by harnessing the power of light and advanced material innovations."

**Transaction Summary:**

The following is a summary of the key terms of the pending Transaction as contemplated by the Arrangement Agreement. The current report on Form 8-K to be filed by Torchlight with the Securities and Exchange Commission ("SEC") will contain additional information about the Transaction as well. The closing of the Transaction is subject to the satisfaction or waiver of customary closing conditions, including approvals by NASDAQ and the Canadian Securities Exchange ("CSE"), Canadian court approval, and approval by the shareholders of both companies. There can be no assurances that the Transaction will be consummated. Pertinent deal terms are as follows:

- Torchlight and Metamaterial will be combined such that at closing, the former equity holders of Torchlight would own approximately 25% of the combined company with the former equity holders of Metamaterial owning the remaining approximately 75% of the combined company.

- Prior to closing, Torchlight must raise gross proceeds of at least $10 million through the issuance of common stock or securities convertible into or exercisable for common stock, less the value of loans Torchlight has made to Metamaterial.

- Prior to closing, all debt of Torchlight is to be converted into common stock or repaid in full, excepting senior secured debt that may alternatively be modified such that the debtholders' sole recourse in respect thereof will be against Torchlight's pre-closing oil and gas assets.

- Metamaterial shareholders may elect to receive either shares of Torchlight common stock or shares of a Canadian subsidiary of Torchlight, which will be exchangeable into Torchlight common stock (the "Exchangeable Shares"). Holders of Exchangeable Shares will be entitled to cast votes on matters for which holders of Torchlight common stock are entitled to vote and will be entitled to receive dividends that are economically equivalent to the dividends declared by Torchlight with respect to its common stock.

- Torchlight will declare a dividend of preferred stock to its common shareholders on the record date, with such dividend being payable immediately prior to closing of the Transaction. The preferred share will provide shareholders of record, the right of participation in the net proceeds of the sale of Torchlight's oil and gas assets, subject to certain holdbacks and time constraints.

- The combined company, formerly known as Torchlight Energy Resources, Inc., will change its name and focus its business to align with the current business of Metamaterial.

- Following the closing of the Transaction, the board of directors of the combined company will be comprised of 7 members, one of whom is to be appointed by Torchlight, a second to be jointly appointed by Metamaterial and Torchlight and the remaining 5 to be appointed by Metamaterial.

- Metamaterial's CEO, George Palikaras will be appointed CEO of the combined company, along with the appointment of Kenneth L. Rice as CFO and Executive Vice President. Torchlight's management will remain, in an advisory role focused on winding down Torchlight's legacy business and maximizing the value obtained from the divestiture of Torchlight's oil and gas assets.

- Torchlight will loan to Metamaterial an additional US$500,000, in exchange for an unsecured promissory note in substantially the same form as the 8% unsecured convertible promissory note that evidences Torchlight's loan to Metamaterial of US$500,000 on September 20, 2020. Upon closing, these two bridge loans, including the aggregate principal and unpaid interest, are to be included in, and credited against, the $10 million pre-closing financing described above, with such notes to be deemed cancelled and paid in full.

- Certain stockholders of each of Torchlight and Metamaterial have executed customary voting and support agreement pursuant to which persons representing approximately 16% of Torchlight's and approximately 48% of Metamaterial's outstanding voting power have agreed to vote in favor of the Transaction, subject to customary applicable terms.

Torchlight and Metamaterial invite all interested parties to view a webcast introduction of George Palikaras, CEO of META and an overview on META. The webcast link will be made available and announced shortly.

In connection with the Transaction, Torchlight and Metamaterial respectively obtained fairness opinions. Torchlight has engaged Roth Capital Partners as financial advisor and Stikeman Elliott LLP and K&L Gates LLP as legal advisors, and Metamaterial has engaged Hamilton Clark and Cormark Securities as financial advisors and Fasken Martineau DuMoulin LLP and Wilson Sonsini Goodrich & Rosati P.C. as legal advisors.

####

### About Metamaterial Inc. (META)

META is changing the way we use, interact with, and benefit from light and other forms of energy. META designs and manufactures advanced materials and performance functional films which are engineered at the nanoscale to control light and other forms of energy. META is an award winning Global Cleantech 100 company with products that support sustainability by doing more with less; they encompass lightweight, sustainable raw materials and processes which consume less energy and offer more performance. META has a growing patent portfolio and is currently developing new materials with diverse applications in concert with companies in the automotive, aerospace, energy, consumer electronics and medical industries. META is headquartered in Halifax, Nova Scotia and has R&D and Sales offices in London, UK and Silicon Valley. For additional information on META, please visit www.metamaterial.com

### Forward Looking Information

This release includes forward-looking information within the meaning of Canadian securities laws regarding Metamaterial and its business, which may include, but are not limited to, statements with respect to the terms and anticipated timing of the proposed transaction, the intention to raise equity capital, the potential continued listing on the NASDAQ and the benefits thereof, the disposition of Torchlight's oil and gas assets, the approval of the Transaction by the shareholders of Metamaterial, the business strategies, product development and operational activities of Metamaterial and Torchlight. Often but not always, forward-looking information can be identified by the use of words such as "expect", "intends", "anticipated", "believes" or variations (including negative variations) of such words and phrases, or state that certain actions, events or results "may", "could", "would" or "will" be taken, occur or be achieved. Such statements are based on the current expectations and views of future events of the management of Metamaterial and are based on assumptions and subject to risks and uncertainties. Although the management of Metamaterial believes that the assumptions underlying these statements are reasonable, they may prove to be incorrect. The forward-looking events and circumstances discussed in this release may not occur and could differ materially as a result of known and unknown risk factors and uncertainties affecting the companies, including risks regarding the ability of the parties to close the proposed transaction, the ability of the parties to raise necessary equity capital, approval of the transaction and continued listing by the NASDAQ, approval of the Canadian Securities Exchange, receipt of shareholder approval and required third party and regulatory consents, the risk that Torchlight may not be able to dispose of its oil and gas assets on favorable terms or at all, risks related to the technology industry, market strategic and operational activities, and management's ability to manage and to operate the business. Although Metamaterial has attempted to identify important factors that could cause actual actions, events or results to differ materially from those described in forward-looking statements, there may be other factors that cause actions, events or results to differ from those anticipated, estimated or intended. Accordingly, readers should not place undue reliance on any forward-looking statements or information. No forward-looking statement can be guaranteed. Except as required by applicable securities laws, forward-looking statements speak only as of the date on which they are made and Metamaterial does not undertake any obligation to publicly update or revise any forward looking statement, whether as a result of new information, future events, or otherwise.

*The Canadian Securities Exchange has neither approved nor disapproved the contents of this news release.*

**About Torchlight Energy Resources, Inc.**

Torchlight Energy Resources, Inc. (TRCH), based in Plano, Texas, is a high growth oil and gas Exploration and Production (E&P) company with a primary objective of acquisition and development of domestic oil fields. Torchlight has assets focused in West and Central Texas where their targets are established plays such as the Permian Basin. For additional information on Torchlight, please visit www.torchlightenergy.com.

**Forward-Looking Statement**

This press release contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, which are intended to be covered by the "safe harbor" created by those sections. All statements in this release that are not based on historical fact are "forward looking statements." These statements may be identified by words such as "estimates," "anticipates," "projects," "plans," "strategy," "goal," or "planned," "seeks," "may," "might", "will," "expects," "intends," "believes," "should," and similar expressions, or the negative versions thereof, and which also may be identified by their context. All statements that address operating performance or events or developments Torchlight Energy Resources expects or anticipates will occur in the future, such as stated objectives or goals, our refinement of strategy, our attempts to secure additional financing, our exploring possible business alternatives, or that are not otherwise historical facts, are forward-looking statements. While management has based any forward-looking statements included in this release on its current expectations, the information on which such expectations were based may change. Forward-looking statements involve inherent risks and uncertainties which could cause actual results to differ materially from those in the forward-looking statements as a result of various factors, including risks associated with Torchlight's ability to obtain additional capital in the future to fund planned expansion, the demand for oil and natural gas which demand could be materially affected by the economic impacts of COVID-19 and possible increases in supply from Russia and OPEC, the proposed business combination transaction with Metamaterial, general economic factors, competition in the industry and other factors that could cause actual results to be materially different from those described herein as anticipated, believed, estimated or expected. Additional risks and uncertainties are described in or implied by the Risk Factors and Management's Discussion and Analysis of Financial Condition and Results of Operations sections of Torchlight's 2019 Annual Report on Form 10-K, filed on March 16, 2020 and other reports filed from time to time with the SEC. Torchlight urges you to consider those risks and uncertainties in evaluating its forward-looking statements. Readers are cautioned to not place undue reliance upon any such forward-looking statements, which speak only as of the date made. Except as otherwise required by the federal securities laws, Torchlight disclaims any obligation or undertaking to publicly release any updates or revisions to any forward-looking statement contained herein (or elsewhere) to reflect any change in its expectations with regard thereto, or any change in events, conditions, or circumstances on which any such statement is based.

**Additional Information and Where to Find It**

Torchlight and Metamaterial will prepare a proxy statement/prospectus for Torchlight's Shareholders to be filed with the SEC. The proxy statement/prospectus will be mailed to Torchlight's Shareholders. Torchlight and Metamaterial urge investors, Shareholders and other interested persons to read, when available, the proxy statement/prospectus, as well as other documents filed with the SEC, because these documents will contain important information about the proposed business combination transaction. Such persons can also read Torchlight's Annual Report on Form 10-K for the fiscal year ended December 31, 2019, for a description of the security holdings of its officers and directors and their respective interests as security holders in the consummation of the transactions described herein. Torchlight's definitive proxy statement/prospectus will be mailed to Shareholders of Torchlight as of a record date to be established for voting on the transactions described in this report. Torchlight's Shareholders will also be able to obtain a copy of such documents, without charge, by directing a request to: John A. Brda, President of Torchlight Energy Resources, Inc., 5700 W. Plano Parkway, Suite 3600, Plano, Texas 75093; e-mail: john@torchlightenergy.com. These documents, once available, can also be obtained, without charge, at the SEC's web site (http://www.sec.gov).

**Participants in Solicitation**

Torchlight, Metamaterial and their respective directors, executive officers and other members of their management and employees, under SEC rules, may be deemed to be participants in the solicitation of proxies of Torchlight Shareholders in connection with the proposed business combination. Investors and security holders may obtain more detailed information regarding the names, affiliations and interests of Torchlight's directors in its Annual Report on Form 10-K for the fiscal year ended December 31, 2019, which was filed with the SEC on March 16, 2020. Information regarding the persons who may, under SEC rules, be deemed participants in the solicitation of proxies to Torchlight's Shareholders in connection with the proposed business combination will be set forth in the proxy statement/prospectus for the proposed business combination when available. Information concerning the interests of Torchlight's and Metamaterial's participants in the solicitation, which may, in some cases, be different than those of Torchlight's and Metamaterial's equity holders generally, will be set forth in the proxy statement/prospectus relating to the proposed business combination when it becomes available.

**Non-Solicitation**

This press release is not a proxy statement or solicitation of a proxy, consent or authorization with respect to any securities or in respect of the proposed transaction and shall not constitute an offer to sell or a solicitation of an offer to buy the securities of Torchlight or Metamaterial, nor shall there be any sale of any such securities in any state or jurisdiction in which such offer, solicitation, or sale would be unlawful prior to registration or qualification under the securities laws of such state or jurisdiction. No offer of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act of 1933, as amended.

**For further information:**

Investor Relations and Media Contacts:

**Torchlight**

Derek Gradwell, Integrous Communications, 512-270-6990, dgradwell@integcom.us, ir@torchlightenergy.com,

**Metamaterial**

Media Inquiries: Graham Farrell, Harbor Access LLC, (416) 842 9003, Graham.Farrell@HarborAccessllc.com,
Investor inquiries: Mark Komonoski, Director Capital Markets and IR, Metamaterial Inc., 877-255-8483, mark@metamaterial.com



**Go Beyond.**

Q

Exhibit D -

🖶 Print 📄 PDF ✉ Email

# META PROVIDES UPDATE TO SHAREHOLDERS ON EXCHANGE PROCESS AND TIMING

**HALIFAX, NS / ACCESSWIRE / June 29, 2021 /** Meta Materials Inc. (the "Company" or "META®") (NASDAQ:MMAT) a developer of high-performance functional materials and nanocomposites, today provided an update to its shareholders regarding the finalization of distribution of the Series A Preferred share dividend and the MMAT shares to be distributed to former holders of Metamaterial Inc.'s common shares that were traded on the Canadian Securities Exchange (the "CSE") prior to closing of the business combination with Torchlight Energy Resources, Inc. ("Torchlight"), which was effective at 12:01 AM EDT on June 28, 2021.

The Series A Preferred share dividend was distributed by Torchlight's transfer agent on June 25, 2021 to shareholders of record of Torchlight on June 24, 2021. The Depository Trust Company ("DTC") informed META that formal allocation of the shares to individual accounts should occur on or about Wednesday June 30, 2021 pending the receipt of certain documentation by DTC. Once the DTC allocation is completed, holders of the Series A preferred shares

should be able to determine appropriate allocations in their individual accounts.

Former holders of Metamaterial Inc.'s common shares (that were previously traded on the CSE) are entitled to receive 1.845 META shares for each previously held common share of Metamaterial Inc. This consideration is payable either directly in META shares or in Exchangeable Shares of a wholly-owned subsidiary of META that reflect the same exchange ratio on issuance. The form of consideration that is received will depend on the election made by the shareholder in a Letter of Transmittal filed by the shareholder earlier in 2021. The deadline for election of Exchangeable Shares has passed.

To complete the share exchanges, META's transfer agent, AST Financial in the US and AST Trust Company (Canada) ("AST") must perform detailed reconciliations of shareholder records held by them, as well as by the depositories DTC and CDS Clearing and Depository Services Inc., along with reconciliations of the Letters of Transmittal received to ensure that the exchange of old Metamaterial Inc.'s common shares for META's shares is accurate and that the shares are being provided to the proper owners. These reconciliations require a bit of time to complete.

AST informed us today that the required reconciliations and share transfers cannot be completed until on or about Friday July 2, 2021 due to administrative procedures. During the proxy process and the Offering Circular communications we did make clear that the exchanges would be performed after the closing in as expeditious a manner as reasonable. After lengthy review and discussions with AST, META believes that the process is being performed in a highly diligent fashion and at the most deliberate speed, especially given the Canada Day holiday on July 1, 2021. All exchanges of Metamaterial Inc.'s securities surrendered with a valid and duly

executed Letter of Transmittal, up to and including June 25, 2021, will have an effective date of June 28, 2021.

For those registered shareholders who hold certificates or DRS (Direct Registration Statements) and have not submitted a letter of transmittal, you will be required to submit the Letter of Transmittal surrendering your position, along with your physical share certificate if applicable, in Metamaterial Inc., in order to receive your META shares. You may find the letter of transmittal form in the investors section of our website under FAQs.

We are committed to expediting this process as much as we are able, and we truly appreciate your patience as we transition to a NASDAQ listed company.

## About Meta Materials Inc.

META® delivers previously unachievable performance, across a range of applications, by inventing, designing, developing, and manufacturing sustainable, highly functional materials. Our extensive technology platform enables leading global brands to deliver breakthrough products to their customers in consumer electronics, 5G communications, health and wellness, aerospace, automotive, and clean energy. Our achievements have been widely recognized, including being named a Global Cleantech 100 company. Learn more at www.metamaterial.com.

## Forward Looking Information

This press release includes forward-looking information or statements within the meaning of Canadian securities laws and within the meaning of Section 27A of the Securities Act of 1933, as amended, Section 21E of the Securities Exchange Act of 1934, as amended, and the Private Securities Litigation Reform Act of 1995, regarding the Company and its business, which may include, but are not limited to, statements with respect to the business strategies, product development and operational activities of the Company.

Often but not always, forward-looking information can be identified by the use of words such as "potential," "predicts," "projects," "seeks," "plans," "expect", "intends", "anticipated", "believes" or variations (including negative variations) of such words and phrases, or statements that certain actions, events or results "may", "could", "should," "would" or "will" be taken, occur or be achieved. Such statements are based on the current expectations and views of future events of the management of the Company and are based on assumptions and subject to risks and uncertainties. Although the management of the Company believes that the assumptions underlying these statements are reasonable, they may prove to be incorrect. The forward-looking events and circumstances discussed in this release may not occur and could differ materially as a result of known and unknown risk factors and uncertainties affecting the Company, including risks related to the timing of the share transfers in connection with the transaction with Torchlight Energy Resources, Inc., the management and potential divestiture of the assets in the Company's oil and gas business, the potential benefits of the Company being publicly listed on the Nasdaq Capital Market, the potential benefits of the transaction with Torchlight Energy Resources Inc. to the Company's stockholders, the research and development projects of the Company, the market potential of the Company's products, the investment priorities and manufacturing plans of the Company, the scalability of the Company's production ability, the technology industry, market strategic and operational activities, and management's ability to manage and to operate the business. More details about these and other risks that may impact the Company's businesses are described under the heading "Risk Factors" in the Company's Form 10-Q filed with the SEC on May 14, 2021, in the Company's Form 10-K filed with the SEC on March 18, 2021, and in subsequent filings made by Meta Materials with the SEC, which are available on SEC's website at www.sec.gov. Although the Company has attempted to identify important factors that could cause actual actions, events or results to differ materially from those

described in forward-looking statements, there may be other factors that cause actions, events or results to differ from those anticipated, estimated or intended. Accordingly, readers should not place undue reliance on any forward-looking statements or information. No forward-looking statement can be guaranteed. Except as required by applicable securities laws, forward-looking statements speak only as of the date on which they are made and the Company does not undertake any obligation to publicly update or revise any forward looking statement, whether as a result of new information, future events, or otherwise, except to the extent required by law.

**CONTACT:**

Mark Komonoski

Senior Vice President

Integrous Communications

Phone: 1-877-255-8483

Email: ir@metamaterial.com

**Media inquiries:**

media@metamaterial.com

## SHARE

f   🐦   in   ✉

## Archives

| | |
|---|---|
| 2024 | **+** |
| 2023 | **+** |
| 2022 | **+** |
| 2021 | **+** |
| 2020 | **+** |

2019   **+**

2018   **+**

2017   **+**

2016   **+**

2014   **+**

## RSS



# Contact Us!

COMPANY

- Investors
- Products
- Technology
- About Us
- Contact Us

## OTHER

- Privacy Policy
- ISO 9001 Certification
- Legal Notice
- Product Support
- Sitemap

Meta Materials Inc.
1 Research Drive / Dartmouth / Nova Scotia / Canada / B2Y 4M9

Tel: 1-902-482-5729
Email: info@metamaterial.com



© 2022 Meta Materials Inc. All rights reserved.

## CERTIFICATE OF SERVICE

I certify that on October 14, 2025, I served a copy of this Petition (including appendix and exhibits) on the following by ~~U.S. Mail, certified~~ with return receipt requested: UPS Ground w/ tracking

United States Attorney's Office
Southern District of Texas
1000 Louisiana St., Suite 2300
Houston, TX 77002

Ford O'Brien Landy LLP
3700 Ranch Road 620 South, Suite B
Austin, TX 78738 (Counsel for Edward Constantinescu)

Dynamis LLP
175 Federal Street, Suite 1200
Boston, MA 02110 (Counsel for John Rybarczyk)

Neal Davis Law Firm, PLLC
1545 Heights Blvd., Suite 700
Houston, TX 77008 (Counsel for Gary Deel)

Mallett Law
4306 Yoakum Blvd., Suite 400
Houston, TX 77006 (Counsel for Stefan Hrvatin)

Sina Zadeh Law Firm
713 Booth St.
Houston, TX 77009 (Counsel for Tom Cooperman)

Jackson Walker LLP
1401 McKinney St., Suite 1900
Houston, TX 77010 (Counsel for Mitchell Hennessey)

**CERTIFICATE OF SERVICE**

I certify that on October 14, 2025, I served a copy of this Petition (including appendix and exhibits) on the following by ~~U.S. Mail, certified~~ with return receipt requested: UPS Ground w/tracking

United States Attorney's Office
Southern District of Texas
1000 Louisiana St., Suite 2300
Houston, TX 77002

Ford O'Brien Landy LLP
3700 Ranch Road 620 South, Suite B
Austin, TX 78738 (Counsel for Edward Constantinescu)

Dynamis LLP
175 Federal Street, Suite 1200
Boston, MA 02110 (Counsel for John Rybarczyk)

Neal Davis Law Firm, PLLC
1545 Heights Blvd., Suite 700
Houston, TX 77008 (Counsel for Gary Deel)

Mallett Law
4306 Yoakum Blvd., Suite 400
Houston, TX 77006 (Counsel for Stefan Hrvatin)

Sina Zadeh Law Firm
713 Booth St.
Houston, TX 77009 (Counsel for Tom Cooperman)

Jackson Walker LLP
1401 McKinney St., Suite 1900
Houston, TX 77010 (Counsel for Mitchell Hennessey)



PERRY MATLOCK
(832) 221-8465
THE UPS STORE #4001
STE 230
8700 WOODLANDS PKWY
THE WOODLANDS TX 77382-2570

7 LBS          1 OF 1
SHP WT: 7 LBS
DATE: 15 OCT 2025

SHIP EN BANC PETITION- TIME SENSITIVE
TO: US COURT OF APPEALS FOR THE 5TH CIR
    STE 115
    600 S MAESTRI PL

NEW ORLEANS  LA 70130-3440

LA 701 9-22

UPS EARLY                    1+

TRACKING #: 1Z A83 28T 15 7526 8934

BILLING: P/P

MMDBCC5CF6802 ISH 13.08C ZZP 450 37.5U 09/2025

SEE NOTICE ON REVERSE regarding UPS terms, and notice of limitation of liability where allowed by law, shipper authorizes UPS to act as forwarding agent for export control and customs purposes. If exported from the US, shipper certifies that the commodities, technology or software were exported from the US in accordance with the Export Administration Regulations. Diversion contrary to law is prohibited.

TIME SENSITIVE –
Enclosing Original + 19 Copies
Petition for Rehearing En Banc
Perry "P.S." Matlock — (Pro Se)
Case # 24-20143
United States v. Constantinescu, et al.

# United States Court of Appeals for the Fifth Circuit

---

No. 24-20143

---

United States Court of Appeals
Fifth Circuit

**FILED**

October 2, 2025

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

*Plaintiff—Appellant*,

*versus*

EDWARD CONSTANTINESCU; PERRY "PJ" MATLOCK; JOHN RYBARCZYK; GARY DEEL; STEFAN HRVATIN; TOM COOPERMAN; MITCHELL HENNESSEY; DANIEL KNIGHT,

*Defendants—Appellees*.

---

Appeal from the United States District Court
for the Southern District of Texas
USDC Nos. 4:22-CR-612-1,
4:22-CR-612-2, 4:22-CR-612-3,
4:22-CR-612-4, 4:22-CR-612-5,
4:22-CR-612-6, 4:22-CR-612-7,
4:22-CR-612-8

---

Before HIGGINSON, WILLETT, and ENGELHARDT, *Circuit Judges*.

KURT D. ENGELHARDT, *Circuit Judge*:

Defendants were indicted for securities fraud for their involvement in a "pump and dump" scheme. The superseding indictment alleges that defendants induced their social-media followers to purchase securities through posts misrepresenting their trading positions and the potential price of

No. 24-20143

securities, artificially inflating the securities' prices and allowing defendants to profit. The district court dismissed the indictment, concluding that it failed to state an offense by merely alleging that defendants sought to deprive their followers of potentially valuable economic information instead of a traditional property interest. Because we conclude that the indictment sufficiently alleges a scheme and intent to defraud, we REVERSE the district court's dismissal of the indictment.

I

The government alleges that Edward Constantinescu, Perry "PJ" Matlock, John Rybarczyk, Gary Deel, Stefan Hrvatin, Tom Cooperman, Mitchell Hennessey, and Daniel Knight engaged in a scheme to "pump and dump" securities. Defendants each had large social media followings across various platforms. They held themselves out to be skilled stock traders and frequently posted their trading activities on social media. To carry out their "pump and dump" scheme, the government alleges that defendants would purchase a security, "'pump' the price of that security by posting false and misleading information about the security on [social media] so that other investors were induced to purchase the security and artificially increase its price," and "dump" by secretly selling the security for a profit. Indictment ¶¶ 13–14. The indictment alleges that defendants profited $114 million from their scheme.

Defendants were indicted for conspiracy to commit securities fraud, in violation of 18 U.S.C. § 1349, and multiple counts of securities fraud, in violation of 18 U.S.C. §§ 1348 & 2. Knight pleaded guilty, and the remaining defendants moved to dismiss the indictment. The district court dismissed

No. 24-20143

the indictment, concluding that it failed to allege that defendants schemed to deprive victims of any traditional property interest.[1]

The government timely appealed.

## II

We review the sufficiency of an indictment *de novo*. *United States v. Rafoi*, 60 F.4th 982, 993 (5th Cir. 2023). "[T]he court is required to take the allegations of the indictment as true and to determine whether an offense has been stated." *United States v. Fontenot*, 665 F.3d 640, 644 (5th Cir. 2011) (quoting *United States v. Crow*, 164 F.3d 229, 234 (5th Cir. 1999)). An indictment must "(1) enumerate each *prima facie* element of the charged offense; (2) fairly inform the defendant of the charges filed against him; and (3) provide the defendant with a double jeopardy defense against future prosecutions." *United States v. Gaytan*, 74 F.3d 545, 551 (5th Cir. 1996). "In sum, to be sufficient, an indictment must allege each material element of the offense." *United States v. Guzman-Ocampo*, 236 F.3d 233, 236 (5th Cir. 2000) (quotation cleaned up).

## III

The securities fraud statute prohibits schemes to "defraud any person in connection with . . . any security" and schemes "to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of . . . any security." 18 U.S.C. § 1348. While "[t]here is scant caselaw construing the securities fraud statute in this circuit," § 1348 "borrows key concepts from the mail

---

[1] The district court dismissed the indictment by applying *Ciminelli v. United States*, 598 U.S. 306 (2023). After the district court dismissed the indictment, the Supreme Court clarified in *Kousisis v. United States*, 145 S. Ct. 1382, 1398 (2025), that an indictment alleging a fraudulent-inducement theory, as here, does not run afoul of *Ciminelli*.

and wire fraud statutes," so "courts have given the terms similar treatment," often relying on mail and wire fraud cases in analyzing securities fraud charges. *United States v. Greenlaw*, 84 F.4th 325, 339 n.6 (5th Cir. 2023). With those concepts in mind, securities fraud requires (1) a "scheme to defraud" (2) enacted with an "intent to defraud." *Id.* at 339. The "scheme to defraud" element requires a material misrepresentation "intended to deceive others in order to obtain something of value, such as money, from the [entity] to be deceived." *Id.* (alteration in original) (quoting *United States v. Evans*, 892 F.3d 692, 711–12 (5th Cir. 2018)). The "intent to defraud" element requires "an intent to (1) deceive, and (2) cause some harm to result from the deceit." *Id.* (quoting *Evans*, 892 F.3d at 712).

In sum, a defendant commits securities fraud when he "'engaged in deception'" and "[o]btaining the victim's money or property" was "'an object' of his fraud." *Kousisis v. United States*, 145 S. Ct. 1382, 1390–91 (2025) (quoting *Ciminelli v. United States*, 598 U.S. 306, 312 (2023)). Defendants concede that the indictment adequately alleges deception. But they contend that the indictment does not allege a scheme to defraud nor an intent to defraud. In their view, the indictment merely alleges that they intended to deprive their followers of valuable economic information (not money or property) to enrich themselves (not injure their followers). In light of the Supreme Court's decisions in *Ciminelli* and *Kousisis*, we disagree.

A

Defendants argue that the district court properly dismissed the indictment because it does not allege a scheme to deprive their followers of a protected property interest. While it is true that a defendant cannot be convicted of fraud for depriving an individual of potentially valuable economic information alone, the indictment here went further, properly alleging defendants' scheme to defraud their followers of money.

No. 24-20143

In *Ciminelli*, the Supreme Court held that a fraud conviction cannot be based solely on the deprivation of valuable economic information. 598 U.S. at 316. There, Ciminelli's construction company paid a lobbyist to help it obtain state-funded jobs. *Id.* at 309–10. The government, in prosecuting Ciminelli for wire fraud, relied solely on a right-to-control theory. *Id.* at 310 & n.1. Under the right-to-control theory, the government attempted to "establish wire fraud by showing that the defendant schemed to deprive a victim of potentially valuable economic information necessary to make discretionary economic decisions." *Id.* at 310. In other words, under the right-to-control theory, the victim's property is the "the right to control [his] assets." *Id.* at 311. The Court held that because the federal fraud statutes protect only traditional property interests, and "[t]he right to valuable economic information . . . is not a traditional property interest," "the right-to-control theory cannot form the basis for a [fraud] conviction." *Id.* at 316.

The situation here is unlike that in *Ciminelli*. The indictment does not mention the right-to-control theory. Rather, it alleges that defendants induced their followers, through misrepresentations, to purchase securities— that is, to part with their money or property. The indictment alleges a "fraudulent-inducement theory," under which a defendant "uses a material misstatement to trick a victim into a contract that requires handing over her money or property." *Kousisis*, 145 S. Ct. at 1388. The Supreme Court, when analyzing the fraudulent-inducement theory, confirmed that it "is not a repackaging of the right-to-control theory." *Id.* at 1398 (quotation cleaned up). Unlike the right-to-control theory rejected in *Ciminelli*, the fraudulent-inducement theory advanced here "protects money and property." *Id.* The indictment does not run afoul of *Ciminelli* because it alleges defendants deprived their followers of a protected property interest by fraudulently inducing them to buy securities.

No. 24-20143

B

Defendants next argue that the indictment fails to allege an intent to defraud because it alleges defendants intended to profit from their scheme, not harm any victim. But the Supreme Court recently rejected a similar argument, holding that the fraud statutes do not require a victim to suffer an economic loss from a defendant's scheme. *Kousisis*, 145 S. Ct. at 1392.

In *Kousisis*, the defendant lied to obtain contracts with a state department of transportation. The state required contractors to subcontract with a disadvantaged business, and Kousisis falsely represented that his company would fulfill that requirement. Once his company was awarded the contracts, Kousisis used the disadvantaged-business subcontractor as "a mere 'pass-through' entity." *Id.* at 1389. When his lie came to light, the government charged Kousisis under the "fraudulent-inducement theory" whereby a defendant "uses a material misstatement to trick a victim into a contract that requires handing over her money or property—regardless of whether the fraudster, who often provides something in return, seeks to cause the victim *net* pecuniary loss." *Id.* at 1388 (emphasis in original). Kousisis argued that the fraudulent-inducement theory could not stand because it permitted a conviction in the absence of evidence that "the defendant sought to hurt the victim's bottom line." *Id.* at 1391. The Court rejected that assertion, holding that a defendant violates the fraud statutes when he "schem[es] to 'obtain' the victim's 'money or property,' regardless of whether he seeks to leave the victim economically worse off." *Id.* at 1392.

The indictment here sufficiently alleges defendants' intent to defraud their followers. For example, it alleges that defendants "post[ed] false and misleading information about the security . . . so that other investors were induced to purchase the security." Indictment ¶ 13. Because the fraud statutes do not require actual economic harm, defendants' followers' receipt

No. 24-20143

of market-value securities does not obviate the fraud charges. *See Kousisis*, 145 S. Ct. at 1391 (concluding defendant may be liable in fraud even when he "provides something—be it money, property, or services—of equal value in return"). Defendants argue they intended to profit—not harm any victim. But here, that is a distinction without a difference. As the indictment alleges, defendants' object was to obtain money, and they did so by fraudulently inducing their followers to purchase securities. The indictment's allegation that defendants pumped and dumped to gain a profit shows that they "had money in mind." *Id.* at 1397. "[A] fraud is complete when the defendant has induced the deprivation of money or property under materially false pretenses"—regardless of whether the victim suffered a net pecuniary loss. *Id.* at 1394 n.5. The indictment's allegation of defendants' fraudulently inducing their followers to purchase securities is sufficient to allege an injury. *See United States v. Baker*, 923 F.3d 390, 403–05 (5th Cir. 2019) (explaining that the fraud statutes do not impose a "mirror image" requirement where the victim's loss of money or property supplied the defendant's gain); *see also United States v. Smith*, Nos. 23-2840, 23-2846, & 23-2849, 2025 WL 2406104, at *6 (7th Cir. Aug. 20, 2025) (applying *Kousisis* in a similar context).

## IV

Because the indictment sufficiently alleges a scheme and intent to defraud, we REVERSE the district court's dismissal of the indictment and REMAND for proceedings consistent with this opinion.